UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD. <br>         Plaintiff, <br><br> JINGAO SOLAR CO., LTD.., ET AL., <br>         Consolidated Plaintiffs, <br><br> and <br><br> SHANGHAI BYD CO., LTD., TRINA SOLAR CO., LTD., ET AL., <br>         Plaintiff-Intervenors, <br> v. <br><br> UNITED STATES, <br>         Defendant. | Consol. Court No. 20-3912 |

**PLAINTIFF'S REPLY BRIEF**

Gregory S. Menegaz  
J. Kevin Horgan  
Judith L. Holdsworth  
Alexandra H. Salzman  
**DEKIEFFER & HORGAN, PLLC**  
Suite 410  
1090 Vermont Ave., N.W.  20005  
Tel: (202) 783-6900  
email:  gmenegaz@dhlaw.com  
*Counsel to Plaintiff*

Dated: December 1, 2021

1

## TABLE OF CONTENTS

I.   The Department's Application of The EBC Countervailing Duty Program to Risen Is Unsupported By Record Evidence And Contrary to Law ........................... 1

II.  The Department's Finding that Electricity is Countervailable is Not Supported by Substantial Evidence or Otherwise in Accordance with the Law ....................... 4

III. The Department's Calculation of the Ocean Freight Benchmark is Not Supported by Substantial Evidence ................................................................................................ 6

IV.  The Department's Reliance on the 2010 Land Benchmark is Not Supported by Substantial Evidence ................................................................................................ 10

V.   Conclusion .............................................................................................................. 12

# TABLE OF AUTHORITIES

**CASES**

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................................ 2-3

*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-143 (Nov. 18, 2019) ................................................................................................... 3-4

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade  2019) .................................................................................................................................. 2-3

**STATUTES & REGULATIONS**

19 U.S.C. § 1677(5) ................................................................................................................. 4, 6-7

19 C.F.R. §351.511(a)(2) ................................................................................................................ 8

Plaintiff Risen Energy Co., Ltd. ("Risen") hereby files its reply brief to Defendant United States' response brief.  *See* U.S. Br. (October 22, 2021); ECF 56; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 79,163 (December 9, 2020) ("Final Results"), *incorporating* Issues and Decision Memorandum ("IDM")*,* **PR241**; *see also Amended Final Results* (April 2, 2021), **PR270**.

I. **The Department's Application of The EBC Countervailing Duty Program to Risen Is Unsupported By Record Evidence and Contrary to Law.**

In its Final Results, the Department claimed that because the GOC failed to provide the 2013 Revisions and a list of all the partner banks involved in the disbursement of funds under the EBC program, necessary information is missing from the record and that the Department was unable to verify Risen's non-use of the EBC program.  IDM at 24.

However, record evidence establishes that Risen and its customers did not use or benefit from the EBC program and no necessary information was missing from the record.  Risen provided that it has never applied for any EBC loans for itself or assisted its customers to apply for such loans.  Risen provided customer declarations of non-use from every single U.S. customer to whom they exported during the POI.  *See See* Risen Section III Resp. at 27 - 28, Exhibit 19 (December 30, 2019), **PR158, CR172**; Risen's Unaffiliated Supplier II's Section III Resp. at 23, Exhibit 15 (January 6, 2020), **PR164, CR277**.  The GOC corroborated Risen's and its customers' non-use by searching the customers' names in China Ex-Im Bank's loan database. GOC Initial Questionnaire Resp. at 126 - 128, Exhibits II.F.1 & II.F.2 (December 30, 2019) **PR140, CR104**.

Nonetheless, the United States maintains that it would be "futile" to verify this information without the 2013 revisions and a list of partner banks that the GOC did not provide

1

on the record.  U.S. Br. at 31-32.  The United States argues that the 2013 revisions may have eliminated the 2 million minimum requirement for participation the EBC program, and therefore without this limitation the Department would have to "unreasonably comb through all the business activities of JA Solar's and Risen's customers without any guidance as to which loans to examine." U.S. Br. at 31.  Then, the United States postulates that without a list of third-party banks that use the program or a sample paper trail of documentation of credit, verification would amount "to looking for a needle in a haystack with the added uncertainty that Commerce might not be able to identify the needle when it was found." U.S. Br. at 32.  The United States has built up a false hypothesis that without this detailed information from the GOC itself, the Department must comb through every single loan of Risen's customers.  This completely ignores what is known about the EBC program.

The GOC has explained that information on partner banks is not necessary because the respondent's customers did not use this program and this information was not relevant as to the usage determination. GOC Initial Questionnaire Resp. at 117-118.  That is, regardless of whether, for example, the program could be disbursed through a partner bank in the United States, usage could still be determined through EX-IM Bank's system in China.  And the GOC has confirmed on this record that none of the customer's used this program by searching the China Ex-Im Bank's loan database.  Or, at most, the Department could have asked the exporter's U.S. customers to indicate the entities through which they received loans and then asked EXIM Bank if any EBC program loans have ever been issued through these entities to a U.S. recipient. Ultimately, the Department fails to make a rational connection between the information requested (a list of third party banks) and the conclusion made (that without this information, the Department cannot determine or verify nonuse). *See Burlington Truck Lines, Inc. v. United*

*States*, 371 U.S. 156, 168 (1962) (explaining that agencies must "articulate a[] rational connection between the facts found and the choice made"). Instead of taking anapproach to examine information on the record, or information that could be obtained easily and reasonably, the Department unreasonably insists it needed information from the GOC alone.

The Department has been criticized time and time again for its approach to this program. For example, in the *Aluminium Foil from China CVD Investigation* litigation, the Court of International Trade held:

> the Department again does not explain why a complete understanding of the operation of the program is necessary to verify non-use of the program. … In its brief to the court, for example, the government provides one such explanation: that the identities of third-party banks allegedly involved are unknown to the Department, and those names, not "China Ex-Im Bank," would appear in the records of U.S. customers that received EBCP credits. Thus, if the Department were to verify the ledgers of U.S. customers, it could check for credits from those third-party banks…. But that argument still fails to explain how the 2013 rule change "affected the way {the Department} conducts verification" of non-use claims. Critically, the Department does not explain why it could not identify the intermediate banks and the corresponding bank disbursement information by soliciting information from respondents. Instead, the Department summarily declares that, as the "primary entity" involved, the Ex-Im Bank is the only entity that possesses records sufficient to verify claims of non-use.

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1333-34 (Ct. Int'l Trade 2019) ("*Jiangsu Zhongji I*"). Or, in an appeal of an earlier review of this same Order, this Court found:

> [I]t appears that "other approved partner bank[s]" may be involved in some capacity in the disbursement of EBCP funds. The discussion with the EX-IM official indicates that after the importer's application for the EBCP is approved, "[t]he foreign importer will then instruct EXIM bank to pay the Chinese exporter by assigning payment to the Chinese exporter's bank account." See EX-IM Discussion at 2. Considering the evidence as a whole, it may be that even if funds are temporarily routed to banks outside the EX-IM bank, funds are sent back to the EX-IM bank and that it disburses those funds to the exporter. If this is indeed the situation, then Commerce would apparently need to verify only whether the exporter had received any funds from the EX-IM bank and then, if so, ask them to provide documentation showing the purpose of those funds. In this situation,

3

> verification seems relatively straightforward.
> If, however, the funds are not routed back through the EX-IM bank prior to reaching the exporter, verification would admittedly be more difficult. But, so long as Commerce were able to access the importer's and exporter's records, it appears that Commerce could cross-reference the records to see if any funds appeared to originate from the EX-IM bank, even if the funds went through an intermediary bank at some point. This seems especially doable with Trina and its affiliated U.S. importer, given that it has only one U.S. customer. See Trina Br. at 3. The court suspects that doing so will either confirm non-use or at least help clarify how the EBCP operates.
> The court cannot sustain Commerce's determination that verification would be impossible or unduly onerous.

*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138, *9-11 (2019).  The arguments made by the United States have been made before this Court and still found unreasonable.  This Court continues to hold in numeorus cases that the China Ex-Im Bank's 2013 revision and a list of the third-party banks involved in disbursing the EBC funds do not create a "gap" on the record that warrants the application of AFA.  The administrative record provides the Department with no basis upon which to find that Risen used or benefitted from the EBC program.  As the Department itself chose not to attempt verification of Risen's customers' assertion of non-use, their statements of non-use must be deemed accurate.  The Department should not be granted further remand on this program and should be ordered to exclude it from its calculations for Risen.

II.  **The Department's Finding that Electricity is Countervailable is Not Supported by Substantial Evidence or Otherwise in Accordance with the Law.**

Based on AFA, the Department found that the electricity LTAR program is specific within the meaning of 19 U.S.C. § 1677(5A).  The Department's basis for AFA was its determination that the GOC failed to provide a full explanation regarding the roles and nature of cooperation between the NDRC and provinces in setting electricity prices or that the information on the record only shows that the NDRC continues to play a major role in setting and adjusting

prices.  *See* IDM at 40-41.  Risen argued that in fact the record only shows the NDRC is not the central price-setting authority.  Risen R56.2 Br. at 13-15.

In response, the United States points to two places on the record that supposedly demonstrate that NRDC is the central price-setting authority.  First, the United States quotes from Article 6 of Notice 748 where it states "{t}he provinces (autonomous regions and municipalities) price department develop and issue specific adjustment plan of electricity price and sales price in accordance with the average price adjustment standards of Annex 1, and reported to our Commission for the record."  *See* GOC Sec. II Qre. Resp. at Exhibit II E.23 **PR140, CR104**.  From this, the United States claims that it must have Annex 1 to ascertain the role the government has in developing the prices.  However, this completely overlooks the critical part of what this article is saying.  The article clearly says the provincial government only reports the electricity sales price to NDRC for "record", not for "approval."  The NDRC is not setting the prices.

Second, the United States quotes from Guangdong Price Catalog where it says the document was "reviewed and approved" by the provincial government and the NDRC.  U.S. Br. at 26.  The United States' reading of this statement (a statement made and signed by the provincial government) is overly narrow and overlooks the specific government notices that clarify the official role of the NDRC in electricity pricing.  This statement does not necessarily entail that the NDRC both reviewed and approved, but that the provincial government and NDRC each played a role in reviewing and approving.  And, as seen in the article above and other official articles, the role of the NDRC is only in reviewing.  Article II of Notice 3105 states that "large-scale industrial electricity price is not regulated" and that the provincial government "shall formulate and release specific regulation plan of on-grid price and sales price in the

province" and report to NDRC for filing. *Id.* at Exhibit II E.22. Again, the provincial government only needed to report the price for filing purposes, it does not need the NDRC's approval in setting the price. Article X of Notice 3105 states that "each local price authority shall organize elaborately, arrange carefully to guarantee in time implementation of electricity price regulation measures", which precisely shows that the NDRC promotes efficiency in provincial governments' implementation of the electricity price reform and delegates the power of setting electricity prices to provincial government. *See id.* The record taken as a whole confirms what the GOC has consistently explained, which is that the NDRC has delegated it price-setting authority to the provinces.

The record evidence demonstrates that the provincial government was in charge of setting the electricity price during the POR, not the NDRC. The Department's claim that the NDRC continues to play a seminal role in setting electricity prices is totally unsubstantiated and the GOC did not withhold necessary information on the NDRC's role in electricity price setting. As such, the Department cannot rely on AFA in finding specificity within the meaning of 19 U.S.C. § 1677(5A). As the Department's specificity finding is not supported by the record, this program is not countervailable.

**III.    The Department's Calculation of the Ocean Freight Benchmark is Not Supported by Substantial Evidence.**

Risen argued that the Department should not rely upon the Descartes data, and in the alternative, that if the Court upholds reliance on both Descartes and Xeneta data then the Court should find the Department's averaging method was not consistent with the regulatory requirement to rely upon world market prices. With respect to the first argument, the United States claims that Risen only presented "perceived flaws" in the Descartes data but failed to explain how such flaws make the rates distorted. U.S. Br. at 21. Risen detailed several issues in

6

the Descartes data that were unusual and non-commercial.  Risen R56.2 Br. at 18-20.  First, most of the rates were for less than a container load ("LTL") shipments.  LTL shipping is used for smaller shipping that does not even amount to a whole container load, that is not a typical commercial shipment.  LTL shipments are more expensive; as seen comparing the Descartes higher prices to Xeneta, as such shipments must be consolidated with other shipments and incur additional attendant costs.  Another rate was also for a 45 foot high-cube container, rather than a typical 20-foot container.  Shipping a 45 high-cube container is more expensive and not reflective of normal shipping conditions.  Another rate included inland U.S. transportation costs, which means the rate includes additional costs that are not supposed to be included.  Moreover, where petitioner included the full rate details (as explained in Risen's opening brief, petitioner did not provide this for all routes), the rates were established in 2008.  As explained, Descartes provides rates from a specific shipment at a certain point in time and that rate remains "effective" in the system unless specifically removed.  As such, these rates have been the same for every month since the date of the actual shipment in 2008.  Thus, this Descates data does not take into account contemporaneous conditions.

All of above elements establish that the Descartes data is not reflective of normal, commercial contemporaneous shipping conditions.  19 U.S.C. § 1677(5)(E) directs the Department to rely upon benchmarks reflective of "prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review."  The statute continues that "prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  The regulation explains that the Department "will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that

such price would be available to purchasers in the country in question" and will "adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product." 19 C.F.R. §351.511(a)(2). Therefore, the fact that the Descartes rates are not reflective of normal or contemporaneous commercial conditions is something the Department was required to consider but did not. Likewise, while the Department may not have to find benchmarks that are "identical" to the conditions of respondents, the statutory and regulatory goal is to be as close to the pricing conditions the respondent, or a similar commercial purchaser, would have experienced. Risen, and any normal commercial purchaser, would not import LTL containers. Nor would Risen or any normal commercial purchaser use an atypical, more expensive container size. In sum, the Descartes data do not present prevailing market conditions for shipping to China during the POR. The Court should find that the Descartes data does not fulfill the statutory and regulatory obligations for benchmark data and direct the Department to exclude the Descartes data from such calculations.

Risen also argued that the Department's reliance on the Descartes data was also not consistent with the regulatory requirement to rely upon world market prices. In response, the United States argues that the Descartes data reflect world prices because they are rates between China and various American cities. U.S. Br. at 21-22. However, even if the Descartes data reflect world prices—it represents **a** world price. The Descartes data, if representative at all, is only representative of shipping costs from the United States—and specifically from the west coast (and one route from Chicago). The Descartes data can only reasonable be considered as one route, a route from the USA to China. While the Xeneta data actually has eight different routes: Barcelona to China, Jakarta to China, Busan to China, Los Angeles to China, Singapore to China, Rotterdam to China, Mumbai to China, and Japan to China. As explained above, the

Department is seeking *worldwide* benchmarks for ocean freight that are indicative of prevailing market prices. By simple-averaging the Xeneta price overall (for the eight world routes) with the Descartes price (U.S. only routes), the Department has calculated a benchmark based primarily on routes between USA and China. Such a benchmark is not a worldwide price. Therefore, it is only reasonable to treat the Descartes data as one route—i.e., average the nine routes together rather than giving the Descartes data equal weight with the Xeneta data in the average.

Lastly, Risen reiterates that the Xeneta data is reasonably reflective of world market prices and the commercial prices that Risen would pay for ocean freight to import materials. Xeneta is an actual world ocean freight benchmarking source. The company gathers several hundred thousand rates per month for the purpose of providing reliable benchmarks for the cost of ocean freight. *See* JA Solar Benchmarks (January 13, 2020) at Exhibit 7C (information on Xeneta) **PR166**. For mature trade routes (i.e. normal commercial routes), the benchmarks are based on several hundred valid rates per day. Before Xeneta will even make information available on a particular route, a minimum of 4 rates per route, per day, per equipment (i.e. container type) is required. Therefore, a monthly benchmark for any particular route from Xeneta would be based on at least 120 individual datapoints (so for the eight routes provided together, the monthly benchmark is based on at least 960 datapoints). The record of this review contains daily ocean benchmarks for eight major routes. Further, as these are major, mature commercial routes, Xeneta is actually collecting several hundred rates per day. Therefore, the Xeneta benchmark data on the record is reflective of thousands of datapoints per month. The wide breadth of collected data on a daily basis, based on numerous carriers, and from major routes around the world, makes the Xeneta data most reflective of prevailing market conditions for freight required by the Department's regulations. In contrast, the Descartes ocean freight

data is only based on routes from USA to China, have unrepresentative aspects to the rates, are based on only a few carrier's prices, and are in reality representative of one repeated datapoint for the entire POR for each standalone rate.  Risen R56.2 Br. at 17-19.  The Court should order the Department to consider the entire record and justify how the Descartes data fulfils the regulatory requirement for benchmarks, or, at a minimum, how the Department's averaging of the rates most accurately reflects worldwide prices.

### IV. The Department's Reliance on the 2010 Land Benchmark is Not Supported by Substantial Evidence.

The Department placed benchmark information on the record to value land from "Asia Marketview Reports" by CBRE Research for Thailand for the year 2010.  Prelim. IDM at 18.  The Department relied upon this data in the Preliminary and Final Results.  IDM at Comment 8.  The record contained  contemporaneous world land values from the same CBRE Research source on the record.  *See* JA Solar Benchmarks at Exhibit 6 ("CBRE Global Prime Rents"); **PR166**.  Risen argued that the Department should rely upon this more contemporaneous source instead, as it better fulfills the Department's preferences for benchmarks.  The United States does not raise any issues with the contemporaneous CBRE Global Prime Rents source itself.  But rather argues that the record lacks information to determine whether the countries in the report are comparable to China.  U.S. Br. at 15-16.

CBRE Global Prime Rents contains land prices from various countries, including Brazil and Mexico.  Risen argued the Department should rely upon the land prices from these two countries as a benchmark because they are comparable to China and this data is contemporaneous with the POR.  The benchmark used by the Department is based solely on land prices in 2010 and the Department had to use an inflation index to extrapolate the price from a single year to apply to the POR, 2017, and other years with land purchases.  However, the CBRE

Global Prime Rents contains land values for 2015-2017. These values are contemporaneous with the POR and provide prices from a larger, more representative period of time. The contemporaneity concern is particularly important because, as evidenced by the CBRE Global Prime Rents data, the value of land does not merely follow the inflation index.

With respect to comparability, Risen has submitted that the Department must reasonably consider Brazil and Mexico comparable to China for benchmarking purposes because the Department has decided these two countries are comparable to China for surrogate value purposes. Indeed, the Department does not consider Thailand to be economically comparable to China (and has not for several years) in antidumping proceedings. Risen R56.2 Br. at 22-23. The Department claims it was improper to "conflate" the Department's surrogate value practice with its benchmark practice. U.S. Br. at 16. However, it is illogical that such findings would not be relevant. Afterall, the purpose of both surrogate values and benchmarks is to find a market price comparable to the conditions in China. It is arbitrary and unreasonable for the Department to dismiss the fact that it finds Brazil and Mexico to be at the same level of economic comparability in the antidumping proceedings (and Thailand not to be) while finding for the same time period on the countervailing proceeding that Thailand is comparable and it does not know whether Brazil and Mexico are comparable.

The Court should order the Department to reconsider its decision to rely upon the outdated 2010 Thai CBRE data for the reasons discussed above.

## V.     Conclusion and Prayer for Relief

In light of the foregoing, the Department's *Final Results* were not supported by substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court remand this case for redetermination consistent with the opinion of the court based on the issues presented in this brief and remedies sought with respect to each program under appeal.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com

Date: December 1, 2021          *Counsel to Plaintiff*

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8)

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **3,736** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*