Slip Op. 22-44

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **RISEN ENERGY CO., LTD.,** | |
| Plaintiff, | |
| **JINGAO SOLAR CO., LTD., *ET AL.*,** | |
| Consolidated Plaintiffs, | Before: Jane A. Restani, Judge |
| **SHANGHAI BYD CO., LTD., TRINA SOLAR CO., LTD., *ET AL.*,** | Consol. Court No. 20-03912 |
| Intervenor Plaintiffs, | |
| v. | |
| **UNITED STATES,** | |
| Defendant. | |

OPINION AND ORDER

Dated: May 12, 2022

[Commerce's Final Results in the Sixth Administrative Review of Commerce's Countervailing Duty order on crystalline silicon photovoltaic cells from the People's Republic of China are partially sustained and partially remanded for reconsideration consistent with this opinion.]

Gregory S. Menegaz and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiffs. With them on the brief was James K. Horgan.

Sarah M. Wyss and Wenhui (Flora) Ji, Mowry & Grimson, PLLC, of Washington, D.C., argued for Consolidated Plaintiffs. With them on brief were Jeffrey S. Grimson, Bryant P. Cenko, Jill A. Cramer, and Kristin H. Mowry.

Craig A. Lewis, Jonathan T. Stoel, and Lindsay K. Brown, Hogan Lovells US LLP, of Washington, D.C., for Intervenor Plaintiffs Shanghai BYD Co., Ltd.

Jonathan M. Freed, Kenneth N. Hammer, MacKensie R. Sugama, and Robert G. Gosselink, Trade Pacific PLLC, of Washington, D.C., for Intervenor Plaintiffs Trina Solar Co., Ltd.

Ann C. Motto, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., argued for the Defendant.  Of counsel on the brief was Spencer Neff, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Restani, Judge:  This action is a challenge to the final determination made by the United States Department of Commerce ("Commerce") in the Sixth Administrative Review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules from the People's Republic of China ("GOC") covering the period from January 1, 2017, to December 31, 2017.

Plaintiffs, Consolidated Plaintiffs, and Plaintiff-Intervenors ("Plaintiffs") request that the court hold aspects of Commerce's final determination unsupported by substantial evidence or otherwise not in accordance with law.  The United States ("Government") asks that the court sustains Commerce's Final Results of its Sixth Administrative Review.

## BACKGROUND

Commerce published a countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells") from the GOC on December 7, 2012.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012).  In March 2019, Commerce began its Sixth Administrative Review of this countervailing duty order, covering the period from January 1, 2017, to December 31, 2017. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 9,297 (Dep't Commerce Mar. 14, 2019).  On November 5, 2019, the U.S. International Trade Administration selected JA Solar Co., Ltd. and Risen Energy Co., Ltd. as mandatory respondents

("Mandatory Respondents") in this review.  See Dep't Commerce, Respondent Selection Memorandum, P.R. at 1-2 (Nov. 5, 2019).

Commerce published its preliminary results on February 11, 2020, see Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 7727 (Dep't Commerce Feb. 11, 2020), along with the accompanying Preliminary Issues and Decision Memorandum, Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, C, POR: 01/01/2017-12/31/2017 (Dep't Commerce)  ("PDM").

Commerce published its final determination on December 9, 2020.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 79,163 (Dep't Commerce Dec. 9, 2020) ("Final Results"); see also Issues and Decision Memorandum for Final Results of the Administrative Review of the Countervailing Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, C-570-980, POR 01/01/2017-12/31/2017 (Dep't Commerce Nov. 27, 2020) ("I&D Memo").

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2021) and 19 U.S.C.

§ 1516a(a)(2)(B)(i) (2021).  The court will uphold Commerce's determinations in a

countervailing duty proceeding unless they are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Export Buyer's Credit Program

As in prior reviews, Mandatory Respondents here reported that none of their customers

received assistance under the GOC's Export Buyer's Credit Program ("EBCP"), and that they

did not assist any customers in using the program.  See Risen Energy Section III Questionnaire

Response, P.R. 144–162, C.R. 109–276 at 27–28, Ex. 19 (Dec. 30, 2019); see Questionnaire

Response of JA Solar and Affiliates, Volume 1, P.R. 132–38, C.R. 31–103 at III 38–40 (Dec. 30,

2019).  Both also provided customer declarations certifying non-use of the EBCP.  Risen

Unaffiliated Supplier II, Section III Questionnaire Response, P.R. 164, C.R. 277 at 23, Ex. 15

(Jan. 6, 2020); Questionnaire Response of JA Solar and Affiliates at Ex. 25.  Commerce claimed,

as it has previously, that it cannot verify the certifications of non-use because it lacks necessary

information regarding the operation of the EBCP and applied adverse facts available ("AFA") to

determine that Mandatory Respondents used the EBCP.  I&D Memo at 34–35.  After arguing in

favor of Commerce's position in briefing and oral argument, the Government, without

explanation, now requests remand on the issue of EBCP "to reconsider its application of adverse

facts available for its program."  See Def.'s Motion For Voluntary Remand, (March 28, 2022),

ECF No. 83, at 5.

Repeatedly, the Government has included the EBCP in its subsidy calculations.  See, e.g.,

Clearon Corp. v. United States, 44 CIT ___, ___, 474 F. Supp. 3d 1339, 1353 (2020); Guizhou

Tyre Co. v. United States, 43 CIT ___, ___, 415 F. Supp. 3d 1335, 1344 (2019); Both-Well Steel

Fittings, Co., Ltd., v. United States, 557 F. Supp. 3d 1327, 1338 (2022).  Repeatedly, the court

has ordered Commerce on remand to conduct verification before rejecting respondent's proof of

non-use. See, e.g. Clearon Corp., 474 F. Supp. 3d at 1354; Guizhou Tyre, 415 F. Supp 3d at

1344; Both-Well, 557 F. Supp. 3d at 1337.  Repeatedly, the Government has removed the EBCP

from the calculation under protest without attempting verification.  See, e.g., Clearon Corp. v.

United States, Slip Op. 21-56, 2021 WL 1821448, at *2–3 (CIT 2021); Changzhou Trina Solar

Energy Co. v. United States, 44 CIT ___, ___, 466 F. Supp. 3d 1287, 1291–93 (2020).

Repeatedly, the Government has also not appealed the court's decisions on the issue.  The result

is the continual collection of deposits which are not owed.  This situation is untenable and

inequitable.

       The court grants the request for remand but with restrictions appropriate to this history.

On remand, the Government may attempt to verify the customer certifications of non-use.  If the

Government decides to remove the EBCP from its subsidy calculation under protest but does not

intend to appeal, it must explain on remand why the Court should not provide some form of

equitable relief, such as the immediate return of deposits, or an injunction of the continued

inclusion of the program with no attempt at verification that results in the temporary collection of

funds that ultimately are not owed.

## II.    Land Value Benchmark

       Prior to finding a countervailable subsidy, Commerce must establish that an authority

provided a financial contribution, and a benefit was thereby conferred.  19 U.S.C. § 1677(5)(B).

A foreign government's provision of goods to a respondent for less than adequate remuneration

constitutes a benefit.  Id. § 1677(5)(E)(iv)).  In such circumstances, Commerce determines the

amount of the subsidy by comparing remuneration actually paid with adequate renumeration

with a market-determined price for the goods or services, under "a three-tiered hierarchy"

employed by Commerce "to determine the appropriate remuneration benchmark."  Changzhou

Trina Solar Energy Co. v. United States, 42 CIT ___, ___, 352 F. Supp. 3d 1316, 1332 (2018)

("Changzhou Trina I"); see 19 C.F.R. § 351.511(a)(2)(i)–(iii) (2021).  Commerce derives a tier-

one benchmark "by comparing the government price to a market-determined price for the good

or service resulting from actual transactions in the country in question."  19 C.F.R. §

351.511(a)(2)(i).

        In the absence of such a benchmark, Commerce turns to a tier-two benchmark "by

comparing the government price to a world market price where it is reasonable to conclude that

such price would be available to purchasers in the country in question."  Id. § 351.511(a)(2)(ii).

"If there is no world market price available to purchasers in the country in question," however,

Commerce moves on to a tier-three analysis and "measures[s] the adequacy of remuneration by

assessing whether the government price is consistent with market principles."  Id. §

351.511(a)(2)(iii).  If Commerce determines that the government price is not consistent with

market principles it will look to construct an external benchmark.  Canadian Solar Inc. v. United

States, 45 CIT __, __, 537 F. Supp. 3d 1380, 1389 n.6 (2021) ("Canadian Solar III").

        At issue here is Commerce's decision to utilize its chosen tier-three benchmark, the 2010

Coldwell Banker Richard Ellis Asian Marketview Report for Thailand Industrial Land Report to

assess the value of land-use rights.  See Dep't Commerce, Asian Marketview Report, P.R. 202

(Jan. 31, 2020) ("2010 CBRE Report").  Plaintiffs claim that: (1) Commerce erred by rejecting

JA Solar's proffered tier-two benchmark, JA Solar Br. at 22-24; Risen Br. 22; see also Letter on

Behalf of JA Solar to Dep't of Commerce re: Benchmark Submission, P.R. 166-168, C.R. 284-

296 at Exs. 6A-B (Jan. 13, 2020) ("JA Solar Benchmark"); (2) Commerce erred by rejecting

tier-three data from Mexico and Brazil in the JA Solar Benchmark, JA Solar Br. at 31; Risen Br.

22-23; and (3) Commerce erred by rejecting the supplemental Nexus Reports as a tier-three

benchmark, JA Solar Br. at 37-38; see also Letter on Behalf of JA Solar to Dep't of Commerce

re: Land Benchmark Submission, P.R. 192 at Ex. 1 (Feb. 18, 2020) ("Nexus Reports").

     First, Commerce determined that neither a tier-one nor a tier-two benchmark were

appropriate land benchmarks on this record.  See I&D Memo at 51; Memorandum, Benchmark

Analysis of the Government Provision of Land-Use Rights in China for Countervailing Duty

Purposes at 2, 26-27 (April 28, 2021) ("Land Use Memo").  Commerce relied upon past

practices to determine that no tier-one benchmarks exist because "Chinese land prices are

distorted by the significant government role in the market."  I&D Memo at 51 (citing Laminated

Woven Sacks from the People's Republic of China: Preliminary Affirmative Countervailing

Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part;

and Alignment of Final Countervailing Duty Determination with Final Antidumping

Determination, 74 Fed. Reg. 67,893, 67906-08 (Dep't Commerce Dec. 3, 2007) ("Sacks from

China).[1]  Commerce determined that a tier-two world-market price was not appropriate because

"land in other countries is not available to a purchaser located in China."  I&D Memo at 51; see

Land Use Memo at 2, 26-27.  Commerce considered the nature and scope of the market for land

---

[1] Plaintiffs do not challenge Commerce's determination that a tier-one benchmark is inappropriate.  JA
Solar Br. at 30.  See JA Solar Br. at 30; see generally Risen Br. at 22-24

and determined that land, as an in situ property, is generally not simultaneously available to an

in-country purchaser while located and sold out-of-country on the world market.  Land Use

Memo at 27 (internal quotations omitted); see Sacks from China, 72 Fed. Reg. at 67, 908

(finding that Commerce cannot apply a tier-two benchmark for land).  This determination was

reasonable and Commerce properly rejected the JA Solar Benchmark as a tier-two benchmark.

See Canadian Solar III, 537 F. Supp. 3d at 1390 (holding that Commerce's rejection of a tier-two

world-wide average price for land was reasonable).

Next, Plaintiffs argue that Commerce erroneously rejected the JA Solar Benchmark as a

tier-three benchmark for two reasons.  See JA Solar Br. at 36; Risen Br. at 22-24.  First,

Plaintiffs contend that the JA Solar Benchmark is more contemporaneous than the 2010 CBRE

Report.  See JA Solar Br. at 36; Risen Br. at 22.  Second, Plaintiffs assert that Commerce

erroneously rejected comparable benchmark data from Mexico and Brazil.  See JA Solar Br. at

32-34; JA Solar Benchmark at Ex. 6A-B.

Commerce conducted a tier-three analysis, based on the 2010 CBRE Report which

utilized land prices in Thailand to evaluate adequate remuneration for land in China.[2]  PDM at

18.  Commerce rejected the JA Solar Benchmark under a tier-three analysis because it omitted

---

[2] The court has previously found that Commerce's reliance on the tier-three 2010 CBRE Report indexed
to the period of review was lawful and supported by substantial evidence.  See Canadian Solar III, 537 F.
Supp. 3d at 1390 ("Commerce's use of an indexed 2010 Thailand industrial land price survey as a
tier-three benchmark for land prices in China was reasonable and supported by substantial evidence.");
see also Sacks from China, 74 Fed. Reg. 67,906–08 (Commerce selected the 2010 CBRE Reports as a
tier-three land benchmark to evaluate land prices in China); Crystalline Silicon Photovoltaic Cells,
Whether or Not Assembled into Modules, from the People's Republic of China: Final Affirmative
Countervailing Duty Determination and Final Affirmative Critical Circumstances, 77 Fed. Reg. 63,788
(Dep't Commerce Oct. 17, 2012), and accompanying Issues and Decisions Memorandum at 13
(Commerce found that the 2010 CBRE Report, appropriately indexed, was a suitable land benchmark).

factors of comparability required to evaluate the report's usability, including "national income levels, population density, and producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production."  I&D Memo at 52 (emphasis added).  Commerce rejected the Mexico and Brazil data because it determined that geographic proximity to China was a heavily weighted factor in the tier-three land benchmark analysis.  See Land Use Memo at 30; Sacks from China, 72 Fed. Reg. at 67,909.  The court has previously sustained Commerce's reliance on geographic proximity to reject data outside of the Asian geographic region.  See Canadian Solar III, 537 F. Supp. 3d at 1390 (finding that Commerce's determination to reject land benchmark data from Mexico and Brazil on the grounds of geographic proximity was reasonable).

　　　The court is not convinced, however, that Commerce may continue to rely on aging data from Thailand in the 2010 CBRE Report without further explanation.  Several factors warrant the reconsideration of the land benchmark data.  First, Plaintiffs properly note that the 2010 CBRE Report is stale compared to more contemporaneous benchmark data and becomes staler with each successive administrative review.  See 2010 CBRE Report at 3-10.  Second, in antidumping determinations, Commerce has considered both Mexico and Brazil to be surrogate countries to China for economic development, specifically comparing Gross National Income levels.[3]  Third, since the 2010 CBRE Report was released, it appears that Thailand and China

---

[3] See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018, 85 Fed. Reg. 7,531 (Dep't Commerce Feb. 10, 2020); see also Preliminary Decision Memorandum at 57 (finding Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia as surrogate countries to China); Antidumping Duty Investigation of Certain Aluminum Foil From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination, 82 Fed. Reg. 50,858 (Dep't Commerce Nov. 2, 2017),

have diverged in terms of comparable national income levels and population density.  Commerce

has not adequately explained how long it can continue to rely on 2010 CBRE Report while the

gap between Thailand and China's comparability metrics widen each successive year.  Given

these factors, the record does not adequately explain why Commerce granted controlling weight

to geographic proximity in evaluating the land benchmark data, while disregarding other factors.

Finally, Plaintiffs challenge Commerce's rejection of the 2018 Nexus Report as a tier-

three benchmark.  JA Solar Br. at 37.  In the Preliminary Results, Commerce stated that it would

continue to examine land benchmark prices on a case-by-case basis and would evaluate the

proposed benchmarks based on comparability factors.  PDM at 18.  Plaintiffs proffered the 2018

Nexus Reports as an alternative benchmark which provided land price information for factories

and warehouses in Thailand.  See Nexus Reports at Ex. 1.  In the Final Results, Commerce

rejected the Nexus Reports because the prices reflected "rental Rates for Ready Built Factories

and Ready Built Warehouses in Thailand and did not include sales prices for industrial land."

See I&D Memo at 52 (emphasis added); Nexus Reports at Ex. 1.  Here, Commerce's rejection of

the Nexus Reports was contained to this single conclusory sentence.  See I&D Memo at 52.

Compared to the multi-factor analysis of the JA Solar tier-three benchmark, Commerce does not

provide sufficient record evidence to reasonably reject the Nexus Reports.  The court accepts that

there is a distinction between the price of rental properties and the sales price for industrial land,

---

see also Preliminary Decision Memorandum at 57 (finding Brazil, Bulgaria, Mexico, Romania, South
Africa, and Thailand as surrogate countries to China based on per capita 2015 Gross National Income
data).  Commerce posits that AD and CVD reviews are different proceedings for different purposes, and
thus the surrogate value country selection is not applicable.  I&D Memo at 52.

but without further explanation, the court is unable to determine whether that distinction is reasonably considered here where one would expect both types of property to be involved.

Commerce's use of an indexed 2010 CBRE Report for Thailand industrial land price as a tier-three benchmark for land prices in China thus was not supported by substantial evidence. The court remands for reconsideration or further explanation of Commerce's reliance on of geographic proximity in the land benchmark analysis. Further, if relevant, Commerce should consider whether land values in Thailand remain a suitable benchmark to determine the value of Chinese land. Finally, Commerce should provide a more robust analysis explaining why it rejected the Nexus Report rental data based on the record evidence.

## III.    Ocean Freight Benchmark

### a.  Background

Under the countervailing duty statute, "[a] benefit shall normally be treated as conferred" by the Department "where goods or services are provided, if such goods or services are provided for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv). As discussed above, Commerce applies a tier-two benchmark "by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). "Where there is more than one commercially available world market price, [Commerce] will average such prices to the extent practicable, making due allowance for factors affecting comparability." Id. Commerce also "adjust[s] the comparison price to reflect the price that a firm actually paid or would pay if it imported the product." Id. § 351.511(a)(2)(iv).

Commerce's regulations for tier-two benchmarks do not require the comparable product and market be identical in order to for a benchmark to appropriately represent the world market price.  See Id. § 351.511(a)(2)(ii); see also Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 52 F. Supp. 3d 1351, 1369 (2015) ("[T]here is nothing that requires that [Commerce] use prices for merchandise that are identical.") (emphasis omitted); Essar Steel Ltd. v. United States, 678 F.3d 1268, 1273-74 (Fed. Cir. 2012) (holding that Australia iron ore prices were an appropriate tier-two benchmark for India iron ore).  At the same time, "[a]n import benchmark's comparability means it must bear a reasonably realistic resemblance to the importing market's reality or it will not be in accordance with the statute."  Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 39 CIT __, __,  61 F. Supp. 3d 1306, 1341 (2015) (internal quotation marks omitted).

At issue is the benchmark set by Commerce in assessing the value of ocean freight. Plaintiffs argue that Commerce's use of a tier-two benchmark, sourced from the average of two datasets, was unlawful and unsupported by substantial evidence because: (1) the Descartes data reflected only carrier prices from the United States to China as opposed to the Xeneta data's wider breadth, see JA Solar Br. at 41-42; Risen Br. at 16-17; (2) the Descartes data did not reflect what Plaintiffs would reasonably pay for imported inputs of glass, aluminum, and polysilicon, see JA Solar Br. at 43-44; Risen Br. at 16; and (3) the Descartes data was flawed by failing to account for market conditions, the container load, and inland transportation, see Risen Br. at 18-21.  Further, Plaintiffs argue that, if Commerce properly relied on the Descartes data, then Commerce's simple average of the routes was not supported by substantial evidence

because the Descartes data only should have been averaged with Xeneta's United States to China route data.  See Risen Br. at 21-22.

Commerce maintains that its ocean freight benchmark determination is lawful because "world market price" would include the Descartes data when those rates were available to Chinese purchasers and the regulations did not require accounting for the commercial reality of respondents, see Def.'s Response in Opposition to Pls.' Mots. For J. on the Agency Record at 19-22, ECF No. 56 (Oct. 22, 2021), and the benchmark accounted for a world market by averaging the Xeneta and Descartes data together, see id. at 21-22.  Commerce also argues that its decision to perform a simple average of the data was reasonable because it was consistent with past practice.  See id. at 22.

Prior to the final results, JA Solar submitted data relevant to benchmark price calculations for ocean freight, which provided "monthly ocean freight data for shipping a 20-foot standard container to Shanghai" from multiple ports.  JA Solar, Benchmark Submission, C.R. 284–94, P.R. 166–68 at Ex. 7C (Jan. 13, 2020).  The data was sourced from Xeneta.  Id.  The Xeneta data reflected the prices from various points across the world to Shanghai, China, including Japan, Barcelona, Busan, Singapore, Jakarta, Los Angeles, Rotterdam, and Mumbai.  Id.  The average ocean freight rate per container ranged from $380.51 to $414.59.  Id.

At the same time, SunPower Manufacturing submitted monthly freight quotes for 2017 from Descartes for shipping rates to Shanghai, China, for solar glass, aluminum extrusions, and polysilicon inputs for solar cells.  Petitioner, Submission of Benchmark Information, P.R. 170–175 at Ex. 5 ("SunPower Benchmark Submission").  The Descartes data reflected the freight rate for the solar glass from Long Beach, California; Los Angeles, California; Oakland, California;

Portland, Oregon; San Francisco, California; Seattle, Washington; and Tacoma, Washington.  Id.

The data stated that the average freight cost per standard dry container from each city was

$5,775.75.  Id.  The specific data behind those numbers were all sourced from "Tariff Code:

005338-001" and freight forwarder code "2845-30-0000-01."  Id. at Ex. 6.  The data also stated

that the container size was, "LTL," or less than a container load.  Id.

      The rates for aluminum extrusions were from Chicago, Illinois for $2,565 per standard

container; Los Angeles, California for $13,941.22; Murrieta, California for $1,660; Portland,

Oregon for $13,941.22; San Francisco, California for $13,941.22; Seattle, Washington for

$13,938.81; and Tacoma, Washington for $13,941.22.  Id. at Ex. 5.  The routes from Los

Angeles, Portland, San Francisco, Seattle, and Tacoma all had the same tariff code, "006053-

002," and freight forwarder identification, "0260-70-1000-0001."  Id. at Ex. 7.[4]  The rates for

polysilicon were from Atlanta, Georgia for $6,224.61, and Long Beach, California for $3,135.

Id. at Ex. 5.  Similarly to the other data, all of the polysilicon data had the same tariff code and

freight forwarder code.  Id. at Ex. 8.

      Commerce accepted submissions of the Descartes data from SunPower and the Xeneta

data from JA Solar as tier-two benchmarks for ocean freight.  I&D Memo at 55.  Over Plaintiffs'

objection, Commerce determined that the Descartes data qualified as a tier-two benchmark.  See

id. at 56.  Commerce acknowledged that the regulations did not define "world market price," but

stated that the Descartes prices qualified because they were prices for ocean freight from the

United States to China.  Id.; see 19 C.F.R. § 351.511(a)(2)(ii).  Commerce explained that the

---

[4] Murrieta and Chicago have different tariff codes and freight forwarder identification numbers
from the other cities.  See SunPower Benchmark Submission, at Ex. 7.

Consol. Court No. 20-03912                                                     Page 15

Descartes prices were representative of prices that "would be available" to Plaintiffs, and thus

found that they were appropriate as a tier-two benchmark.  <u>I&D Memo</u> at 56; <u>see</u> 19 C.F.R. §

351.511(a)(2)(ii).  Commerce also rejected Plaintiffs' argument that the Descartes rates were

more expensive than they would have paid because the regulations did not require the benchmark

to "match the particular commercial reality of the companies."  <u>I&D Memo</u> at 56; <u>see</u> 19 C.F.R.

§ 351.511(a)(2)(ii).  Finally, Commerce stated it would use "a simple average" of all the

shipping routes from the two data sets instead of treating the Descartes data as a single route to

average with the Xeneta date.  <u>See</u> <u>I&D Memo</u> at 55-56.

    **b.  Analysis**

    Commerce's selection of a tier-two benchmark is not in dispute, and the only issues are

whether Commerce erred in using the Descartes data and in performing a simple average

between it and the Xeneta data.  The regulations do not define "world market price," and

Commerce generally has discretion to interpret its regulations.  <u>See</u> 19 C.F.R. §

351.511(a)(2)(ii).  In some contexts, Commerce's choice might be viewed as a world market

price.  Here, however, the Descartes data likely does not add to the accuracy of the benchmark

calculation when there is the clearly acceptable Xeneta data available.

    The Descartes data appears to be sourced from limited samples because many of the

shipments use the same tariff codes and freight forwarder codes.  <u>See</u> SunPower Benchmark

Submission, at Exs. 6, 7, 8.  Risen asserts that this reflects that the provided prices are "only one

actual rate from only one company."  Risen Br. at 18.  Further, some of the data is marked as an

"LTL" rate, which is a less than a container load shipment rate and that is more expensive than a

normal commercial shipment rate.  <u>See</u> SunPower Benchmark Submission, at Exs. 6, 7, 8.

Additionally, some of the routes are from inland American cities such as Chicago, Murrieta, and

Atlanta, which would incur additional fees not associated with ocean freight or found in the

Xeneta data.  See SunPower Benchmark Submission, at Ex. 5.  Commerce's analysis does not

presently address any of these potential flaws.

Thus, the court remands to Commerce to reconsider the flaws raised by Plaintiffs.  The

court acknowledges that in some contexts, such data might result in a reasonably determination

of the world market price.  Here, however, Commerce should also consider the language and

purpose of the controlling regulation to decide whether it is necessary to use the Descartes data

to arrive at a "world market price" and discuss the identified flaws in the data.  Presently, the

analysis does not consider these flaws and whether the resulting Descartes data reasonably

"reflect[s] the price a firm actually paid or would pay if it imported the product."  19 C.F.R. §

351.511(a)(2)(iv); see also Borusan Mannesmann Boru Sanayi ve Ticaret A.S, 61 F. Supp. 3d at

1341.

Finally, Commerce has offered no logical reason to perform its current simple average of

the datasets.  Absent such a reason, if Commerce concludes that it is necessary to use the

Descartes data to represent a world market price, Commerce must average the Descartes data

with the United States to China routes data from Xeneta before combining it with the remainder

of the Xeneta data or otherwise utilize another methodology that does not skew the calculation

by overvaluing the United States to China route data.  Such methodology should prevent the

Descartes US-focused routes from having an oversized impact on the calculation, represent a

more accurate world market price for ocean freight and avoid a ballooning of the average price.

See 19 C.F.R. § 351.511(a)(2)(ii) ("Where there is more than one commercially available world

market price, [Commerce] will average such prices to the extent practicable, making due

allowance for factors affecting comparability."); see also RZBC Grp. Shareholding Co. v. United

States, 39 CIT __, __, 100 F. Supp. 3d 1288, 1309 (2015) (explaining that Commerce's simple

average involving "[h]igh prices from small transactions can balloon the average to absurd

proportions").

## IV.   **Electricity Subsidy**

In the Final Results, Commerce applied AFA to determine that Plaintiffs received

regionally specific electricity subsidies subject to countervailing duties under 19 U.S.C. §

1677(5A)(D)(iv).  Final Results at cmt. 4; I&D Memo at 38–39, 41.  Plaintiffs argue that

Commerce: (1) impermissibly relied on AFA to determine that the NDRC is the central price-

setting authority, (2) failed to designate a subsidized geographic region, and (3) relied on

unreasonably high benchmark rates for electricity.  See JA Solar Br. at 20; Risen Br. at 12–15.

The court sustains Commerce's electricity subsidy determination because it is supported by

substantial evidence.

First, Plaintiffs challenge Commerce's application of AFA.  JA Solar Br. at 23; Risen Br.

at 4.  Commerce is entitled to apply AFA where an interested party declines to provide requested

information and fails to cooperate with an investigation to the best of its ability.  See 19 U.S.C. §

1677e(b); Deacero S.A.P.I. de C.V. v. United States, 996 F.3d 1283, 1297 (Fed. Cir. 2021).  The

Federal Circuit has previously affirmed Commerce's application of AFA where the GOC has not

provided sufficient data to establish a benchmark price for electricity and refused to provide

verification concerning "how the electricity process and costs varied among the various

provinces that supplied electricity to industries within their areas."  Canadian Solar Inc. v. United

States, 23 F.4th 1372, 1378 (Fed. Cir. 2022) ("Canadian Solar CAFC Opinion")[5] (citing Fine

Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1372 (Fed. Cir. 2014)); see also

Changzhou Trina III, 466 F. Supp. 3d. at 1302.

 Plaintiffs argue that since 2015 the provincial governments, and not the NDRC, have

been responsible for setting electricity sales process and that "a competitive system" exists to

create prices that are tied to market fluctuations.  JA Solar Br. at 25; see GOC, Initial

Questionnaire Response, P.R. 140-143, C.R. 104-108 at 73 (December 30, 2019) ("GOC

December 30, 2019 QR").  Commerce counters that the GOC failed to provide information

required to evaluate the cooperation between the provinces and the NDRC for electricity price

adjustments.  PDM at 32; Dep't Commerce, Countervailing Duty Questionnaire, P.R. 95

(November 5, 2019).  Specifically, Commerce claims that the GOC failed to provide "provincial

price proposals for each of the relevant provinces that might demonstrate that the provinces are

the authorities setting prices or that there are market- or cost-based reasons underlying the

variation in prices among provinces."  I&D Memo at 40; see GOC December 30, 2019 QR at 73,

Ex. II E.24.  Commerce explained that this information was required to understand the "nature of

cooperation between the NDRC and the provinces in deriving price adjustments," stating that it

could not confirm whether variances in prices among the provinces were "in accordance with

---

[5] In the fourth administrative review of Commerce's countervailing duty order, the Federal Circuit held that Commerce reasonably relied on adverse inferences to fill two critical information gaps raised in the record.  Canadian Solar CAFC Opinion, 23 F.4th at 1379.  In the present case, Commerce relied on AFA to fill the same gaps in the record.  See I&D Memo at 38. ("What has been at issue in Commerce's numerous determinations countervailing the provision of electricity is why prices vary from province to province and who makes the decision–ultimately–to set or allow distinct prices in each province.").

market principles or cost differences." PDM at 34, 36. For the following reasons, Commerce's

determination is supported by substantial evidence.

Here, as in the fourth administrative review of the Commerce's countervailing duty order,

Commerce reasonably found that the GOC did not comply to the best of its ability to fill

informational gaps in the record. I&D Memo at 40; see GOC December 30, 2019 QR at 74;

Canadian Solar CAFC Opinion, 23 F.4th at 1378. Commerce requested the original provincial

price proposals and the GOC did not provide the requested information. GOC December 30,

2019 QR at 73-74. Further, Commerce specifically relied on Notice 748 and the Guangdong

Price Catalogue to support its determination that the NDRC is the central price-setting authority.

I&D Memo at 40.

Article 6 of Notice 748 requires each provincial price department to develop and issue a

"specific adjustment plan of electricity and sales price" and to report this plan to the NDRC for

record. GOC December 30, 2019 QR at Ex. II E.23. The court has previously sustained

Commerce's determination, in view of Notice 748. See Jiangsu Zhongji Lamination Materials

Co. v. United States, 43 CIT __, __, 405 F. Supp. 3d 1317, 1136-38 (2019); Canadian Solar Inc.

v. United States, Slip Op. 20-149, 2020 WL 6129754 *5 (CIT Oct. 19, 2020) ("Canadian Solar

II"), aff'd, 23 F.4th 1372. Notice 748 supports Commerce's determination that the NDRC is still

involved in price setting because Article 6 directs provinces to report their plans to the NDRC.

Here too, the court sustains Commerce's determination. See GOC December 30, 2019 QR at Ex.

II E.23. Next, Commerce's determination relied on the Guangdong Price Catalog. See I&D

Memo at 40. The document is the basis for the provincial government's price regulation, and it

states that it was "reviewed and approved by the provincial government and the NDRC." I&D

<u>Memo</u> at 40-41; GOC December 30, 2019 QR at 76 at Ex. II E.38.  Finally, Plaintiffs'

supplemental evidence does not deprive Commerce's determination of substantial evidence.[6]

Plaintiffs' supplemental information fails to fill the gaps in the record Commerce reasonably

identified as critical—the provincial price proposals for each of the relevant provinces.

 Because the GOC did not act to the best of its ability in responding to Commerce's

requests, Commerce was authorized to apply an adverse factual inference to fill the relevant

gaps.  <u>See</u> <u>Deacero S.A.P.I. de C.V.</u>, 996 F.3d at 1297.  On the totality of the record, Commerce

reasonably considered record evidence to support the finding that the NDRC is the ultimate

price-setting authority for electricity prices.  <u>See</u> <u>I&D Memo</u> at 40.  Commerce's determination

to use AFA is thus supported by substantial evidence.

 Next, Plaintiffs argue that Commerce failed to identify a designated region that received

subsidized electricity prices.  JA Solar Br. at 20–23.  "Subsidies provided by a central

government to particular regions (including a province or a state) are specific regardless of the

degree of availability or use within the region."  Uruguay Round Agreements Act, Statement of

Administrative Action, H. R. Rep. No. 103-316, vol. 1, at 932 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4242.  The court has previously held that "no additional showing of

specificity is required if Commerce finds that a central government is providing subsidies based

on region."  <u>Changzhou Trina III</u>, 466 F. Supp. 3d at 1303 n.12 (citing <u>Royal Thai Gov't v.</u>

<u>United States</u>, 30 CIT 1072, 1079, 441 F. Supp. 2d 1350, 1358 n.5 (2006)).

---

[6] Plaintiffs submitted two supplemental documents to address whether the GOC provided electricity for LTAR: GOC December 30, 2019 QR at Ex. II E.19 (Completing Price Linkage Mechanism Between Coal and Electricity), and GOC December 30, 2019 QR at Ex. II E.34 (Pricing Catalogues of Central Government).

Plaintiffs' contention that Commerce failed to designate a subsidized geographic region has been previously raised before the court and rejected.  Canadian Solar CAFC Opinion 23 F.4th at 1380-81.  The Federal Circuit held that Commerce may find a countervailable regionally specific subsidy "where documents support the inference [that] the central [GOC] was involved in provincial electricity pricing that results in regional price variability."  Id. at 1380; see also Royal Thai Gov't, 30 CIT at 1709, 441 F. Supp. 2d at 1385 (affirming Commerce's determination that regional specificity was reasonable even when every region in the subject country received uniform electricity prices); Changzhou Trina III, 466 F. Supp. 3d at 1303 n.12 ("[N]o additional showing of specificity is required if Commerce finds that a central government is providing subsidies based on region.") (internal citations omitted).

Contrary to Plaintiffs' argument, Commerce was not required to identify a particular subsidized region.  As summarized above, Commerce reasonably applied AFA to determine that the NDRC is the centralized price-setting authority for electricity.  Commerce reasonably found that the NDRC provided subsidies to the region, thus no "additional showing of specificity is required."  See Changzhou Trina III, 466 F. Supp. 3d at 1290 n.12 (internal citations omitted).  Moreover, "even if a particular electricity subsidy is provided to more than one province, so long as it is provided to less than all regions or varies by region, that subsidy can be fairly regarded as regionally specific under the statute."  Id.  No further inquiry is required, and Plaintiffs' regional specificity argument fails.

Finally, Plaintiffs argue that Commerce's benchmark calculations were unreasonable.  JA Solar Br. at 26.  Plaintiffs once more raise arguments that were considered, and rejected, before the court and the Federal Circuit.  See id.; Canadian Solar CAFC Opinion, 23 F.4th at 1381.

Consol. Court No. 20-03912                                            Page 22

Here, as in as in the fourth administrative review of the Commerce's countervailing duty order,

Commerce calculated the amount of electrical subsidy as the difference between what the

respondent companies paid, and the highest tariffs set for any province.  I&D Memo at 41;

Canadian Solar CAFC Opinion, 23 F.4th at 1381.  The court found Commerce's methodology to

be reasonable, and the Federal Circuit sustained.  Canadian Solar II, 2020 WL 6129754 *6, aff'd,

23 F.4th at 1372.  On this analogous factual record, the court finds no reason to deviate from its

prior decisions that Commerce's benchmark calculations were reasonable and supported by

substantial evidence.

 Accordingly, the court sustains Commerce's determination regarding the countervailable

subsidization of electricity in China.

<div align="center"><b>CONCLUSION</b></div>

 The court sustains Commerce's determination regarding the specificity finding for

electricity for LTAR program.  For the foregoing reasons, the court remands to Commerce for a

determination consistent with this opinion on the remaining issues.  The remand shall be issued

within 60 days hereof.  Comments may be filed 30 days thereafter and any response 15 days

thereafter.

<div style="margin-left: 40%;">/s/  Jane A. Restani  <br>Jane A. Restani. Judge</div>

Dated: May 12, 2022<br>
  New York, New York