C-570-980
Slip Op. 22-44
POR:  01/01/2017 – 12/31/2017
~~Business Proprietary Information~~
E&C/OVII:  MEH
**Public Version**

***Risen Energy Co., Ltd., et al. v. United States,***
**Consol. Court No. 20-03912; Slip Op. 22-44 (CIT May 12, 2022)**
**Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
People's Republic of China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.      SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade

(the Court) in *Risen Energy Co., Ltd., et al. v. United States*, 570 F. Supp. 3d 1369 (CIT 2022)

(*Remand Order*).[1]  These final results of redetermination concern the 2017 administrative review of

crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells), from the

People's Republic of China (China).[2]  The petitioner in the underlying investigation is SunPower

Manufacturing Oregon.  The respondents selected for individual examination in the review are JA

Solar Co., Ltd. (JA Solar) and Risen Energy Co., Ltd. (Risen).

Pursuant to Commerce's request for remand, and the Court's *Remand Order*, we have

attempted verification of the respondents' use of the Export Buyer's Credit Program (EBCP) and

have found no indication that JA Solar used the program, but continue to find that Risen used the

program.  Also pursuant to the *Remand Order*, we have reconsidered our exclusive reliance on

2010 data from Thailand in determining a tier-three benchmark for the provision of land for less

---

[1] Citations to the *Remand Order* in these final results of redetermination are to the Slip Opinion, which is Slip Op. 22-
44 (May 12, 2022).
[2] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of
China:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 79163 (December 9, 2020) (*Final
Results*), and accompanying Issues and Decision Memorandum (IDM).

than adequate remuneration (LTAR) and have recalculated the benchmark to rely on an average of the Thai data and Malaysian data placed on the record of this remand, consistent with our practice in the most recently completed review of this order.[3]  Finally, pursuant to the *Remand Order*, we have recalculated the benchmark for ocean freight, used in several subsidy calculations involving the provision of raw materials for LTAR, to adjust for the overreliance on data related to the United States-to-China route.

## II.   BACKGROUND

On December 9, 2020, Commerce published the *Final Results* in the 2017 administrative review of this order.  In the *Final Results*, Commerce relied on adverse facts available (AFA) in finding that both respondents benefited from the EBCP as a result of a failure to cooperate by the Government of China (GOC).  Specifically, Commerce determined that both respondents used the program in light of the GOC's failure to provide an adequate explanation of the operation of the program, documentation of the 2013 revisions to the administrative rules regulating the program, and a list of partner/correspondent banks.[4]

In addition, in the *Final Results*, Commerce countervailed the provision of land for LTAR, relying on Thai land values taken from a 2010 Coldwell Banker Richard Ellis (CBRE) report as a benchmark.[5]  In doing so, Commerce rejected the respondents' arguments that Commerce should rely, instead, on alternative sources of data that JA Solar had placed on the record, including a more

---

[3] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 40491 (July 7, 2022) (*Solar Cells from China 2019*), and accompanying IDM, at 70; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind, in Part; 2019*, 87 FR 748 (January 6, 2022), and accompanying Preliminary Decision Memorandum (PDM), at 22.
[4] *See Final Results* IDM at Comment 3.
[5] *Id.* at Comment 8.

recent CBRE report for Brazil and Mexico and a report by Nexus Innovative Real Estate Solutions for Thai values for "ready built factories" and "ready built warehouses."[6]

Finally, Commerce relied on a benchmark for ocean freight for several subsidy calculations, including the provision of aluminum frames, solar glass, and solar-grade polysilicon for LTAR.[7] Commerce determined the ocean freight benchmark by first taking a simple average of ocean freight values published by Descartes Systems Group, Inc. (Descartes) (a transportation and logistics company) provided by the petitioner, which were limited to routes between China and the United States.  Separately, Commerce also took a simple average of ocean freight values published by Xeneta (a publisher of benchmark freight information) provided by JA Solar, which included routes between China and the United States and between China and additional worldwide locations. Commerce then took a simple average of the two results to derive the final benchmark.  Thus, the petitioner's dataset, limited to United States-to-China routes, was given the same weight in the final benchmark calculation as JA Solar's global data.

On April 2, 2021, Commerce published the *Amended Final Results*, correcting certain ministerial errors made in the calculations of the subsidy rates determined in the *Final Results*.[8]

On May 12, 2022, the Court remanded three issues from the *Final Results*.[9]  First, the Court granted Commerce's request for a voluntary remand regarding the EBCP, which Commerce requested in light of recent changes in practice with respect to the EBCP.[10]  The Court also remanded Commerce's reliance on Thai data from 2010 as a benchmark for measuring the benefit

---

[6] *Id.* at 52.  This report is hereinafter referred to as the *Nexus Reports*.
[7] *Id.* at Comment 9.
[8] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Notice of Amended Final Results of the 2017 Countervailing Duty Administrative Review*, 86 FR 17356 (April 2, 2021) (*Amended Final Results*).
[9] *See Remand Order*.
[10] *Id.* at 5.

from the provision of land for LTAR for further consideration.[11]  Finally, the Court remanded for further consideration Commerce's use of ocean freight data provided by the petitioner, which Commerce relied on in determining the benefit from the provision of aluminum extrusions, solar glass, and solar-grade polysilicon for LTAR.[12]

On August 31, 2022, we issued the Draft Remand Results, reconsidering our findings in the five programs at issue (*i.e.*, the EBCP, as well as the land, aluminum extrusions, solar grade polysilicon, and solar glass for LTAR programs).[13]  We found the EBCP to be not used for one of the two respondents in this review, JA Solar, pursuant to our verification of the loan information provided by JA Solar.[14]  We, therefore, removed the EBCP rate from JA Solar's total subsidy rate calculation.  Because Risen was unable to provide all lending information needed to verify its claims of non-use, we made no changes to Risen's rate for the EBCP.[15]  Further, we recalculated the benefits provided by the provision of land for LTAR using an average of the 2010 Thai land values and more recent Malaysian values.[16]  Finally, pursuant to the Court's order, we recalculated the benchmark for ocean freight to correct a bias in favor of U.S. routes and have also recalculated the subsidy rates for the three LTAR programs that rely on an ocean freight benchmark.[17]

On September 13, 2022, we received comments on the Draft Remand Results from JA Solar and Risen,[18] as well as two companies subject to the "non-selected" companies rate determined in the *Amended Final Results*, Shanghai BYD Co., Ltd. (BYD) and Trina Solar Co., Ltd. (Trina).[19]

---

[11] *Id.* at 11.
[12] *Id.* at 17.
[13] *See* Draft Results of Remand Redetermination, *Risen Energy Co., Ltd., et al. v. United States*, Consol. Court No. 20-03912; Slip Op. 22-44 (CIT May 12, 2022), dated August 31, 2022 (Draft Remand Results), at 13-14.
[14] *Id.* at 5-6.
[15] *Id.* at 7-8.
[16] *Id.* at 9-10.
[17] *Id.* at 12-13.
[18] *See* JA Solar's Letter, "Comments on Draft Remand Redetermination," dated September 13, 2022 (JA Solar Comments); and Risen's Letter, "Draft Remand Comments," dated September 13, 2022 (Risen Comments).
[19] *See* BYD's Letter, "Shanghai BYD's Comments on Draft Results of Redetermination," dated September 13, 2022

Based on the comments received, we corrected a clerical error in the calculation of the ocean freight benchmark used in the calculations for aluminum extrusions, solar grade polysilicon, and solar glass for LTAR. We otherwise made no other changes to the Draft Remand Results, for which the analysis is repeated below. We have responded to all comments from parties after the Final Analysis section, below.[20]

## III.   FINAL ANALYSIS

On May 12, 2022, the Court remanded the *Final Results* for reconsideration of the three decisions noted above, including, at our request, the EBCP decision.[21] The Court's specific instructions, and our further analysis pursuant to them, are discussed further below.

1.   Export Buyer's Credit Program

In the *Final Results*, Commerce concluded as AFA that the respondents benefitted from usage of the EBCP because the GOC withheld necessary information. After a discussion of the information withheld by the GOC and our inability to verify the respondents' reported non-use of the EBCP without it, we concluded:

> Commerce has considered all information on the record of this proceeding, including the statements of non-use provided by the respondent companies (*i.e.*, declarations of non-use from the respondents' customers); however, as explained above, we are unable to rely on information provided by respondent companies due to Commerce's lack of a complete and reliable understanding of the program, which is a prerequisite to our reliance on information provided by the respondent companies regarding non-use. Thus, without the GOC's necessary information, the information provided by the respondent companies is insufficient for reaching a determination of non-use.[22]

---

(BYD Comments); and Trina's Letter, "Letter in Lieu of Comments on Draft Results of Redetermination Pursuant to Court Remand," dated September 13, 2022 (Trina Comments).
[20] The comments submitted by Trina consist of a letter endorsing the comments of the other interested parties; thus, we have not summarized them separately below.
[21] *See Remand Order* at 5, 11, and 16-17.
[22] *See Final Results* IDM at 35.

On March 28, 2022, we requested that the Court remand this finding to Commerce "to reconsider {the} application of adverse facts available for its program."[23]  The Court granted the request, but noted:

> On remand, the Government may attempt to verify the customer certifications of non-use.  If the Government decides to remove the EBCP from its subsidy calculation under protest but does not intend to appeal, it must explain on remand why the Court should not provide some form of equitable relief, such as the immediate return of deposits, or an injunction of the continued inclusion of the program with no attempt at verification that results in the temporary collection of funds that ultimately are not owed.[24]

On June 7, 2022, Commerce began its reexamination of the EBCP by issuing questionnaires to JA Solar and Risen requesting that JA Solar and Risen complete a template worksheet to provide "all loans/financing to each of your U.S. importers/customers" during the period of review (POR).[25]  The questionnaires also requested information regarding the record-keeping procedures of the respondents and their customers, as well as the steps taken to determine whether EBCP assistance was received.  On July 6 and 8, 2022, Commerce received responses to the questionnaires.[26]  These responses are discussed, in turn, below.

    a.  <u>JA Solar</u>

JA Solar provided complete information on behalf of JA Solar USA, Inc. (JA Solar USA), "the sole importer customer of {JA Solar} during the POR."[27]  JA Solar reported that its sole importer/customer had received no loans/financing during the POR and had no loans/financing outstanding during the POR,[28] and it supported its claim with JA Solar USA's financial

---

[23] *See Remand Order* at 4.
[24] *Id.* at 5.
[25] *See* Commerce's Letters, "Export Buyer's Credit Supplemental Questionnaire," dated June 7, 2022, at 3.
[26] *See* JA Solar's Letter, "EBCP Supplemental Questionnaire Response," dated July 8, 2022 (JA Solar EBCP QR); Risen's Letter, "Crystalline Silicon Photovoltaic Cells from the People's Republic of China- EBC Supplemental Questionnaire," dated July 8, 2022 (Risen EBCP QR); and DEPCOM Power, Inc.'s Letter, "Export Buyer's Credit Supplemental Questionnaire," dated July 6, 2022 (a response submitted separately by a customer of Risen).
[27] *See* JA Solar EBCP QR at 1.
[28] *Id.* at 2.

statements.[29]  It, thus, concluded that the "absence of any loans or financing during the POR of the only importer customer, JA Solar USA, definitely establishes that JA Solar did not use the EBCP because the EBCP benefits the importer customer in the form of a loan."[30]  Earlier, in the underlying administrative review, JA Solar had also provided a declaration of non-use of the EBCP on behalf of JA Solar USA.[31]

Given that JA Solar provided complete information on behalf of its sole importer/customer in response to the EBCP questionnaire, we then proceeded to verification of the customer's information.  During verification, Commerce was able to corroborate JA Solar's claims that its sole importer/customer received no loans or other forms of financing during the POR and that it had no loans or other forms of financing outstanding during the POR.[32]  We also examined several expense accounts and JA Solar USA's cash flow statement and found no evidence of interest being paid.[33]  Thus, while Commerce continues to maintain that the GOC's cooperation is necessary for a true understanding of the EBCP, the record on remand regarding usage of the EBCP does not contradict JA Solar's claimed non-use of the program.  As a result, we find it appropriate to remove the EBCP subsidy rate from JA Solar's total *ad valorem* rate.

     b.  <u>Risen</u>

Unlike JA Solar, Risen provided the requested information on behalf of only six of its 12 U.S. customers; Risen estimated that these six customers are responsible for [  ] percent of its POR sales.[34]  With respect to the six remaining customers, Risen claimed that these companies had

---

[29] *Id.* at Exhibit 1.
[30] *Id.* at 2.
[31] *See* JA Solar's Letter, "Section III Response," dated December 30, 2019 (JA Solar December 30, 2019 IQR), at Exhibit 25.
[32] *See* Memorandum, "Verification of Questionnaire Responses Submitted by JA Solar Technology Yangzhou Co., Ltd. Regarding Usage of the Export Buyer's Credit Program," dated August 30, 2022.
[33] *Id.*
[34] *See* Risen EBCP QR at 2.

not provided complete responses to the questionnaire despite its best efforts.[35]  One customer,

[        ], did not complete the loan template Commerce had requested because "it insisted that its

loans outstanding in 2017 had nothing to do with the EBC program or Risen."[36]  Another

customer, [        ], according to Risen, ceased operations in 2017.[37]  A third customer,

[          ], responded that "it did not use any financing for its payments to Risen."[38]  Finally,

three other customers, [                    ], provided no response to "Risen's repeated

requests."[39]

  Regardless, Risen argues that Commerce should find non-use of the EBCP.  According to

Risen, it is not affiliated with the U.S. customers who failed to comply with Commerce's request

for information; its relationships with the customers at issue were several years in the past; the

responses it did provide should be deemed representative of its overall customer base; and it,

therefore, has fully complied to the best of its ability.

  However, because Risen was unable to provide complete information for all

importers/customers, the record continues to contain evidentiary gaps concerning whether certain

U.S. importers/customers of Risen used the EBCP.  Specifically, the company information on the

record with regard to Risen's use of the EBCP remains incomplete and unverified and, thus,

insufficient to compensate for the existing record deficiencies stemming from the GOC's

withholding of necessary information.  Commerce requires information regarding *all* of a

respondent's U.S. importers/customers in order to ensure that none of those importers/customers

have received benefits under the EBCP.  While Commerce attempted to verify the non-usage of the

---

[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*

program by first requesting the information that would be further examined at verification, Risen was unable to provide such information and, thus, Commerce could not verify Risen's claim.

Commerce cannot verify non-usage of the program by only a portion of Risen's importers/customers because doing so would provide Risen an opportunity to evade Commerce's scrutiny by providing responses only from importers/customers that have not used the EBCP.  Even though Risen claims that the customers for which it provided information are "representative" of its overall customer base, Risen would have Commerce assume, without evidence, that six of its importers/customers from the POI did not receive benefits from the EBCP.  Commerce does not find this inference warranted or reasonable, particularly in light of the GOC's failure to cooperate, which renders this program difficult for Commerce to verify reliably.

Finally, we emphasize that Commerce is not applying AFA as a result of the failure of Risen to cooperate – rather, as in the case of JA Solar, the information provided by Risen may "fill the gaps" stemming from the GOC's failure to cooperate (for which we are applying AFA). Therefore, whether Risen was cooperative in its attempts at procuring this information from its importers/customers is irrelevant; rather, what is relevant is that the information that it did provide was insufficient to establish that none of its customers used the EBCP during the POR.  In conclusion, Risen has failed to overcome the GOC's failure to cooperate, and Commerce continues to determine, as a result of the GOC's failure to cooperate, that AFA is warranted in determining that Risen benefitted from the program.

2.     <u>Tier-Three Benchmark for the Provision of Land at LTAR</u>

Commerce has traditionally cited three grounds for choosing Thailand as a source for a tier-three benchmark for measuring the benefits from the provision of land for LTAR:  (1) Thailand has a level of economic development similar to China; (2) Thailand has geographic proximity to China (*i.e.*, investors/producers consider Thailand to be a reasonable substitute for China); and (3) there

are "demographic factors" (*e.g.*, a population density similar to China).[40]  Commerce has also recognized that "in making benchmark choices in a country that satisfies the economic comparability requirement, it may be appropriate to the extent the data permit to consider the *per capita* income (GNI) and population density of the region or area in which the land in China is located to that of different regions or areas in benchmark candidate countries."[41]

However, in the *Remand Order*, the Court expressed concerns with Commerce's continued reliance on "aging data" from Thailand in the 2010 CBRE report.[42]  In particular, the Court questioned the "staleness" of the data compared to other ostensibly usable data, such as the Mexican and Brazilian data provided by JA Solar.  In this regard, the Court noted that Commerce has found both Mexico and Brazil to be economically comparable to China in the context of selecting surrogate countries in antidumping duty proceedings, whereas Thailand and China have diverged since 2010 in terms of both national income levels and population density.  Thus, the Court concluded that Commerce appeared to be putting controlling weight on geographic proximity.[43]

The Court also took issue with Commerce's dismissal of the *Nexus Reports*, an additional source of Thai land values placed on the record by JA Solar.  The Court found Commerce's concern that the *Nexus Reports* are for "Ready Built Warehouses" and "Ready Built Factories" to be insufficient without further elaboration.[44]

---

[40] *See Laminated Woven Sacks from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 35646 (June 24, 2008) (*LWS from China*), and accompanying IDM, at 17 and Comment 11; *see also* Memorandum, "Land-Use Rights Analysis," dated April 21, 2018 (Land-Use Rights Analysis), at Attachment (page 30) (placed on the record of this administrative review on April 28, 2021).
[41] *See* Land-Use Rights Analysis at 30.
[42] *See Remand Order* at 9.
[43] *Id.* at 10.
[44] *Id.* at 12-13.

On August 8, 2022, Commerce placed Malaysian land values on the record[45] in response to the Court's concerns and consistent with the recent precedent in this proceeding noted above.[46]  We also placed on the record certain economic development information, as well as population density data, for China, Thailand, Brazil, and Mexico.[47]  We provided parties seven days to respond with information to rebut, clarify, or correct the new factual information.  In response, Risen submitted earlier versions of the same Malaysian land data, used by Commerce in prior reviews.[48]  It also submitted Commerce's land benchmark calculations from prior reviews.[49]  In addition, JA Solar submitted *per capita* GNI data from the World Bank, purporting to show that Thailand's *per capita* GNI is 30 percent less than China's and that Brazil's is almost equal to that of China.[50]

After evaluating this information, Commerce now determines that a simple average of the Malaysian land values and the Thailand values (indexed for inflation) constitutes the best tier-three benchmark on the record.  Moreover, data placed on the record by Commerce indicate that China, Malaysia, and Thailand are all considered "upper middle income" countries by the World Bank in terms of their level of economic development.[51]  Data placed on the record also indicate the three countries have similar population densities with China at 140 persons per square kilometer ($K^2$), Malaysia at 99/$K^2$, and Thailand at 130/$K^2$ (for context, Brazil is at 25/$K^2$ and Mexico is at 65/$K^2$).[52]

---

[45] *See* Memorandum, "Upcoming Draft Remand Results – The Provision of Land for Less Than Adequate Remuneration – Malaysia:  Costs of Doing Business," dated August 8, 2022.

[46] *See* fn. 3, *supra*, for recent precedent.

[47] *See* Memoranda, "Upcoming Draft Remand Results – Level of Economic Development," dated August 8, 2022 (Commerce Economic Development Information); and "Upcoming Draft Remand Results – Population Densities of Countries," dated August 8, 2022 (Commerce Population Density Data).

[48] *See* Risen's Letter, "Rebuttal Information," dated August 16, 2022.

[49] *Id.*

[50] *See* JA Solar's Letter, "Rebuttal Comments on Level of Economic Development," dated August 16, 2022.

[51] *See* Commerce Economic Development Information.

[52] *See* Commerce Population Density Data.

With respect to the *per capita* GNI data from the World Bank submitted by JA Solar, it is not Commerce's policy to select land values from countries with per capita GNIs that are closest to China, but from a country that is at a *similar* level of economic development.[53]  The World Bank data offer the clear conclusion that China and Thailand are at a similar level of economic development, as both are grouped together within the same income class.[54]  For example, in *LWS from China*, we noted China's per capita GNI was $2,010 and Thailand's was $2,990 (*i.e.*, Thailand's per capita GNI was 49 percent greater).[55]  Nevertheless, we considered the two countries to have similar per capita GNI and continued to use Thailand as a source for benchmark values given our finding that the two countries were "equally comparable in terms of economic development."[56]

Thus, both Malaysia and Thailand appear similar to China in terms of the factors traditionally considered by Commerce in selecting a land benchmark.  As the Court notes, the geographic proximity of the source of the land values is of critical importance in Commerce's analysis.[57]  Commerce has noted, "{c}onsideration of geographic proximity to China reflects the fact that many countries near China compete as production and export platforms for foreign direct investment, and land cost is one important factor investors consider."[58]  Additionally, Commerce has found that, "Thailand and China competed as production and export platforms for foreign direct investment.  For example, the Japan External Trade Organization (JETRO) found that Thailand ranked second to China as a location for expanding both high and mid-to-low-end production."[59]  Thus, the continued inclusion of Thailand in the benchmark calculation, along with the more recent

---

[53] *See LWS from China* IDM at 63; *see also* Land-Use Rights Analysis at 30.
[54] *See* Commerce Economic Development Information at 6 and 8.
[55] *See LWS from China* IDM at 63.
[56] *Id.*
[57] *See Remand Order* at 10.
[58] *See* Land-Use Rights Analysis at 30.
[59] *Id.*

Malaysia data, is particularly appropriate.  By contrast, intuitively, given their geographic distance from China, neither Brazil nor Mexico could be perceived as a reasonable substitute for China for establishing a factory to serve Asian markets.

Finally, Commerce continues to find that it is correct to rely on a benchmark for land alone, not land with ready-built factories and warehouses.  The initial questionnaire issued in this review requested information regarding the "Provision of Land-Use Rights for LTAR."[60]  Moreover, the questionnaire specifically requested that the respondents complete a template reporting the "price paid for *land-use rights*" and also asks for the "land-use certificates and land-use agreements issued to you by your local {government}."[61]  JA Solar stated that it was reporting the requested information "related to the leased *land-use rights*."[62]  Risen responded that it had acquired "land-use rights," and referred to its exhibits for the related purchase information.[63]  Neither company provided any indication in the completed charts summarizing its land purchases that it was reporting anything other than prices paid for land.  Therefore, we have continued to compare the reported prices with benchmarks for the value of land alone in determining the benefit from this program.

      3.    <u>Ocean Freight Benchmark</u>

In the *Final Results*, we relied on an ocean freight benchmark in determining the benefits from the provision of aluminum extrusions, solar glass, and polysilicon for LTAR.[64]  In doing so, we first calculated a simple average of shipping rates provided by JA Solar for routes between Shanghai and several world ports (Japan "main ports," Barcelona, Busan, Singapore, Jakarta, Los

---

[60] *See* JA Solar December 30, 2019 IQR at Volume I (III-36).
[61] *Id.* at Volume I (III-37) (emphasis added).
[62] *Id.* at Volume I (III-38) (emphasis added).  JA Solar provided usage information for 35 companies using 35 separate responses, but the quoted language is an example of how it characterizes the land information it reported.
[63] *See* Risen's Letter, "Section III Questionnaire Response," dated December 31, 2019, at 26.
[64] *See Final Results* at Comment 9.

Angeles, Rotterdam, and Mumbai).[65]  We then calculated a simple average of shipping rates provided by the petitioner for routes between U.S. cities and Chinese ports (*e.g.*, for polysilicon, the petitioner provided shipping rates for Atlanta to Shanghai and for Long Beach to Shanghai).[66] Finally, we took a simple average of the prior two averages.  The Court concluded this method provides excessive weight to the routes between China and the United States, and it also concluded that the inclusion of routes from inland American cities such as Atlanta in the calculation likely includes costs for inland U.S. freight (the benchmarks for the inputs – aluminum extrusions, solar glass, and polysilicon – are already on a "free on board" port basis; thus, adding inland freight for Atlanta to the shore – embedded in the ocean freight estimate – results in double counting inland freight).[67]

        As the Court suggests, the problem of overweighting the U.S. routes can be fixed by averaging the petitioner's U.S. route values with the respondents' U.S. route values before averaging the results with the respondents' values for other global routes.[68]  Thus, each route under this method would receive the same weight in the overall average, essentially resulting in a simple average of global routes consistent with our regulations and with the Court's opinion.  The problem of double counting U.S. inland freight can be resolved by simply ignoring the Atlanta to Shanghai route.  We have implemented both of these changes.

        Finally, the Court notes other issues with the petitioner's data, suggesting an overall concern that the petitioner has cherrypicked data in order to inflate the benchmark.  In particular, the Court notes the estimates filed by the petitioner are often for less than a full container (the LTL rate) and many use the same tariff codes and freight forwarder codes.[69]  Commerce acknowledges

---

[65] *See* JA Solar's Letter, "Benchmark Submission," dated January 13, 2020 (JA Solar Benchmark Submission), at 5.
[66] *See* Petitioner's Letter, "Submission of Benchmark Information," dated January 13, 2020, at Exhibit 5.
[67] *See Remand Order* at 16.
[68] *Id*.
[69] *Id.* at 13-15.

14

the Court's concerns.  We do not agree, however, that these issues warrant excluding the petitioner's data from the calculation altogether.  As the Court recognizes, Commerce has argued in this review that a "world market price" (*i.e.*, tier-two) is a price for a good or service that is available to the respondents and Commerce is not required to account for the commercial reality of respondents.[70]  Commerce does not believe a hypothetical importer would as a rule not buy less than a container, and Commerce cannot conclude that the tariff codes or freight forwarder codes indicated in the petitioner's documents indicate a shipment method that an importer of the materials at issue would be unlikely to use.  Therefore, we continue to include the petitioner's ocean freight values in the benchmark calculation, modified as described above.

## IV.    COMMENTS

On August 31, 2022, Commerce released the Draft Remand Results and invited parties to comment.[71]  On September 13, 2022, BYD, JA Solar, Risen, and Trina submitted comments on the Draft Remand Results.[72]  These comments are addressed below, as appropriate.

**Issue 1:  Application of AFA in Determining Usage of the EBCP**

*JA Solar's Comments*

- Commerce's Draft Remand Results is consistent with the instructions from the Court.[73]

---

[70] *Id.* at 13; *see also Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316 (2018) ("Canadian Solar mistakenly asserts that Commerce's calculations should be based on the specific circumstances of the Respondents.  As the court has indicated, however, Commerce has determined that benchmark calculations are assessed based on a hypothetical importer making a market-price purchase, not the specific parties in a proceeding.").
[71] *See* Draft Remand Results.
[72] *See* BYD Comments; JA Solar Comments; Risen Comments; and Trina Comments.  As noted above, the comments submitted by Trina consist of a letter endorsing the comments of the other interested parties; thus, we have not addressed them further below.
[73] *See* JA Solar Comments at 2-3.

*Risen's Comments*

- Risen was able to obtain cooperation and responses from customers covering approximately 95 percent of its POR sales by value.[74]

- Commerce's insistence that it needed complete responses from *all* customers to attempt to verify *any* non-use is not reasonable and does not consider the record as a whole.[75]

- The declarations provided by U.S. customers demonstrate non-use and the additional information on this record, from customers representing 95 percent of Risen's POR sales, only constitutes additional evidence of non-use.  It is still the case that nothing on the record suggests U.S. buyer use of the EBCP.[76]

- Commerce should consider the substantial information Risen obtained in conjunction with the maximum efforts that Risen put forward to obtain this information.  The cooperation efforts must also be considered in the context of the particular facts of this case where Commerce is requesting information from Risen's customers from five years ago.[77]

- Two of the customers that did not provide questionnaire responses nevertheless provided some information.[78]  [        ] explained that its loans outstanding in 2017 had nothing to do with the EBCP, and [        ] responded that it did not use any financing for its payments to Risen.  The remaining [    ] customers represent only [    ] percent of Risen's sales.

- At the very least, consideration of all of the affirmative responses precludes a conclusion that those buyers used the EBCP.[79]  Commerce should, thus, weight average the dollar

---

[74] *See* Risen Comments at 1.
[75] *Id.* at 2.
[76] *Id.*
[77] *Id.* at 3-4.
[78] *Id.* at 4.
[79] *Id.* at 6.

value of the purchases of the responding U.S. customers with the dollar value of the non-responding U.S. customers and reduce the EBCP rate accordingly.[80]

*BYD's Comments*

- Risen cooperated to the maximum extent possible under the circumstances and the information provided by Risen during the remand proceeding is consistent with a finding of non-use of the EBCP.  No information on the record supports a finding that Risen or its customers benefitted from the EBCP and Commerce's draft determination to the contrary is entirely speculative.[81]

**Commerce's Position:**

As explained above, in the *Final Results*, Commerce concluded as AFA that Risen benefited from usage of the EBCP because the GOC withheld necessary information.  In this remand proceeding, Commerce afforded Risen the opportunity to "fill the gaps" stemming from the GOC's failure to cooperate; however, Risen was unable to do so.  Therefore, whether Risen was cooperative in its attempts at producing the information from its importers/customers is irrelevant; rather, what is relevant is that the information that it did provide was insufficient to establish that none of its customers used the EBCP during the POR.

We disagree that Commerce is required to consider whether Risen put forward its best efforts or what hurdles it faced in attempting to acquire all necessary information (*e.g.*, the requested information is from several years ago and it may no longer have an active relationship with all of its POR customers).  The question at issue is simple:  does a gap continue to exist, given the information currently on the record of this proceeding?  And the answer is equally simple:  it does.

---

[80] *Id.* at 6-7.
[81] *See* BYD Comments at 3.

We similarly disagree that the relevant issue is whether affirmative evidence that Risen or its U.S. customers benefited from the EBCP exists.  The Court's instructions to Commerce were clear, that we "may attempt to verify the customer certifications of non-use."[82]  The Court did not instruct Commerce to reconsider the information on the record to determine whether affirmative evidence of usage existed in spite of the existing gaps in the record.  Moreover, the purpose of verification is to ensure that the lack of affirmative evidence of usage is because the program is, in fact, not used and is not because of an inadequate record.  In this case, because we were unable to verify non-use of the EBCP by Risen and all of its customers, and because of the GOC's failure to cooperate, we infer from the missing information as AFA that the program did benefit Risen.

We are mindful that the Court has, on numerous occasions, remanded our use of AFA based on the GOC's failure to provide necessary information and cooperate to the best of its ability.  To take a recent example, in *Both-Well*, the Court stated:

> In cases where Commerce confronts non-use certifications connected to the EBCP, determining that a gap exists requires Commerce to explain "exactly what information is missing from the record necessary to verify non-use" and why "only the withheld information can fill the gap."  Although using facts available with an adverse inference may be permissible, doing so when it collaterally affects a cooperating party is disfavored.[83]

As the Court stated in *GPX*, "{w}hen Commerce has access to information on the record to fill in the gaps created by the lack of cooperation by the government, as opposed to the exporter/producer, however, it is expected to consider such evidence."[84]

This rule, as stated in *GPX* and applied in *Both-Well* and other cases preceding *Both-Well*, has led the Court to remand our EBCP findings in many cases.  Therefore, in 2021, we revised our approach to the EBCP.  Now, in cases in which a respondent company has provided non-use

---

[82] *See Remand Order* at 5.
[83] *See Both-Well Taizhou Steel Fittings v. United States*, 557 F. Supp. 3d 1327, 1332 (CIT 2022) (*Both Well*) (internal citations omitted).
[84] *See GPX International Tire Corp. v. United States*, 893 F. Supp. 2d 1296, 1332 (CIT 2013) (*GPX*).

certifications from *all* of its U.S. customers, Commerce will send a supplemental questionnaire to the respondent, seeking information on the loans received by its customer(s) during the relevant period.  If the respondent provides this information from its customer(s), Commerce will verify the customer(s)' information (if verification is necessary under section 782(i) of the Tariff Act of 1930, as amended) or otherwise take into account the customer(s)' information.  Commerce's findings in the investigation of *Mobile Access Equipment from China* and the administrative review of *Forged Steel Fittings from China* are examples of this change in practice.[85]  However, when we do *not* receive voluntary non-use certifications from *all* U.S. customers of a respondent, Commerce normally will *not* issue the supplemental questionnaire or otherwise take steps to verify the respondent's claims of non-use.  Our recent final results of the 2019 administrative review in this *Solar Cells from China 2019* proceeding are an example of Commerce not receiving complete "gap-filling" information.[86]

      Commerce's practice in this regard has been developed because the Court has found that Commerce must consider gap-filling information provided by the respondent companies even when Commerce is confronted with the GOC's clear lack of cooperation.[87]  However, the converse must also be true – that is, when a respondent has *not* provided complete gap-filling information, Commerce is left only with the GOC's non-cooperation and the adverse inferences that must flow from that non-cooperation.  When we do not receive non-use certifications from all U.S. customers of a respondent,[88] or when we do receive all such certifications but do not receive full responses to

---

[85] *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 86 FR, 57809 (October 19, 2021) and accompanying IDM, at Comment 5; and *Forged Steel Fittings from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 35498 (June 10, 2022), and accompanying IDM, at Comment 2.
[86] *See Solar Cells from China 2019* IDM at Comment 1.
[87] For a recent example, *see Dalian Meisen Woodworking Co. v. United States*, Court No. 20-00110, Slip Op. 22-45 (May 12, 2022), at 16-17.  Commerce's practice, thus far, has been unaffected by the Court's recent decision in *Fujian Yinfeng Imp. & Exp. Trading Co. v. United States*, Slip Op. 22-107 (September 13, 2022) (*Fujian Yinfeng*), which we are still evaluating.
[88] *See Solar Cells from China 2019* IDM at Comment 1.

our supplemental questionnaire or are not able to verify the customers' information,[89] then the record gaps caused by the GOC have not been remedied or filled.  This is the situation in this remand redetermination with respect to Risen.  Risen did not provide complete gap-filling information for Commerce to use as the facts available as a result of the GOC's non-cooperation.  Therefore, we continue to find that Risen benefited from the EBCP, not as an application of AFA related to Risen's inability to provide evidence, but as an application of AFA with respect to the GOC's failure to supply necessary information in its possession, for which Risen was not able to fill the gaps.  To the extent that Risen contends that it cannot compel certain customers to provide gap-filling information, we emphasize that Risen's concern lies truly with the GOC, not with its customers.

Finally, we do not agree with Risen that we should adjust the AFA rate applied to the EBCP to account for Risen's U.S. customers who did provide the requested information.  Risen has cited no precedent for adjusting a countervailing duty (CVD) subsidy rate selected on the basis of AFA and Commerce is unaware of any precedent for doing so.  While the customers who did not respond fully to the request for information account for only a small percentage of Risen's U.S. market during the POR, we have no way of knowing the size of the subsidies received by the customers.

---

[89] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 36305 (June 16, 2022), and accompanying IDM, at Comment 1 (where Commerce found usage of the EBCP for respondent Jiangsu Senmao because, despite providing non-use certifications from all U.S. customers, Jiangsu Senmao did not provide complete responses to the supplemental questionnaire that sought lending information from the customers).

**Issue 2:  Determination of Land Benchmark Value**

*JA Solar's Comments*

- Commerce failed to comply with the Court's *Remand Order* because it did not provide a sufficient explanation for relying on the Thailand data that the Court considers "stale compared to more contemporaneous benchmark data."[90]

- Commerce relied on a finding from the Land-Use Rights Analysis memorandum that Thailand ranked second to China as a location for expanding both high and mid-to-low-end production.[91]  However, that memorandum is dated 2018 (a year after the POR) and contains no record citation for its conclusions regarding Thailand.

- Commerce failed to comply with the Court's *Remand Order* because it did not adequately address the fact that "Thailand and China have diverged in terms of comparable national income levels."[92]  Even though China, Thailand, and Malaysia may fall within the broad range of upper middle-income countries as defined by the World Bank, the difference between Thailand's and China's GNIs is almost twice that of the comparison between Malaysia's and China's GNIs.

- By contrast, in administrative reviews of the companion antidumping duty order on solar cells, Commerce has removed Thailand from the surrogate country list.[93]

---

[90] *See* JA Solar Comments at 4-5.
[91] *Id.* (citing Draft Remand Results at 11; and Land-Use Rights Analysis at 30).
[92] *Id.* at 6.
[93] *Id.* at 6-7 (citing *Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017*, 83 FR 67222 (December 28, 2018), and accompanying PDM, at 17; and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 85 FR 7531 (February 10, 2020) (*Solar Cells AD Preliminary Results*), and accompanying PDM, at 15).

*Risen's Comments*

- The Malaysian land values on the record are contemporaneous with the POR and the Thai land values are from 2010.[94]  Commerce's determination to rely on both datasets fails to consider the importance of contemporaneity.  Commerce should rely solely on the Malaysian land values.

**Commerce's Position:**

We disagree that we have failed to explain adequately why we continue to use the 2010 Thai land values in our benchmark calculation.  As we noted in the Draft Remand Results, we consider Thailand's geographic proximity to be a key factor in making it a suitable source for a benchmark for land values in China.  While JA Solar and Risen may wish Commerce to prioritize the closeness of per capita GNI in selecting a benchmark, that is not the policy Commerce follows.

Even the public sources of benchmark information on the record of the underlying review – including the information placed on the record by the respondents – acknowledge the importance of distinguishing between geographic regions or groupings in benchmarking land values.  The 2010 CBRE report, for example, is for land values in "Asia," with two subcategories for "Greater China" and "South East Asia."[95]  Likewise, the CBRE report placed on the record by JA Solar breaks down its analysis by regions such as "The Americas" and "APAC" or "ASIA."[96]  There is no information on the record supporting the conclusion that geographic proximity is immaterial in selecting a benchmark.

Likewise, we do not believe, as explained in the "Final Analysis" section above, that we need to select one of the most comparable countries in terms of per capita GNI as a source for

---

[94] *See* Risen Comments at 7-8.
[95] *See* Memorandum, "Asian Marketview Report," dated January 31, 2020.
[96] *See* JA Solar Benchmark Submission at Exhibit 6B.

benchmark information.  Rather, we need to select among the countries that are similar in terms of per capita GNI and level of economic development, and that is what we have done by referencing the World Bank economic classifications.

While there are no surrogate country memoranda on the record of this remand or the underlying review, we believe JA Solar and Risen mischaracterize the nature of the surrogate country memoranda.  They are "non-exclusive lists" of countries that Commerce considers to be at the "same level of economic development as China" in terms of per capita GNI.[97]  They explicitly acknowledge that they are not exhaustive and that there may be other countries that are either the "same" in terms of level of economic development or "comparable" in terms of level of economic development (*i.e.*, the terms "same" and "comparable" are not equivalent in this context).[98]

Finally, we note that the Court has recently upheld Commerce's continued use of the 2010 Thai data as a source for land benchmarks in an investigation covering calendar year 2019,[99] a period two years later than the 2017 POR underlying this review.  The Court noted that, "{i}n view of the deference the court owes to {Commerce} on this most technical subject, the court sustains the land benchmarking approach used in Commerce's final determination."[100]

**Issue 3:  Ocean Freight Benchmark**

*JA Solar's Comments*

- Commerce fails to adequately address the flaws identified by the Court in the Descartes data.  Specifically, the Court noted that the Descartes data appear to be sourced from limited

---

[97] *See Solar Cells AD Preliminary Results* PDM at 14-15 (explaining that Thailand is not at the *same* level of economic development as China, but allowing that it may still be at a comparable level of economic development); *see also Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 85 FR 5384 (January 30, 2020), and accompanying PDM, at 46 (distinguishing between countries at the same and at comparable levels of economic development).
[98] *Id.*
[99] *See Fujian Yinfeng* at 19-20.
[100] *Id.* at 20.

samples because many of the shipments use the same tariff codes and freight forwarder codes and are for less than a full container load.[101]

- To avoid overvaluing ocean freight data from U.S. ports, Commerce correctly determined to average the petitioner's U.S. route values with the respondents' U.S. route values before averaging the results with the respondents' values for other global routes. However, Commerce's Excel formulas fail to recalculate the rates accordingly.[102]

*Risen's Comments*

- Commerce failed to properly recalculate the ocean freight rates to avoid overvaluing ocean freight data for U.S. ports, as the Court suggested. Commerce should recalculate the ocean freight rates for the final remand results so that U.S. route values are only counted once in the final average.[103]

- Commerce failed to address adequately the flaws in the Descartes data identified by the Court.[104]

**Commerce's Position:**

We continue to believe that we have provided an adequate explanation for accepting the Descartes data despite the two concerns identified by Risen and the Court. Relying on the "hypothetical importer" standard discussed in the Draft Remand Results, there is no evidence on the record that a hypothetical importer would, as a rule, buy only full container loads; in contrast, evidence on the record appears to contradict this assertion. We also noted there was no reason to conclude that the tariff codes or freight forwarder codes indicated in the Descartes data indicate a shipment method that an importer of the materials at issue would be unlikely to use. While JA

---

[101] *See* JA Solar Comments at 8.
[102] *Id.* at 8-9.
[103] *See* Risen Comments at 8.
[104] *Id.* at 8-10.

Solar and Risen appear to suggest that our conclusions are based on speculation, there is no record information supporting the contrary conclusions either.  In other words, there is no record information suggesting importers of the raw materials at issue only buy full containers or that the tariff codes or freight forwarder codes in the Descartes data represent anomalous shipping methods or prices.[105]

Regarding parties' arguments that our recalculations for ocean freight in the Draft Remand Results contain errors, we agree.  Our intent was to average all the U.S. route data provided by the petitioner and then average the result with the U.S. route data provided by Risen, leaving one U.S. value to be averaged with the values for other global destinations.  However, instead, we calculated one U.S. route value for the petitioner's data and one U.S. route value for Risen's data, and then averaged them both with the remaining global values.  For these final results of redetermination, we have corrected this error, using only one U.S. value in the final benchmark calculation.

## V.   FINAL RESULTS OF REDETERMINATION

Pursuant to the *Remand Order*, we have reconsidered our findings in the five programs at issue (*i.e.*, the EBCP, and the land, aluminum extrusions, solar grade polysilicon, and solar glass for LTAR programs).  We now find the EBCP to be not used for one of the two respondents in this review, JA Solar, pursuant to our verification of the loan information provided by JA Solar.  We have, therefore, removed the EBCP rate from JA Solar's total subsidy rate calculation.  Because Risen was unable to provide all lending information needed to verify its claims of non-use, we have made no changes to Risen's rate for the EBCP.  Further, pursuant to the Court's *Remand Order*, we have recalculated the benefits provided by the provision of land for LTAR using an average of the

---

[105] Commerce examined the purchase templates provided by both JA Solar and Risen for aluminum extrusions, solar glass, and solar grade polysilicon and found numerous instances of purchases far less than a full container load (*i.e.*, far less than 20,000 kilograms).  These data do not appear to support the respondents' argument that benchmarks of less than a full container load are inappropriate.

2010 Thai land values and more recent Malaysian values.  We have also explained why Thailand and Malaysia are the most reasonable sources of land values on the record and why we continue to rely on benchmarks for land instead of benchmarks for land plus factories and warehouses.  Finally, pursuant to the Court's *Remand Order*, we have recalculated the benchmark for ocean freight to correct the bias in favor of U.S. routes and have also recalculated the subsidy rates for the three LTAR programs that rely on an ocean freight benchmark.  In response to comments received on the Draft Remand Results, we have corrected a clerical error in the revised ocean freight calculation.  If these final results of redetermination are affirmed by the Court, we intend to issue amended final results providing the updated subsidy rates below:

| Company Name | Program | Subsidy Rate in *Amended Final Results* (percent *ad valorem*) | Subsidy Rate Pursuant to Redetermination (percent *ad valorem*) |
|---|---|---|---|
| JA Solar | EBCP | 5.46 | 0.00 |
| | Aluminum Extrusions for LTAR | 0.00 | 0.00 |
| | Solar Grade Polysilicon for LTAR | 0.12 | 0.11 |
| | Solar Glass for LTAR | 5.01 | 3.71 |
| | Land for LTAR | 0.43 | 0.37 |
| | Other Subsidy Programs | 3.41 | 3.41 |
| | Total CVD Rate | 14.43 | 7.60 |

|  | EBCP | 5.46 | 5.46 |
|---|---|---|---|
| Risen | Aluminum Extrusions for LTAR | 0.01 | 0.01 |
|  | Solar Glass for LTAR | 3.06 | 2.08 |
|  | Solar Grade Polysilicon for LTAR | 0.00 | 0.00 |
|  | Land for LTAR | 0.29 | 0.25 |
|  | Other Subsidy Programs | 2.04 | 2.04 |
|  | Total CVD Rate | 10.86 | 9.84 |
| Non-Selected Companies | Total CVD Rate | 11.97 | 9.14 |

10/6/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance