UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD. <br>                 Plaintiff, <br><br> JINGAO SOLAR CO., LTD.., ET AL., <br>                 Consolidated Plaintiffs, <br><br>    and <br><br> SHANGHAI BYD CO., LTD., TRINA SOLAR <br> CO., LTD., ET AL., <br>                 Plaintiff-Intervenors, <br>    v. <br><br> UNITED STATES, <br>                 Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )        **PUBLIC VERSION** <br>        Consol. Court No. 20-3912 |

## <u>PLAINTIFF'S COMMENTS ON REMAND REDETERMINATION</u>

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: November 7, 2022

# TABLE OF CONTENTS

I.     The Department's Application of The EBC Countervailing Duty Program to Risen Is Unsupported By Record Evidence And Contrary to Law..........................1

II.    The Department's Reliance on the 2010 Land Benchmark is Not Supported by Substantial Evidence.....................................................................................8

III.   The Department's Calculation of the Ocean Freight Benchmark is Not Supported by Substantial Evidence ............................................................................9

IV.   Conclusion ...................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326 (Ct. Int'l Trade 2019) .......... 6

*Canadian Solar Int'l Ltd. v. United States*, 378 F. Supp. 3d 1292 (Ct. Int'l Trade 2019) .......... 6

*Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ................................................................................................................................ 2

*Dalian Meisen Woodworking Co. v. United States*, 2022 Ct. Intl. Trade LEXIS 52 .............. 3-4

*Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) ........... 7

*Diamond Sawblades Manufacturers' Coalition v. United States*, 547 F. Supp. 3d 1323 (Ct Int'l Trade 2021) ............................................................................................................ 7-8

*Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) .................... 2

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ............................................................................................................. 3

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224 (2021) . 4

*Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331 (Ct. Int'l Trade 2020) ................. 5-6

**Statute**

19 U.S.C. § 1677e(a) ......................................................................................................... 7-8

Plaintiff Risen Energy Co., Ltd. ("Risen") hereby files comments on the Department's

Remand Results. *See* Remand Results (October 7, 2022); ECF 93; *see also* Slip Op. 22-44 (CIT

May 12, 2022).  The Court remanded three issues: 1) the application of AFA to the EBC

program, 2) the land benchmark selection, and 3) the ocean freight benchmark selection.

I.      **The Department's Application of The EBC Countervailing Duty Program to Risen
        Is Unsupported By Record Evidence And Contrary to Law.**

After briefing and oral argument supporting the Department's application of AFA to this

program, the government then requested remand on the issue.  This Court criticized the cyclical

scenario seen in multiple cases where the Court remands the government's position that it cannot

conduct verification of respondents' proof of non-use, then under protest the government

removes the EBC program, but makes no appeal to the CAFC and no changes to its position

during review and investigation at the agency level—resulting in an "untenable and inequitable"

situation with the "continual collection of deposits which are not owed."  Slip. Op. 22-44 at 5.

The Court granted the government's request for remand, ordering the government to either

attempt verification or if deciding to remove the EBC program without intention to appeal to

explain why the Court should not provide some form of equitable relief.  *Id.*

On remand, the Department issued a supplemental questionnaire on the EBC program.

The questionnaire requested information from the respondents' customers on all loans/financing

outstanding during the POR information on how the customers confirmed they did not receive

export buyer's credits, and further questions on the EBC program if the customer did benefit.

Risen reached out to its [          ] customers and was able to obtain cooperation and responses

from customers covering [          ], or approximately 95%, of its POR sales by value.  *See* Risen

EBC Questionnaire (July 8, 2022) at 1, Rem. CR2-4, Rem. PR8; *see also* Depcom Questionnaire (July 6, 2022), Rem. CR1, Rem. PR11.

Despite these best efforts and the substantial additional information on the record which only supported the customer's statements all along that they did not apply, use, or benefit from the EBC program, the Department found that because not *all* of Risen's customers provided a questionnaire response, "the company information on the record with regard to Risen's use of the EBCP remains incomplete and unverified and, thus, insufficient to compensate for the existing record deficiencies stemming from the GOC's withholding of necessary information." Remand Results at 8.

Risen maintains that the record *does* contain sufficient information to verify non-use of EBC by its customers. The Department's insistence that it needed complete responses from *all* customers to attempt to verify *any* non-use is not reasonable and does not consider the record as a whole. As this Court has found in numerous appeals of this issue, the declarations provided by the U.S. customers demonstrate non-use and the record lacks evidence to the contrary. *Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312, 1318 (Ct. Int'l Trade 2017) ("In light of the customer declarations provided by JA Solar certifying non-use of the program and the lack of evidence to the contrary, the mere possibility that one of JA Solar's customers participated in the program is not enough…"); *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346, 1350-1352 (Ct. Int'l Trade 2019) (Summarizing past decisions on this issue). The additional information on this record, from customers representing 95% of Risen's POR sales, only constitutes additional evidence of non-use. It is still the case that nothing on the record suggests U.S. buyer use of the EBC Program.

For example, Customer C, [                    ], responded to the questionnaire and its

purchases represented [      ]% of Risen's sales.  Risen EBC Qre at Exhibit 7.  The company

explained that it had [                                    ] not related to the EBC program

or the EXIM Bank.  The company explained how it verified with its accounting and financing

team and its financial accounting system that it had received nothing related to the EBC program.

Likewise Customer A, [                    ], responded to the questionnaire and its purchases

represented [     ]% of Risen's sales.  *See* Risen EBC Qre at Exhibit 5. The Treasurer of the

company signed a statement explaining that the company [

                    ].

Each of the cooperating customers' responses is corroborating evidence of all of the

customers' declarations that they did not benefit from the EBC program.  No evidence to the

contrary is on the record. Moreover, the Department has not explained why it cannot verify non-

use of the information on the record.  The Court was critical of the Department's blanket

dismissal of record evidence from the cooperating respondents, and here again, the Department

is doing the same.  *See Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp.

3d 1317, 1333-34 (Ct. Int'l Trade 2019) (The Court instructed the Department to "consider what

information could be verified that would show non-use" and emphasized that "effort should be

made to avoid the collateral consequences to cooperating parties of another's non-cooperation.").

Further, the Department should have considered the substantial information Risen did

obtain in conjunction with the maximum efforts that Risen put forward to obtain this

information.  The responses of the cooperative customers, which again consist of a substantial

percentage of the POR sales, should be deemed representative of the entire pool of POR

customers.  Risen reached out to its customers multiple times requesting this information and

offering various ways for the companies to respond or work with Risen's U.S. Counsel. Risen EBC Qre at Exhibit 2. After several rounds of efforts, Risen was able to obtain responses from customers accounting for 95% of Risen's U.S. sales in 2017. *Dalian Meisen Woodworking Co. v. United States*, 2022 Ct. Intl. Trade LEXIS 52, *16 (Discussing the EBC program and reminding the Department that the "application of an adverse inference is based on a respondent's efforts to comply with Commerce's requests for information. The purpose of the application of adverse facts available is to encourage respondents to comply with Commerce's requests.") *citing Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224, 1239-40 (2021). The cooperation efforts must also be considered in light of the particular facts of this case where the Department is requesting information from Risen's customers *from five years ago*.

The Department claims that it "cannot verify non-usage of the program by only a portion of Risen's importers/customers because doing so would provide Risen an opportunity to evade Commerce's scrutiny by providing responses only from importers/customers that have not used the EBC." Remand Results at 9. Risen was able to provide information from customers representing approximately 95% of its sales; this is not cherry-picking. Risen is not evading scrutiny when the overwhelming majority of its customers have responded. Moreover, Risen received certain information from [          ] customers that did not provide questionnaire responses. Risen EBC Qre at Exhibit 2. [          ] explained that its loans outstanding in 2017 had nothing to do with the EBC program or Risen. [          ] responded that it did not use any financing for its payments to Risen. *Id.* The remaining [          ] customers represent only [    ]% of Risen's sales. *Id*. at Exhibit 1.

For the customers that did not respond to this EBC questionnaire, Risen submits that the Department failed to consider that their business with Risen was very small and took place more than five years ago. The U.S. Customers were also not even the POR importers of record; [

], and therefore the POR buyers do not even have an interest in the review results in terms of liquidation rates. And again, it is not that the record lacks evidence of non-use. The record does have certifications of non-use from all customers, including the handful of small volume buyers that did not respond to the Department's supplemental questionnaire. Therefore, the only evidence on the record concerning this program is of non-use. Nonetheless, the Department insists inexplicitly that there is a gap on the record (namely the additional information from less than 5% of Risen's POR customer base) that prevents the Department from verifying the statements of non-use from any customers. Remand Results at 20.

Although Risen was unable to submit full and complete responses for all of its POR U.S. customers, Risen put forth the maximum effort to obtain the information requested by the Department. Responses from the cooperative customers consist of a very substantial percentage of sales and should be deemed representative of the entire pool of POR customers.

This situation is comparable to the *Solar Cells from China Antidumping* litigation, where time after time the Court has criticized the Department for penalizing cooperative respondents for some deficiency or failure to respond by unaffiliated entities with some connection to the response (where the Court overturned the Department's adverse inferences in connection with unaffiliated solar cell providers who did not supply their own factors of production to the mandatory respondents). For example, in a recent opinion addressing Risen (also a mandatory respondent on the antidumping proceeding) specifically, the Court found the Department's past

justification of applying AFA to the cooperating Risen wholly unreasonable and unsupported by

the statute and caselaw:

> Commerce's determination is unsupported by substantial evidence. The evidence that Commerce cites does not support its claim that using partial AFA furthers its policy objectives. Regarding the threat of duty evasion, unlike the supplier at issue in Mueller, the unaffiliated suppliers in this case are not mandatory respondents refusing to participate in the review, *see Mueller*, 753 F.3d at 1229-30, 1235, and Commerce does not point to substantial evidence to otherwise support its concern that the unaffiliated suppliers intend to evade their own potential duties by exporting subject merchandise into the U.S. through Risen. *See id*. Moreover, regarding Commerce's aim of deterring non-cooperation, Commerce cites no evidence of a mechanism or relationship that Risen could use to induce the cooperation of their unaffiliated suppliers. *Compare id*., 753 F.3d at 1234-35 (explaining how Commerce's policy objective of inducing cooperation may be advanced where there is an existing relationship between the mandatory respondent and uncooperative supplier) with Final Decision Memo at 13 (determining that a plausible threat that the mandatory respondent may refuse to purchase subject merchandise from the suppliers is sufficient to induce cooperation). Commerce observes that Risen is a large producer that may refuse to purchase subject merchandise from the non-cooperating, unaffiliated suppliers, see id. at 12, but such observations do not demonstrate that Risen had leverage over its unaffiliated suppliers under a more searching § 1677e(a) analysis.
>
> Commerce also fails to adhere to Mueller's emphasis on accuracy above all else. *See Mueller*, 753 F.3d at 1233… Commerce does not cite record evidence that using the highest FOP consumption rates on the record result in accurate dumping margins for Risen. *See Mueller*, 753 F.3d at 1232-33.

*Risen Energy Co. v. United States*, 477 F. Supp. 3d 1331, 1343-44 (Ct. Int'l Trade 2020).

Indeed, the Court has a growing body of caselaw rejecting all of the Department's reasoning for

applying AFA under these circumstances. *See also Canadian Solar Int'l Ltd. v. United States*,

415 F. Supp. 3d 1326 (Ct. Int'l Trade 2019); *Canadian Solar Int'l Ltd. v. United States*, 378 F.

Supp. 3d 1292 (Ct. Int'l Trade 2019). Therefore, AFA for the unreported EBC Program

supplemental questionnaire is not defensible in light of Court precedent and the record of Risen's

cooperation in this segment.

In the worst case, the Department should have accepted all the affirmative responses as they preclude a conclusion that those buyers used the EBC Program. Indeed, for JA Solar, the Department accepted the questionnaire response from its [      ] customer and found non-use of the program by JA Solar. Remand Results at 6-7. The Department thus must make the same finding with respect to Risen's customers that provided questionnaire responses.

Risen argued that the Department should weight-average the dollar value of their purchases reported by Risen with the dollar value of the non-responding U.S. customers and thus reduce the EBC deposit rate assigned. The Department claims this is not appropriate because it does not know the size of the subsidies received by the customers, but the Department does know the percentage of sales to these customers and does have its AFA rate for this program (5.46%) and therefore can certainly calculate a rate in the manner proposed below. Remand Results at 20. The Department also rejects this proposition on the mere premise that it is not normal Department practice. *Id*. However, this is a unique program that is being applied in a wholly unique way based on suppositions about third-parties in the United States that to Risen's knowledge have never benefited from the EBC program. Accordingly, it is appropriate to apply a different methodology to a such different type of subsidy program. To do otherwise runs afoul of the AFA statute because there are no gaps in the record for the responding U.S. buyers and they did cooperate to the best of their ability, as explained below.

For those [    ]% of Risen's sales, the Department received requested and verifiable information from Risen's customers. The Department cannot use "facts otherwise available" under 19 U.S.C. § 1677e(a) or apply adverse inference under § 1677e(b) because necessary information is not missing from the record. To comply with the statute and to act reasonably (i.e. not arbitrarily given its approach to JA Solar), for instance, as [    ]% of Risen's buyers

responded, the Department should at worst apply an EBC deposit rate of 5.46% x [

    ]%.  Such a determination would account for the fact that the Department has no basis to

apply facts available to at least [    ]% of the data because no necessary information is missing.

*Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351, 1366-1367 (Fed. Cir.

2021) (finding the Department's application of AFA to the entire sales database was not

supported by substantial evidence when the missing information only involved 2.5% of the

sales.); *see also Diamond Sawblades Manufacturers' Coalition v. United States*, 547 F. Supp. 3d

1323 (Ct Int'l Trade 2021) (Upholding the Department's application of AFA to only the 2.5% of

the sales).

In light of the foregoing, the Department's Remand Results are not supported by

substantial evidence and are an otherwise unreasonable approach to verifying non-use of a

program by unaffiliated customers.  Risen respectfully requests that this Court remand the

determination to the Department and order the Department to find non-use of the Export Buyer's

Credit Program overall or make a reasonable attempt to use the information on the record as

proposed by Risen.

II.     **The Department's Reliance on the 2010 Land Benchmark is Not Supported by
        Substantial Evidence.**

The Court remanded the Department's reliance on a non-contemporaneous benchmark

and non-contemporaneous comparability metrics while the Department rejected more

contemporaneous land benchmarks from countries considered economically comparable in the

antidumping proceeding.  On remand, the Department reopened the record and placed Malaysian

land values as well additional information on the comparability of Malaysia and Thailand to

China on the record.  The Department then determined to rely on a simple average of the

Malaysian and Thai land values.  Remand Results at 12.  The Malaysian land values on the

record are contemporaneous with the POR and prior few years. The Thai land values are from

2010. The Department's determination to rely on both datasets continues to fail to consider the

importance of contemporaneity. Risen requests that the Court remand again because the

Department has failed to justify its reliance on the Thai 2010 values.

## III. The Department's Calculation of the Ocean Freight Benchmark is Not Supported by Substantial Evidence.

The Court remanded the Department's reliance on the Descartes freight data as well as

the Department's methodology for averaging the freight data. On remand, the Department

adjusted its averaging of the shipping rate and agreed to exclude freight rates that included inland

freight. Remand Results at 14. After commenting on the Draft Remand Results, the Department

further adjusted its calculation methodology to better arrive at a world market price. *Id*. At 24-

25. However, the Department's remand still does not fully comply with the Court's order to

discuss the identified flaws with the Descartes data.

While the Department properly excluded the inland routes to Chicago and Atlanta, the

Department has not fully considered the flaws in the Descartes data. The Court itself noted how

much higher the Descartes data rates are and apparent flaws in the dataset generally. Slip Op.

22-44 at 15-16. Risen submits that the Descartes data is not representative and should be

excluded all together. The Descartes data provided are from only one actual rate from only one

company that has not even been updated to consider any prevailing contemporaneous market

conditions. The same code for the rate and the same freight forwarder code appears on each

Descartes printout—i.e. it is only one rate for glass, one rate of aluminum, and one rate for

polysilicon. Notably, for the Descartes routes upon which the Department is now relying on

remand, the petitioner did not provide a "Rate Detail" sheet where information on when the route

was first filed and the details of the routing is provided. *See* Pet. Benchmarks at Exhibit 7

(where the Rate Detail was provided for some routes), PR170.  The "Rate Details" provide the first date that the rate was effective, which, for the routes where it was provided, were from 2008—almost ten years prior to the POR.  Therefore, it is uncertain when the Descartes rates the Department relied upon first became effective.  In contrast the Xeneta data rates are based on several hundred rates per day of the POR.  The wide breadth of collected data on a daily basis, based on numerous carriers makes the Xeneta data by far the most reflective of prevailing market conditions for freight.

Moreover, the glass Descartes freight is for less than a container load, as evidenced by the "LTL" on each calculation sheet.  Less than a container load shipments are not commercial shipments.  LTL shipments are more expensive; such shipments must be consolidated with other shipments and incur additional attendant costs.  The Descartes data for glass must be excluded for this reason.  It is not a normal prevailing market condition to ship in small container loads. Further, the aluminum Descartes data is on a "M" basis and "SS" service, but the record does not provide what this entails or other potentially important details about this rate as noted above. Likewise, the polysilicon Descartes data is on an "LS" basis and "DO" service.  Given the lack of information and very limited nature of the Descartes data, it is only reasonable that this data should also be excluded.  Only the Xeneta data fulfills the Department's requirements for ocean freight data.  The Court should find that the Department's ocean freight benchmark selection remains unsupported by substantial evidence in connection with what constitutes the best available information for this benchmark.

**IV.     Conclusion**

In light of the foregoing, the Department's Remand Results are not supported by substantial evidence and are an otherwise unreasonable approach to verifying non-use of a program by unaffiliated customers.  Risen respectfully requests that this Court remand the determination to the Department and order the Department to find non-use of the Export Buyer's Credit Program or make a reasonable attempt to use the information on the record as proposed by Risen.  The Court should also find that the Department's land and ocean freight benchmark selections are not supported by substantial evidence.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Date: November 7, 2022

*Admitted to California Bar; practice supervised by
attorneys of the firm who are active D.C. Bar
members pursuant to D.C. Bar Rule 49(c)(8)

### Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **3,262** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*