C-570-980
Remand
Slip Op. 23-48
POR: 01/01/2017 – 12/31/2017
~~Business Proprietary Information~~
E&C/OVII: GHC
**Public Version**

***Risen Energy Co., Ltd. et al. v. United States*,**
**Consol. Court No. 20-03912; Slip Op. 23-48 (CIT April 11, 2023)**
**Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the**
**People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court) in *Risen Energy Co., Ltd. et al. v United States*, Consol. Court No. 20-03912, Slip Op. 23-48 (CIT April 11, 2023) (*Second Remand Order*).  These final results of redetermination concern the 2017 administrative review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells), from the People's Republic of China (China).[1]  Specifically, these final results of redetermination concern the *Remand Results*, wherein Commerce:  (1) continued to find that Risen Energy Co., Ltd. (Risen) used the Export Buyer's Credit program (EBCP); (2) reconsidered its exclusive reliance on 2010 data from Thailand in determining a tier three benchmark for the provision of land for less than adequate remuneration (LTAR) and recalculated this benchmark by relying on

---

[1] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 79163 (December 9, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).  On April 2, 2021, Commerce published *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Notice of Amended Final Results of the 2017 Countervailing Duty Administrative Review*, 86 FR 17356 (April 2, 2021), correcting certain ministerial errors made in the calculations of the subsidy rates determined in the *Final Results*.

an average of the Thai data and Malaysian data placed on the record of this remand; and (3)

recalculated the benchmark for ocean freight, which is used in several subsidy calculations

involving the provision of goods for LTAR, to adjust for the overreliance on data related to the

United States-to-China route.[2]

On May 12, 2022, the Court remanded certain aspects of the *Remand Results* to

Commerce for further consideration.[3]  First, the Court ordered Commerce to attempt to verify

Risen's importers/customers to the extent Commerce finds appropriate and, if successful, to

either apply a *pro rata* program rate adjustment to Risen's questionnaire responses or to find that

Risen did not use the EBCP.  The Court also ordered Commerce to provide a compelling reason

for its continued use of Thai land price data from the 2010 CBRE Report or otherwise only use

Malaysian Land Values data.  Finally, the Court instructed Commerce to provide "a convincing

reason as to why the Descartes data improves accuracy" for the ocean freight, or to not use it

when constructing its ocean freight benchmark.

On June 23, 2023, we issued the Draft Remand Results, and reconsidered our findings

regarding the subjects at issue (*i.e.*, Risen's usage of the EBCP, Commerce's explanation for

continuing to use Thai land price data when constructing its land benchmark, and Commerce's

use of the Descartes ocean freight data in its ocean freight benchmark).[4]  First, because

Commerce is not able to verify non-use for all of Risen's U.S. sales for the January 1, 2017,

through December 31, 2017, period of review (POR), we made no changes to Risen's program

---

[2] *See Risen Energy Co., Ltd. v United States*, 570 F. Supp. 3d 1369 (CIT 2022) (*First Remand Order*); *see also Final Results of Redetermination Pursuant to Court Remand, Risen Energy Co., Ltd. v. United States*, Consol. Court No. 20-03912, Slip Op. 22-44 (CIT May 12, 2022), dated October 6, 2022 (*Remand Results*), available at https://access.trade.gov/resources/remands/22-44.pdf.
[3] *See Second Remand Order*.
[4] *See* "Draft Results of Redetermination Pursuant to Court Remand, *Risen Energy Co., Ltd. et al. v. United States*, Consol. Court No. 20-03912; Slip Op. 23-48 (CIT April 11, 2023)," dated June 23, 2023 (Draft Remand Results).

rate for the EBCP.[5]  Further, we provided a "compelling" explanation for why it is appropriate to continue to rely on Thai land prices from 2010 CB Richard Ellis when calculating the benefits for certain of JA Solar's and Risen's land purchases, and we recalculated the respondents' benefits from this program as appropriate.[6]  Finally, pursuant to the Court's order, we recalculated the benchmark for ocean freight by removing prices sourced from the Descartes data.[7]  We otherwise made no changes to the Draft Remand Results, for which our analysis is repeated below.  We have responded to all comments from parties after the Final Analysis section, below.

## II.    FINAL ANALYSIS

### 1.   **Export Buyer's Credit Program**

In the *Final Results*, Commerce relied on adverse facts available (AFA) in finding that both respondents (*i.e.*, JA Solar Co., Ltd. (JA Solar) and Risen) benefited from the EBCP as a result of the failure to cooperate by the Government of China (GOC), notwithstanding the submission of non-use declarations from the respondents' customers.  In the *First Remand Order*, the Court granted Commerce's request to reconsider the application of AFA for this program and ordered Commerce to attempt to verify the responses of JA Solar and Risen to the extent possible.[8]  On remand, Commerce reopened the record and issued supplemental EBCP questionnaires to JA Solar and Risen.  In the *Remand Results*, Commerce concluded that JA Solar provided complete information on behalf of its sole importer/customer in response to the EBCP questionnaire.[9]  Given that JA Solar provided complete information from its sole

---

[5] *Id*. at 12.
[6] *Id*. at 6-10, and at 12.
[7] *Id*. at 10-12.
[8] *See First Remand Order* at 5.
[9] *See Remand Results* at 6-7.

importer/customer, Commerce conducted verification of this customer's information. Based on a satisfactory verification of JA Solar's response to the EBCP questionnaire, Commerce concluded that the record, on remand, did not contradict JA Solar's claimed non-use of the program, while also maintaining that the GOC's cooperation is necessary for a true understanding of the EBCP.[10] As a result, Commerce found it appropriate to remove the EBCP subsidy rate from JA Solar's total *ad valorem* rate.[11]

Unlike JA Solar (which was able to provide complete information on behalf of its sole importer/customer), Risen provided requested information on behalf of six of 12 U.S. customers, stating that these six customers are responsible for over 94 percent of its U.S. sales during the POR.[12] In the *Remand Results*, Commerce stated that because "Risen was unable to provide complete information for all of its importers/customers, the record continues to contain evidentiary gaps whether certain U.S. importers/customers of Risen used the EBCP."**[13]** Commerce stated further that it "requires information regarding *all* of a respondent's U.S. importers/customers in order to ensure that *none* {emphasis added} of those importers/customers have received benefits under the EBCP."[14] As a result of Risen's inability to provide complete information regarding its customers' usage of the EBCP, Commerce again found that Risen used this program consequent to the AFA applied on the GOC.[15]

Risen disagreed, arguing that: (1) Risen is not affiliated with the U.S. customers who failed to comply with Commerce's request for information; (2) its relationships with the

---

[10] *Id*.
[11] *Id*.
[12] *Id*. at 7-9; *see also* Risen's Letter, "EBC Supplemental Questionnaire," dated July 8, 2022; and DEPCOM Power, Inc.'s Letter, "Export Buyer's Credit Supplemental Questionnaire," dated July 6, 2022 (a response submitted separately by a customer of Risen) (collectively, Risen's EBCP QR).
[13] *See Remand Results* at 8.
[14] *Id.* at 7-9.
[15] *Id*.

customers at issue were several years in the past; and (3) the responses it did provide should be deemed representative of its overall customer base and, therefore, Risen has fully complied to the best of its ability.[16]

In the *Second Remand Order*, the Court remanded the *Remand Results* with respect to the EBCP, holding that Commerce's findings were unsupported by substantial evidence.[17]  The Court identified three reasons for its holding:  (1) all of Risen's customers' non-use certifications were already on the record of the proceeding; (2) the EBCP questionnaire response that Risen was able to provide from its importers/customers accounted for 95 percent of its POR U.S. sales; and (3) Risen cooperated with Commerce's requests for information and, given the length of time between the *First Remand Order* and the underlying administrative review, Risen had no way to receive questionnaire responses from all of its customers.[18]

On remand, the Court ordered Commerce to attempt to verify Risen's importers/customers to the extent Commerce finds appropriate and, if successful, to either apply a *pro rata* program rate adjustment to Risen's questionnaire responses or to find that Risen did not use the EBCP.[19]  Pursuant to the Court's order, Commerce reached out to Risen to gauge its U.S. customers' availability for verification.[20]  In response, Risen informed Commerce that all of its importers/customers consented to verification except for [

].[21]  Commerce's review of the record leads it to conclude that [                  ], the sole importer/customer that declined to be verified by Commerce, accounted for approximately [   ]

---

[16] *Id.*
[17] *See Second Remand Order* at 4-11.
[18] *Id.*
[19] *Id.* at 11.
[20] *See* Memorandum, Microsoft Teams Call with Counsel to Risen Energy Co., Ltd., dated May 1, 2023.
[21] *See* Risen's Letters, "Risen EBC Verification Information," dated May 16, 2023 (Risen EBCP Verification Information); and "Risen EBC Verification Information," dated May 17, 2023.  Some of Risen's U.S. importers/customers timely responded separately to Commerce's request for verification information.

percent of Risen's U.S. sales for the POR.[22]  As a result, because Commerce is not able to verify

non-use for all of Risen's U.S. sales for the POR (specifically, Commerce is not able to verify

non-use for approximately [   ] percent of Risen's U.S. sales), Commerce decided not to proceed

with verification of Risen's U.S. importers/customers.  Thus, Commerce cannot verify Risen's

claim of non-usage of the EBCP.  Commerce explained in the *Remand Results* that it cannot

verify non-usage of this program by only a portion of Risen's importers/customers, because

doing so would provide Risen with an opportunity to evade Commerce's scrutiny by providing

responses only from importers/customers that have not used the EBCP.[23]  The record now

contains an even larger evidentiary gap than in the first *Remand Results*.  The approximately [   ]

percent of U.S. sales for which the record is incomplete and unverified exceeds the

approximately five percent at issue earlier in this proceeding.  Therefore, Commerce finds that

the company information on the record is insufficient to compensate for the deficiencies that

stem from the GOC's withholding of necessary requested information.  Accordingly, for these

final remand results of redetermination, Commerce continues to find that AFA is warranted in

finding that Risen used the EBCP during the POR.

Commerce continues to emphasize that it is not applying AFA to Risen as a result of the

failure to cooperate by its customers/importers.  Instead, as in the case of respondent JA Solar,

the information that a respondent provides, if complete, may "fill the gaps" which stem from the

GOC's failure to cooperate (for which Commerce is applying AFA).[24]  Therefore, and as

Commerce stated in the *Remand Results*, whether Risen was cooperative in its attempts at

---

[22] *See* Risen EBCP Verification Information at Exhibit 2 (where [            ] declined Commerce's request for verification); *see also* Risen's Letter, "EBC Supplemental Questionnaire," dated July 8, 2022, at Exhibit 1 (showing that [            ] accounted for approximately [   ] percent of Risen's U.S. POR sales, by quantity).
[23] *See Remand Results* at 9.
[24] *Id.*

procuring information from its importers/customers is irrelevant; rather, what is relevant is that the information that Risen did provide was insufficient to establish that each of Risen's customers, and therefore Risen, did not use the EBCP during the POR.

With respect to Commerce calculating a *pro rata* adjustment for Risen regarding the EBCP, upon remand, the Court ordered Commerce to "attempt to verify Risen's submissions to the extent Commerce finds appropriate, *and if that is successful* {emphasis added}, it should either accept the *pro rata* adjustment sought by Risen or conclude that the EBCP was not used at all."[25]  As detailed above, [                    ], which accounted for [  ] percent of Risen's U.S. sales during the POR, declined Commerce's request for verification regarding the EBCP.  Because Commerce cannot verify information regarding [  ] percent of Risen's U.S. sales for the POR,[26] Commerce declined to conduct verification of any of Risen's submissions regarding the EBCP. Thus, Commerce concludes that, because verification of Risen's submissions was not successful within the meaning of the Court's instructions, it is not necessary or appropriate here to apply a *pro rata* adjustment as sought by Risen or conclude that Risen did not use the EBCP.

## 2. <u>Tier Three Benchmark for the Provision of Land for LTAR</u>

In the *First Remand Order*, the Court remanded Commerce's benefit calculations for the provision of land for LTAR.  Specifically, the Court ordered Commerce to:  (1) reconsider or further explain its reliance on geographic proximity in its land benchmark analysis; (2) consider whether land values in Thailand remain a suitable benchmark to determine the value of Chinese land; and (3) provide a more robust explanation for why it rejected the Nexus Innovative Real Estate Solutions rental pricing data (Nexus Reports) in developing its land for LTAR

---

[25] *See Second Remand Order* at 11.
[26] Risen submitted responses to the EBCP supplemental questionnaire covering 95 percent of its POR U.S. sales, which included sales to [                    ] that accounted for [  ] percent of these sales.  Combining [
          ] sales of [  ] percent with the five percent of sales unaccounted for in Risen's EBCP QR equals [  ] percent.

benchmark.[27]  Commerce responded to the Court's request and attempted to address these issues

in the *Remand Results*.[28]  With respect to the Court's instructions for Commerce to consider

whether the land values in Thailand remain a suitable benchmark for valuing Chinese land,

Commerce first attempted to address the Court's concerns by averaging Thai land prices from the

2010 Coldwell Banker Richard Ellis Asian Marketview Report (2010 CBRE Report), indexed for

inflation, with Malaysian land prices from the Malaysian Investment Development Authority

Cost of Doing Business Report (Malaysian Land Values).[29]

     In the *Second Remand Order*, the Court stated that it was no longer addressing arguments

regarding geographic proximity or Commerce's rejection of the Nexus Reports in developing the

land for LTAR benchmark.[30]  On remand, the Court ordered Commerce to provide a compelling

reason for its continued use of Thai land price data from the 2010 CBRE Report or otherwise

only use Malaysian Land Values data.[31]  In its ruling, the Court indicated that it is concerned that

the Thai data in the 2010 CBRE Report are relatively "stale" for purposes of developing the land

for LTAR benchmark.[32]  As instructed by the Court, we explain the reasons for Commerce's

continued use of the Thai land price data as a source for the land benchmark, addressing the issue

of contemporaneity of data sources on the record.

     As an initial matter, when allocating non-recurring subsidies, contemporaneity is

identified in Commerce's regulations with reference to the year in which the subsidy is approved

(*e.g.*, when identifying a discount rate for purposes of allocating a non-recurring subsidy).  In

particular, pursuant to 19 CFR 351.524(d)(3), Commerce will "select a discount rate based on the

---

[27] *See First Remand Order* at 11.
[28] *See Remand Results* at 9-13.
[29] *Id*. at 11.
[30] *See Second Remand Order* at 12 (footnote 3).
[31] *Id*. at 11-14.
[32] *Id*.

data for the year in which the government agreed to provide the subsidy."  Additionally, in identifying a land for LTAR benchmark, Commerce's practice is to look to the year in which the land-use rights were acquired from the government, and the terms of the acquisition (reflecting land values and prices for the year) were set, to determine the appropriate time period for calculating the land benchmark.[33]  The Court has acknowledged this practice.[34]  Thus, for purposes of identifying a land for LTAR benchmark in China, under Commerce's regulations and practice, we must determine when the producer/exporter acquired the land-use rights from the GOC and seek benchmark information that is contemporaneous with the year(s) of acquisition. In other words, the appropriate methodology for calculating land benchmarks is to index land prices to the date of the purchase of the land-use rights rather than to the POR.  The land-use rights in question were purchased by JA Solar between the years [      ] and [      ],[35] and by Risen between [      ] and [      ].[36]  Thus, certain indexed Thai land prices in the 2010 CBRE Report are not "stale" and are, therefore, suitable for purposes of establishing appropriate benchmarks for the respondents' purchases of Chinese land-use rights in certain years.

---

[33] *See, e.g.*, *Laminated Woven Sacks from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 FR 35639 (June 24, 2008) (*Laminated Sacks from China*), and accompanying IDM at 17 ("In order to calculate the benefit, we first multiplied the benchmark land rate (deflated from 2007 *to the year the transaction was officially approved by the country*) … ." (emphasis added)); *see also Aluminum Extrusions from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 76 FR 18521 (April 4, 2011) (*Aluminum Extrusions from China*) ("New Zhongya acquired its land-use rights in 2006, and the Guang Ya Companies acquired their land-use rights in 2007.  As 2007 is more contemporaneous *with the time of these purchases*, we have used 2007 prices for Thai land industrial land for benchmarking purposes." (emphasis added)).

[34] *See Zhaoqing New Zhongya Aluminum Co. v. United States*, 961 F. Supp. 2d 1346, 1354 (CIT 2014) (upholding Commerce's selection of the land benchmark as reasonable and stating "{Commerce's} defense of its decision not to discount for inflation rests on the relatively short time separating New Zhongya's *acquisition of land use rights in* June and October 2006 and the second quarter of 2007 from which the indicative values in the CBRE Report were drawn." (emphasis added)).

[35] *See* JA Solar's Letter, "Countervailing Duty Questionnaire Response – Section III Response," dated December 30, 2019, at various exhibits regarding Land for LTAR purchases.

[36] *See* Risen's Letter, "Section III Questionnaire Response," dated December 31, 2019, at various exhibits regarding Land for LTAR purchases.

In the *Remand Results*, Commerce relied on a simple average of Thai land prices from the 2010 CBRE Report and the Malaysian Land Values data (for 2021) that Commerce placed on the record.[37]  In response to Commerce placing this information on the record, Risen submitted earlier versions of the same Malaysian land data, which Commerce has used in prior China proceedings.[38]  While the Malaysian Land Values placed on the record by Commerce are based on data that were compiled in 2021 (*i.e.*, four years after the 2017 POR), Risen's Malaysian Land Prices dataset contains actual Malaysian land values for the years 2014 through 2019, as well as indexed land values covering 2002 through 2013.[39]  Commerce concludes that Risen's Malaysian Land Prices are more contemporaneous with certain years in which the respondents purchased their land-use rights, when compared to the Malaysian land prices used by Commerce in the *Remand Results*.

Thus, for these final remand results, Commerce finds that it is appropriate to continue to rely on Thai land prices from the 2010 CBRE Report (indexed where necessary) as the sole land benchmark for land-use rights purchases during the years [    ] through [    ], as these prices are more contemporaneous for these years than the Malaysian values listed in Risen's Malaysian Land Prices.  For land-use rights acquired by the respondents between [    ] and [    ], Commerce finds it suitable to rely solely on Risen's Malaysian Land Prices (indexed where necessary), as these prices are more contemporaneous for these years than the Thai values from the 2010 CBRE Report.  For [    ], because the indexed prices from the 2010 CBRE Report and Risen's Malaysian Land Prices are equally contemporaneous to [    ], for these final remand

---

[37] *See* Memorandum, "Upcoming Draft Remand Results – The Provision of Land for Less Than Adequate Remuneration – Malaysia:  Cost of Doing Business," dated August 8, 2022; *see also Remand Results* at 11.
[38] *See* Risen's Letter, "Rebuttal Information," dated August 16, 2022 (Risen's Malaysian Land Prices).
[39] *Id*.

results, Commerce concludes that it is reasonable to rely on a simple average of the Thai land prices and Risen's Malaysian Land Prices duly indexed to [      ].[40]

### 3. <u>Ocean Freight Benchmark</u>

In the *Final Results*, Commerce calculated a "tier two" benchmark for the price of ocean freight when constructing the LTAR benchmark the respondents' purchases of solar glass, polysilicon, and aluminum extrusions, by using a simple average of data from Descartes and from Xeneta.[41]  In the *Remand Order*, the Court remanded Commerce to "reconsider the flaws" in the Descartes data, and to consider whether it was necessary to use the Descartes data to arrive at a "world market price" in developing its LTAR benchmarks.[42]  In the *Remand Results*, Commerce concluded that it provided an adequate explanation for accepting the Descartes data and recalculated the ocean freight benchmark to correct the bias toward U.S. routes.[43]  In its *Second Remand Order*, the Court found that it could not sustain Commerce's ocean freight benchmark calculation in the *Remand Results*, finding that Commerce did not comply with the Court's remand instructions to explain its continued use of the Descartes data.[44]  Specifically, the Court stated that Commerce "did not consider the potential impact that a small sample size {from the Descartes data} could have when affecting the comparability of the Descartes and Xeneta datasets."[45]  In light of its finding, the Court instructed Commerce to provide "a convincing reason as to why the Descartes data improves accuracy" for the ocean freight, or to not use it.[46]

---

[40] *See* Memorandum, "Calculations for the Draft Results of Second Redetermination Pursuant to Court Remand," dated June 23, 2023.  Commerce has made no changes to these calculations for this final remand redetermination.
[41] *See* 19 CFR 351.511(a)(2)(ii); *see also Final Results* IDM at 55-56.
[42] *See Remand Order* at 16.
[43] *See Remand Results* at 23-25.
[44] *See Second Remand Order* at 18.
[45] *Id*.
[46] *Id*.

Commerce has considered the options presented by the Court and is complying with the Court's *Second Remand Order* by no longer relying on the Descartes data when developing its ocean freight benchmark.  Instead, Commerce is relying solely on the Xeneta ocean freight prices for these final results of redetermination.  In reaching this conclusion, Commerce finds that reevaluating the Descartes data would potentially involve reopening the record to append information regarding tariff codes and freight forwarder codes that are found in the Descartes data, analyzing this new information, and providing interested parties with an opportunity to comment on this issue.  After careful consideration, Commerce finds that it would not be feasible to conduct such an analysis within the time constraints associated with the Court's *Second Remand Order*.[47]  Accordingly, we have recalculated the ocean freight benchmark by relying solely on the Xeneta ocean freight prices.

## III.    COMMENTS

On June 23, 2023, Commerce released the Draft Remand Results and invited comments from parties.[48]  On June 30, 2023, we received comments from JA Solar and Risen, and from Shanghai BYD.[49]  These comments are addressed below, as appropriate.

---

[47] Commerce notes that the Descartes data were placed on the record of the underlying administrative review by SunPower Manufacturing Oregon, LLC (SunPower).  *See* SunPower's Letter, "Submission of Benchmark Information," dated January 13, 2020, at Exhibits 5-9.  SunPower, which has access to the Descartes data, is not involved in this litigation.

[48] *See* Draft Remand Results.

[49] *See* JA Solar's Letter, "Comments on Draft Remand Redetermination," dated June 30, 2023 (JA Solar's Comments); *see also* Risen's Letter, "Comments on Draft Remand Redetermination," dated June 30, 2023 (Risen's Comments); and Shanghai BYD Co., Ltd.'s Letter, "Shanghai BYD's Comments on Draft Results of Second Redetermination," dated June 30, 2023 (Shanghai BYD's Comments).

**Issue 1:        Application of AFA in Determining Use of the EBCP for Risen**

*Risen's Comments:*[50]

- Commerce's application of the EBCP to Risen is unsupported by record evidence and is contrary to law, and the record in its entirety does not support a finding of use of this program.

- There is no information on this record to support any finding of {usage} regarding the EBCP.  There is no evidence in any review of this proceeding, or in any review for any proceeding, that this program has ever been used.

- All of Risen's U.S. customers provided signed certifications of non-use of this program. The GOC corroborated Risen's and its customers non-use by querying the China Ex-Im Bank's loan database.

- The information in Risen's responses to Commerce's EBCP supplemental questionnaire, which covered 95 percent of Risen's sales value, corroborated non-use of this program.

- On second remand, all but one of Risen's unaffiliated customers agreed to verification. Risen attempted to gain cooperation with this company but was not able to gain its cooperation.  This company had no financial incentive to agree to verification, even with Risen offering to compensate for any associated legal expenses.  That this company declined verification cannot be a reasonable inference that Risen's customers used this program without Risen's or the GOC's knowledge.

- The Court's conclusions in the last remand still hold:  "{A}pplication of an adverse inference is based on a respondent's efforts to comply with Commerce's request for

---

[50] *See* Risen's Comments at 1-7.

information.  The purpose of the application of adverse facts available is to encourage respondents to comply with Commerce's requests."[51]

- The cooperative efforts and the amount of cooperation Risen was able to obtain must also be considered in light of the particular facts of this case where Commerce is requesting to verify unaffiliated customers from years ago.

- Commerce continues to refuse to examine information on the record regarding this program.  Commerce's determination that it need not consider non-use of this program or apply a *pro rata* adjustment because verification was "not successful within the meaning of the Court's instructions" is contradictory to the Court's instructions.

- Nothing in the Court's opinion defined "successful" as meaning that all of Risen's customers must be verified in order for any one of them to have a successful verification. The Court addressed a *pro rata* rate of 95 percent because five percent of Risen's customers did respond to Commerce's supplemental questions on this program.

- The Court stated that a *pro rata* rate would be appropriate because not all of Risen's U.S. customers could be verified (*i.e.*, at a minimum the five percent that did not provide a supplemental questionnaire {response}).

- Commerce's reasoning here is the same reasoning that the Court found to be illogical at oral arguments.  If one customer did use the EBCP, that has no bearing on whether another customer used this program.

- Even if assuming program usage by applying AFA (which would still not be supported by the record) to find that a certain customer did benefit from the EBCP, Commerce could

---

[51] *Id.* (citing *Remand Order* at 11; *see also Dalian Meisen Woodworking Co., v. United States*, 2022 CIT Lexis 52, *16; and *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224, 1239-40 (2021)).

verify and find non-use of this program for the other customers.  This is the situation
contemplated by applying the *pro rata* adjustment.

- Commerce cannot rely on "facts otherwise available" under section 776(a) of the Tariff
  Act of 1930, as amended (the Act) or apply an adverse inference under section 776(b) of
  the Act because necessary information is not missing from the record.  At a minimum, for
  the customers that consented to verification, Commerce has no basis to apply facts
  available because no information is missing, and the information is verifiable.

*JA Solar's Comments*:[52]

- Commerce must continue to remove the AFA rate for the EBCP with respect to JA Solar.
  Although JA Solar continues to disagree with Commerce that the GOC's cooperation is
  necessary for a full understanding of this program, it agrees that Commerce's Draft
  Remand Results are correct and consistent with the instructions from the Court.

*Shanghai BYD's Comments*:[53]

- Shanghai BYD disagrees with Commerce's decision to continue applying AFA in
  determining that Risen benefitted from the EBCP.  Shanghai BYD agrees with Risen that
  Risen cooperated to the maximum extent possible under the circumstances, and the
  information provided by Risen prior to and during the second remand proceeding is
  consistent with a finding of non-use.

- Commerce's decision not to proceed with verification based on the alleged non-use of a
  single customer is unreasonable and unsupported by evidence.  Commerce provided no
  reason why it could not have proceeded to verify the information pertaining to the other
  customers, or why verification had to be all customers or none at all.

---

[52] *See* JA Solar's Comments at 2.
[53] *See* Shanghai BYD's Comments at 3-4.

- The Court explicitly suggested that Commerce should consider applying a *pro rata* rate adjustment in the event that not all customer claims could be verified.  Commerce seeks to evade this obligation by claiming that the instruction to apply a *pro rata* adjustment was contingent upon Commerce verifying every customer, but that is not what the Court said or meant.  The Court's suggestion to apply a *pro rata* adjustment only makes sense where Commerce is not able to verify all of the customers because this adjustment would not be necessary if all customers cooperated.

- Shanghai BYD supports and incorporates by reference the comments submitted by JA Solar and Risen with respect to Commerce's determination on Risen's use of the EBCP.

**Commerce's Position:**

As explained above, in the *Final Results*, Commerce concluded as AFA that Risen benefitted from using the EBCP because the GOC failed to cooperate with Commerce's requests for information regarding this program.  Once again, in this second remand proceeding, Commerce provided Risen with an opportunity to "fill the gaps" in the record as a result of the GOC's non-cooperation, by attempting to verify the questionnaire responses submitted by Risen on behalf of its U.S. customers.  However, because Commerce is not able to verify non-use for approximately [   ] percent of Risen's U.S. sales, the "gaps" on the record remain.  As such, Commerce maintains that it cannot verify Risen's claim of non-usage for the EBCP because the company information on the record remains insufficient to remedy the deficiencies resulting from the GOC's withholding of necessary information.

Although the information in Risen's responses to the EBCP supplemental questionnaire may cover 95 percent of Risen's POR sales values, Commerce concludes that it can only verify [   ] percent of that reported information due to [                    ], which accounts for [   ]

percent of Risen's POR sales, declining Commerce's request for verification.  As we stated above, the evidentiary gap is larger now than it was in the first *Remand Results* where this gap accounted for only five percent of Risen's sales.  Commerce concludes that a gap of [   ] percent of verifiable information is not sufficient to provide evidence of Risen's non-usage of this program during the POR, and that any attempt by Commerce to verify Risen's claims of non-use in this instance would be futile.  Although Risen argues that the record contains sufficient evidence of non-use to support an overall finding of non-use for the EBCP, Commerce finds that it is not required to consider information provided by Risen which cannot be verified, pursuant to section 782(e)(2) of the Act.

Commerce disagrees that it is required to consider whether Risen exerted its best efforts or any hurdles it may have faced to acquire requested information from years ago and to get its POR customers that submitted certifications of non-use to agree to verification regarding these certifications.  With respect to these non-use certifications from its U.S. customers, Risen submitted these certifications on its own without any prompting from Commerce, fully knowing that these certifications could be subject to verification.  Indeed, the "General Instructions and Information" section of Commerce's CVD Questionnaire notified Risen that all of its submitted information is subject to verification, and that submitted information which Commerce is not able to verify may impact Commerce's findings and determinations.

> All information submitted is subject to verification.  Failure to allow full and complete verification of any information may affect the reconsideration accorded to that or any other verified or non-verified item in the responses.[54]

---

[54] *See* Commerce's Letter to the GOC, "Countervailing Duty Questionnaire," dated November 5, 2019 (CVD Questionnaire) at Section I, General Instructions and Information, subsection G., "Verification."  The GOC was instructed to forward the CVD Questionnaire to JA Solar and to Risen.

Further, although Commerce requested that Risen and the GOC provide information regarding Risen's export customers during the POR (*e.g.*, a list of customers and their shipment addresses),[55] Commerce did not require Risen to provide non-use certifications from their customers; Risen voluntarily provided these certifications in an attempt to fill the gaps caused by the GOC's non-cooperation.  In the CVD Questionnaire, we asked that if Risen claimed none of its customers used the EBCP during the POR, to detail the steps it took to support its claim,[56] for which Risen responded:

> In preparing for this response, Risen contacted all of the POR US customers and confirmed with them that they have not used this program during the POR.  Our US customers provided certificates that they have not used this program during the POR.  Please refer to Exhibit 19 for the certificates from US importers.[57]

Again, Commerce did not ask Risen to submit these certificates of non-use - Risen did so on its own.  One of Risen's U.S. customers that provided a non-use certification in Risen's CVD Response is [                    ],[58] the company that refused to be verified by Commerce.  Risen voluntarily submitted a non-use certification signed by [                    ] (knowing that this certification would be subject to verification) and is now contending that it cannot get [

] to agree to Commerce's verification regarding this certification.  Commerce concludes that the non-use certification and EBCP QR provided by [                    ] are not appropriate for a finding of non-use of the EBCP because they cannot be verified.

Even so, to the extent that Risen contends that it cannot compel certain customers to provide gap-filling verifiable information, we emphasize that Risen's concerns lie with the GOC (for not providing information requested by Commerce) not with its customers.

---

[55] *Id.* at Section III, subsection F., "Export Buyer's Credits from the China Ex-Im Bank."
[56] *Id.*
[57] *See* Risen's Letter, "Section III Questionnaire Response," dated December 31, 2019 (Risen's CVD Response) at 27-28 and at Exhibit 19.
[58] *Id.*

We disagree with the arguments that Commerce should apply a *pro rata* program rate to the EBCP for Risen if Commerce was not able to verify the claims from all of Risen's U.S. customers, and that Commerce misunderstood the Court's instructions and the spirit thereof. The Court's directions to Commerce were very clear:

> On remand, Commerce should attempt to verify Risen's submissions to the extent Commerce finds appropriate, and if that is successful, it should either accept the *pro rata* adjustment sought by Risen or conclude that the EBCP was not used at all.[59]

A plain reading of the Court's instructions shows that Commerce was to use its discretion in defining what would be a "successful" verification of Risen's submissions.

When the Court directed Commerce to attempt to verify Risen's submissions, the missing financial data only accounted for five percent of Risen's U.S. sales for the POR. Indeed, the Court reasoned that "{t}he missing financial data from roughly 5% of sales involved *smaller importers* who likely did not have enough of an interest to justify sharing the sensitive financial information with Commerce years after the POR."[60] However, this is not the case regarding [                  ], which accounted for [   ] percent or Risen's U.S. sales during the POR, and, thus, maintains "enough of an interest" to justify sharing its financial information relevant to the EBCP with Commerce.

In setting up the logistics for verifying Risen's U.S. customers, Commerce was then informed that [                  ] declined to participate in verification, thus increasing the missing financial data [          ] to [   ] percent. In declining Commerce's request for verification, [                  ] not only stated that "onsite verification would create an undue burden on our company," it also stated that "we believe an onsite verification is not warranted."[61] The

---

[59] *See Second Remand Order* at 11.
[60] *Id.* at 10-11 (emphasis added).
[61] *See* Risen EBCP Verification Information at Exhibit 2.

discretion for when verification is warranted lies with Commerce and not with parties such as

[                    ].

      Thus, Commerce concluded that it could not conduct a "successful" verification of

Risen's submissions if it could not verify information submitted by [                    ], which

affects [                    ] of Risen's U.S. sales.  And because Commerce could not conduct a

successful verification as instructed by the Court (due to [                    ] explicit

unwillingness to participate), Commerce is not required to either accept the *pro rata* adjustment

requested by Risen or conclude that the EBCP was not used at all.  As Commerce explained in its

first *Remand Results*, it is not Commerce's practice to adjust a rate selected based on AFA to

account for partial cooperation.[62]

      Finally, Commerce notes that this *pro rata* adjustment sought by Risen and Shanghai

BYD has multiplied from five percent (prior to the *Second Remand Order*) to [  ] percent at this

time.

**Issue 2:**      **Continued Use of Thai Land Prices in the Land for LTAR Benchmark**

*JA Solar's Comments*:[63]

- Commerce's land benchmark calculation violated the Court's *Second Remand Order*.
  The Court remanded Commerce's determination to rely on a simple average of the Thai
  land prices from the 2010 CBRE Report and the Malaysian land prices from the
  Malaysian Land Values, when calculating its land benchmark.

- For the first time, however, Commerce determined that the "appropriate methodology for
  calculating land benchmarks is to index land prices to the date of the purchase of the

---

[62] *See Remand Results* at 20.
[63] *See* JA Solar's Comments at 2-6.

land-use rights rather than to the {period of review}."[64]   Based on this change in policy, Commerce determined that it would rely on indexed prices from the 2010 CBRE Report for certain years, indexed prices from the Malaysian Land Values for other years, and on a simple average of the indexed prices from both sources for other years to calculate its land benchmark.

- Commerce failed to follow the Court's instructions because it exceeded the scope of the Court's remand order.  The Court instructed Commerce to either provide a compelling reason for continuing to use Thai land prices from the 2010 CBRE Report or to, otherwise, only use Malaysian land prices from the Malaysian Land Values.

- The Court's instructions indicated that Commerce could have provided a "compelling reason" for its continued use of the 2010 CBRE Report.  However, the Court's reference to "continued use" in the *Second Remand Order* demonstrates that the Court only intended to allow Commerce on remand to provide a "compelling reason" for its land benchmark calculation in the prior remand (*i.e.*, an average of the 2010 CBRE Report and the Malaysian Land Values).[65]

- If Commerce could not provide such an explanation in support of its prior land benchmark calculation, the Court ordered that Commerce should only rely on the Malaysian Land Values.  The Court did not expand Commerce's authority to apply an entirely new benchmark methodology for valuing land based on the respondent's purchase date of the land-use rights, as opposed to the POR, at this late stage of the proceeding.

---

[64] *Id*. (citing Draft Remand Results at 8).
[65] *Id*. (citing *Second Remand Order* at 11).

- The limited instructions provided by the Court in its *Second Remand Order* align with the broader implications of Commerce's remand redetermination both in this proceeding and in future proceedings where Commerce examines the provision of land for LTAR. Specifically, Commerce's change in its benchmark methodology will inform respondents' benchmark submissions.

- For instance, here, the respondents could have submitted Malaysian Land Values or other data that more closely match the purchase year of their land-use rights had it known Commerce would take a purchase-year approach to the land benchmark, rather than using POR data as has been its standard past practice. Commerce cannot now change its benchmark methodology at this late stage when it has not provided JA Solar with an opportunity to submit benchmark information based on the years that it purchased land-use rights.

- For the final remand redetermination, Commerce must abandon its new land benchmark methodology used in the Draft Remand Results, because it is contrary to the limited instructions in the Court's *Second Remand Order*.

- Commerce failed to explain sufficiently its new practice to select land benchmarks that correspond more closely to the date of the purchase of the land-use rights. In the Draft Remand Redetermination, Commerce cited to the regulation on non-recurring subsidies in determining that Commerce will "select a discount rate based on the date for the year in which the government agreed to provide the subsidy."[66]

- Commerce's explanation for its change in methodology, however, conflicts with its practice in other cases. For example, in the 2019 administrative review of solar cells

---

[66] *Id*. (citing Draft Remand Results at 7, and 19 CFR 351.524(d)(3)).

from China, Commerce did not mention this practice concerning land purchase years as in this case, but, instead, relied on the 2010 CBRE Report, even though it is "not as contemporaneous as they were when we were sustained in {the 2016 review}."[67]

- It is unreasonable and arbitrary for Commerce to claim that it has a practice here, simply because the facts in this case happen to support it, while failing to follow the supposed "practice" in other cases when the facts do not support it.

- For the final remand redetermination, Commerce must exclude Thai land prices from the 2010 CBRE Report and rely solely on Malaysian land prices from the Malaysian Land Values.

*Risen's Comments*:[68]

- For the land benchmark selection, Commerce recalculated its averaging of the land benchmarks to more appropriately account for contemporaneity. Risen generally supports this change for the land for LTAR benchmark.

*Shanghai BYD's Comments*:[69]

- Commerce's Draft Remand Results do not comply with the Court's instructions to "provide a compelling reason for its continued use of the stale 2010 CBRE report" or to "otherwise use the Malaysian data only."[70] Commerce should only use the Malaysian Land Values submitted by Risen.

- Shanghai BYD also supports and incorporates by reference the comments submitted by JA Solar with respect to this issue.

---

[67] *Id*. (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2019*, 87 FR 40491 (July 7, 2022) and accompanying IDM 71).
[68] *See* Risen's Comments at 1.
[69] *See* Shanghai BYD's Comments at 4.
[70] *Id*. (citing Draft Remand Results at 7).

**Commerce's Position:**

We disagree with the arguments that Commerce did not provide a "compelling" reason for continuing to rely on the Thai land prices from the 2010 CBRE Report. We stated above that the Court indicated that it was concerned that the land values in the 2010 CBRE Report are "stale" for developing the land benchmark for purchases of land-use rights in China. But the Court held that the 2010 CBRE Report is "stale" when compared to the 2017 POR and not when compared to when the respondents purchased their land-use rights. As we explained above, the land-use rights under examination were purchased by JA Solar between the years [    ] and [    ], and by Risen between [    ] and [    ]. No party has disputed the dates that the respondents purchased these land-use rights. The Thai land prices include actual Thai prices for 2007 and 2010, and indexed prices covering 2002 through 2006, and 2008 through the 2017 POR.[71] The Malaysian Land Values submitted by Risen contain indexed Malaysian land values for 2002 through 2013, and actual prices covering 2014 through 2019.[72] When comparing the contemporaneity of these two data sources against the dates the respondents purchased their land-use rights, it is clear that the Thai prices from the 2010 CBRE Report (*i.e.*, actual prices and indexed where appropriate) provide a more contemporaneous benchmark price for land-use rights purchased during the years [    ] through [    ], because the actual Thai prices for 2007 and 2010 are more contemporaneous with the dates of these purchases than the actual Malaysian prices that begin in 2013. As a result, Commerce considers its analysis of the Thai data to provide a "compelling" argument for continuing to rely on the Thai data for certain land purchases, as discussed above. Therefore, with respect to contemporaneity of the two sources,

---

[71] *See* JA Solar's and Risen's Excel spreadsheets at the work tab, "RevisedLandBM."
[72] *Id.*

Commerce concludes that it is appropriate to continue to rely on Thai land prices from the 2010 CBRE Report for certain land purchases (actual prices and indexed where warranted).

In addition, we disagree with JA Solar's argument that Commerce has changed its benchmark calculation methodology for this remand proceeding and is applying an "entirely new benchmark methodology for valuing land – based on the respondent's purchase date of the land-use rights as opposed to the period of review . . . at this late stage of the proceeding."[73]  JA Solar should have been aware that in the *Final Results*, Commerce based its benchmark methodology for valuing land on the purchase date of the respondents' land-use rights and not on the POR.[74] In calculating JA Solar's benefits from its land-use rights purchases, it is clear that the land benchmarks are tied to JA Solar's reported "Date of transaction," for its land purchases and not to the POR.[75]  To the extent that Commerce's benchmark methodology did not align with what was stated in its *Final Results*, we have clarified here that Commerce's practice is to select land benchmarks based on the purchase date of the land-use rights in question.  Our benchmarking methodology used for these remand results comports with the benchmarking methodology underlying our calculations in the *Final Results* and in the above-referenced cases regarding *Laminated Sacks from China* and *Aluminum Extrusions from China*.[76]

Finally, we also disagree with JA Solar's argument that we overstepped the Court's instructions by applying a new benchmark methodology for this final remand redetermination. As we explained directly above, we have not changed our methodology and we are applying the same land benchmark methodology that we have applied to the *Final Results* with respect to the

---

[73] *See* JA Solar's Comments at 3-4.
[74] *See*, *e.g.*, Memorandum, "Final Analysis Memorandum for JA Solar Technology Yangzhou Co., Ltd." dated November 27, 2020, and associated Excel calculations spreadsheet at the work tabs "LandBM" and "Land."
[75] *Id*.
[76] *See*, *e.g.*, *Laminated Sacks from China* IDM at 17 ("In order to calculate the benefit, we first multiplied the benchmark land rate (deflated from 2007 to the year the transaction was officially approved by the country) … ." (emphasis added)); and *Aluminum Extrusions from China,* 76 FR at 18521.

date for which the benchmark applies.  In the *Remand Results*, Commerce used an average of the Thai and Malaysian land prices to construct its land benchmark.  Here, Commerce addressed the Court's concerns by providing a "compelling" reason to continue using the Thai land prices, while also adjusting the land benchmark to further address the Court's concerns regarding the contemporaneity of both the Thai and Malaysian land prices.

**Issue 3:          Ocean Freight Benchmark**

*Risen's Comments*:[77]

- For the ocean freight benchmark selection, Commerce properly determined to rely solely on the Xeneta ocean freight data.  Risen generally supports this change for the ocean freight benchmark.

*JA Solar's Comments*:[78]

- For the final remand redetermination, Commerce must continue to rely on the Xeneta data alone to calculate its ocean freight benchmark.

*Shanghai BYD's Comments*:[79]

- Commerce's determination to exclude the Descartes data and to rely solely on the Xeneta ocean freight data to recalculate the ocean freight benchmark is supported by substantial evidence on the record and is consistent with the Court's opinion and remand instructions.

- Shanghai BYD also supports and incorporates by reference the comments submitted by JA Solar and Risen regarding Commerce's selection of the benchmark used for ocean freight.

---

[77] *See* Risen's Comments at 1.
[78] *See* JA Solar's Comments at 6.
[79] *See* Shanghai BYD's Comments at 4-5.

**Commerce's Position:**

In the Draft Remand Results, Commerce stated that it considered the options presented by the Court (*i.e.*, provide a reason as to why the Descartes data improve the accuracy for the ocean freight benchmark or not use it), and is complying with the *Second Remand Order* by solely relying on the Xeneta ocean freight prices for the final remand redetermination. As explained above, Commerce concludes that re-evaluating Descartes data would involve reopening the record to supplement information regarding tariff codes and freight forwarder codes that are found in the Descartes data, examining this new information, and providing interested parties with an opportunity to comment on this issue. Commerce also noted that the Descartes data were submitted by SunPower, a party that is not involved in this litigation. As a result, Commerce finds that it is not practicable to conduct such an analysis within the time limits associated with the Court's *Second Remand* and is complying with the Court's order by removing the Descartes ocean freight prices from the ocean freight benchmark.

**Issue 4:        Rate for Non-Selected Companies Under Review**

*Shanghai BYD's Comments*:[80]

- Shanghai BYD supports Commerce's determination to reconsider its separate rate calculation given the changes to JA Solar and Risen's {calculated countervailing duty rates}. Shanghai BYD maintains that any properly revised margin must apply to Shanghai BYD because its rate is determined by, and is a derivative of, JA Solar and Risen's rates.

**Commerce's Position:**

---

[80] *Id*. at 6.

In the *Final Results* of the underlying administrative review, Commerce calculated a subsidy rate for the non-selected companies under review by weight-averaging the calculated subsidy rates of JA Solar and Risen using their (*i.e.*, JA Solar and Risen's) publicly-available sales data for exports of subject merchandise to the United States during the POR.[81]  For these final results of remand redetermination, Commerce has maintained this calculation methodology for calculating a subsidy rate for the non-selected companies under review, and has updated this rate based on the revised subsidy rates calculated for JA Solar and Risen.  Pursuant to its practice, Commerce will only be applying this updated rate to the non-selected companies participating in this litigation.[82]

## IV.    FINAL RESULTS OF REMAND REDETERMINATION

Pursuant to the Second Remand Order, we have reconsidered our findings in the three programs at issue (*i.e.*, EBCP, the use of Thai land prices for the land for LTAR program, and the continued use of Descartes ocean freight prices for the programs regarding the provision of solar grade polysilicon, solar glass, and aluminum extrusions for LTAR).  In response to comments received on the Draft Remand Results, we have made no changes to the Draft Remand Results for these final results of remand redetermination.  As such, the calculations for JA Solar, Risen, and for the non-selected companies under review with respect to the Draft Remand Results are applicable for these final results of remand redetermination.

Because we are not able to verify Risen's responses regarding its customers' use of the EBCP, we have made no changes to Risen's rate for this program.  Further, we have explained

---

[81] *See Final Results* at section, "Final Results of Administrative Review."

[82] The non-selected companies under review that are subject to this litigation are Shanghai BYD; Changzhou Trina Solar Yabang Energy Co., Ltd.; Hubei Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science and Technology Co., Ltd.; Trina Solar Co., Ltd.; Yancheng Trina Solar Energy Technology Co., Ltd.; and Turpan Trina Solar Energy Co., Ltd.

why indexed Thai land prices from the 2010 CBRE Report provide a reasonable benchmark for valuing certain of the respondents' Chinese land-use rights, and we have modified the source of the Malaysian Land Values to now use more contemporaneous Malaysian prices as submitted by Risen.  Finally, pursuant to the Court's order, we have recalculated the benchmark for ocean freight by removing prices sourced from the Descartes data.  If these remand results are affirmed by the Court, we intend to issue amended final results providing the updated subsidy rates below **(in bold):**

| Company | Program | Subsidy Rate in *Remand Results* (percent *ad valorem*) | **Subsidy Rate Pursuant to Final Results of Redetermination (percent *ad valorem*)** |
|---|---|---|---|
| JA Solar | Aluminum Extrusions for LTAR | 0.00 | **0.00** |
|  | Solar Grade Polysilicon for LTAR | 0.11 | **0.11** |
|  | Solar Glass for LTAR | 3.86 | **3.51** |
|  | Land for LTAR | 0.37 | **0.65** |
|  | Total CVD Rate | 7.75 | **7.68** |
| Risen | EBCP | 5.46 | **5.46** |
|  | Aluminum Extrusions for LTAR | 0.01 | **0.01** |
|  | Solar Glass for LTAR | 2.08 | **1.93** |
|  | Solar Grade Polysilicon for LTAR | 0.00 | **0.00** |
|  | Land for LTAR | 0.25 | **0.25** |
|  | Total CVD Rate | 9.84 | **9.69** |
| Non-Selected Companies Under Review that are | Total CVD Rate | 9.14 | **9.07** |

| Subject to this Litigation | | | |
|---|---|---|---|
| | | | |

7/11/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance