UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD.<br>    Plaintiff,<br><br>JINGAO SOLAR CO., LTD.., ET AL.,<br>    Consolidated Plaintiffs,<br><br>  and<br><br>SHANGHAI BYD CO., LTD., TRINA SOLAR CO., LTD., ET AL.,<br>    Plaintiff-Intervenors,<br>  v.<br><br>UNITED STATES,<br>    Defendant. | Consol. Court No. 20-3912 |

**PLAINTIFF'S COMMENTS ON SECOND REMAND REDETERMINATION**

                 Gregory S. Menegaz
                 Alexandra H. Salzman
                 Judith L. Holdsworth
                 **deKieffer & Horgan, PLLC**
                 Suite 410
                 1090 Vermont Ave., N.W.  20005
                 Tel: (202) 783-6900
                 email:  gmenegaz@dhlaw.com
                 *Counsel to Plaintiff*

Dated: August 11, 2023

## TABLE OF CONTENTS

I.     The Department's Application of The EBC Countervailing Duty Program to Risen Is Unsupported By Record Evidence And Contrary to Law ........................... 1

      A.     Background ................................................................................................. 1

      B.     The Record in its Entirety Does Not Support a Finding of Use of the EBC program. ..................................................................................................... 4

      C.     The Department Continues to Refuse to Examine the Information on the Record ........................................................................................................ 7

II.     Conclusion and Request to Directed Remand Results ............................................... 8

# TABLE OF AUTHORITIES

**Cases**

*ABB, Inc. v. United States*, 273 F. Supp. 3d 1186, 1199 (Ct. Int'l Trade 2017) ........................ 10

*Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ................................................................................................................................. 6

*Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d 1317, 1328 (Ct Int'l Trade 2018) ............................................................................................................................... 10

*Dalian Meisen Woodworking Co. v. United States*, 2022 Ct. Intl. Trade LEXIS 52 .................. 6

*Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) ............ 8

*Diamond Sawblades Manufacturers' Coalition v. United States*, 547 F. Supp. 3d 1323 (Ct Int'l Trade 2021) ........................................................................................................................ 8

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224 (2021) . 6

*Royal Thai Gov't v. United States*, 850 F. Supp. 44 (Ct. Int'l Trade 1994) ............................... 10

**Statute**

19 U.S.C. § 1677e(a) ............................................................................................................... 7-8

Plaintiff Risen Energy Co., Ltd. ("Risen") hereby files comments on the Department's Remand Results. *See* Remand Results (July 12, 2023); ECF 115; *see also* Slip Op. 23-48 (CIT April 11, 2023).  The Court remanded two issues: 1) the application of AFA to the EBC program and 2) the land benchmark selection, and 3) the ocean freight benchmark selection.  For land, the Department recalculated its averaging of the land benchmarks to more appropriately account for contemporaneity.  For ocean freight Department, the Department properly determined to rely solely on the Xeneta ocean freight data.  Risen generally supports these changes to the benchmark data.  However, for the EBC program, the Department continues to act contrary to law and the Court's remand instructions.  The Court should order the Department to either find Risen did not benefit from the EBC rate or apply a pro rata adjustment to the EBC rate.

**I.     The Department's Application of The EBC Countervailing Duty Program to Risen Is Unsupported By Record Evidence And Contrary to Law.**

**A.     Background**

In the original review, the Department ignored the statements provided by Risen's customers that they did not use the EBC program, corroborating evidence to the statements from Risen and the GOC attesting to the same fact.  Risen appealed this decision that was contrary to a plethora of CIT decisions.  The Court criticized the cyclical scenario seen in multiple cases where the Court remands the government's position that it cannot conduct verification of respondents' proof of non-use, then under protest the government removes the EBC program, but makes no appeal to the CAFC and no changes to its position during review and investigation at the agency level—resulting in an "untenable and inequitable" situation with the "continual collection of deposits which are not owed."  Slip. Op. 22-44 at 5.  The Court granted the government's request for remand, ordering the government to either attempt verification or if

1

deciding to remove the EBC program without intention to appeal to explain why the Court should not provide some form of equitable relief. *Id*.

Several years after Risen's original submission of the certifications, and more than five after the POR (2017), in the first remand, the Department issued a supplemental questionnaire on the EBC program. The questionnaire requested information from the respondents' customers on all loans/financing outstanding during the POR information on how the customers confirmed they did not receive export buyer's credits, and further questions on the EBC program if the customer did benefit. The questionnaire was very burdensome, requesting completely unaffiliated companies to provide information on not only whether they had loans or financing related to the EBC program, but to report all loans/financing outstanding during the POR including supporting documentation on the loans, financial statements, and charts of accounts. This is the type of information requested from respondents that are parties to a proceeding, but the Department requested this information from completely unaffiliated customers more than 5 years after they conducted the relevant business with Risen. Nonetheless in full cooperation, and after several rounds of communication and discussions with the customers or Counsel at the various Customers, Risen was able to obtain cooperation and responses from customers covering approximately 95%, of its POR sales by value. *See* Risen EBC qre (July 8, 2022) at 1. Notably, this information only corroborated what Risen and its Customers had maintained and certified to all along—non-use of the EBC program.

Nonetheless, in the first remand, the Department found because Risen could not provide answers from every single unaffiliated customer, that the Department could not verify non-use of the program and continued to apply the total AFA rate. Once again, the information provided by Risen and its unaffiliated Customers was disregarded by the Department. The Court, noting the

2

"sensitive and voluminous" nature of the information requested in the EBC questionnaires from unaffiliated customers from many years prior, discussed Risen's extensive cooperative actions to obtain this information and Risen's "cooperation at every step along the way" of this proceeding. Slip. Op. 23-48 at 9.  The Court ruled that "Commerce cannot reasonably conclude that Risen did not supply information that rendered the missing data from the GOC irrelevant and essentially eliminated any gap in the record." Slip. Op. 23-48 at 10.  The Court remanded back to the Department ordering them to "attempt to verify Risen's submissions to the extent Commerce finds appropriate, and if that is successful, it should either accept the pro rata adjustment sought by Risen or conclude that the EBCP was not used at all." *Id*. at 11.

On remand, the Department again took a completely unprecedented step and decided to verify every single unaffiliated Customer of Risen.  The Department requested that Risen approach each of its Customers again, and now for a period six years prior, and report back to the Department on availability for an in-person verification at each unaffiliated Customer lasting 1-2 days.  Risen and its Counsel spent significant time discussing this request with various staff, executives, and Counsel at each Customer.  Customers had to have multiple meetings to decide whether to allow this unprecedented action to review their confidential documentation and accounting systems in person regarding sales from six years prior, when they had already complied beyond any expectation in providing financial and loan data the year prior in a supplemental questionnaire.  Ultimately, all but one of the Customers agreed to verification.  As elaborated further below, the one Customer that decided not to consent to verification had not been a Customer of Risen's for many years and would receive no actual benefit from the result of this proceeding.  Instead of complying with the Court's Order to attempt verification, the Department found that because one Customer had refused verification, it could not verify any of

3

the Customers and could not find non-use of the program or even a pro rata rate of the program. After almost 3 years of litigation with multiple remands and 6 years after the actual POR, on this remand the Department has continued to do what it has done since the original review, and ignored the record evidence from the Customers.  In each remand, the Department has only taken the opportunity to try to justify its original decision rather than actually consider and comply with the Court's orders.  At each remand, the Department has made more unprecedented requests of these unaffiliated Customers, becoming more and more problematic given the ever lengthening gap in time from the review period.  The Department's remand is wholly unsupported by the record, Court precedent generally, and the specific remand orders of the Court.  Under these circumstances, Risen respectfully requests that this Court take more directed action on this remand and order the Department to either find Risen did not benefit from the EBC rate or apply a pro rata adjustment to the EBC rate.

> **B.     The Record in its Entirety Does Not Support a Finding of Use of the EBC program.**

First, Risen again reiterates that there is no information on this record to support any finding of the EBC program nor has there been any evidence in any review of this Order or any review of any Order that this program has ever been used.  Every single one of Risen's U.S. Customers provided signed certifications of non-use of the EBC program. *See* Risen Section III Resp. at 27 - 28, Exhibit 19 (December 30, 2019) PR158, CR172; *see also* Risen's Unaffiliated Supplier II's Section III Resp. at 23, Exhibit 15 (January 6, 2020) PR164, CR277.  These certifications were from U.S. Customers that signed to the accuracy of their statement in full understanding that the statement was before a U.S. government agency.  Further, nothing on this record has undermined the reliability of these certifications.  Rather, all additional information on the record has only corroborated these certifications.  First, in the original proceeding, the

4

GOC corroborated Risen's and its customers' non-use by searching the customers' names in China Ex-Im Bank's loan database. GOC Initial Questionnaire Resp. at 126 - 128, Exhibits II.F.1 & II.F.2 (December 30, 2019) PR140, CR104. Next, the information in the EBC supplemental questionnaires covering 95% of Risen's sales value corroborated non-use of the program. The Customers either had no loans/financing or no loans/financing that could possibly be connected to the EBC program or the purchase of subject merchandise at all. *See* Risen EBC Qre (July 8, 2022) Rem. CR2-4, Rem. PR8. Lastly, on this second remand, all but one of the unaffiliated Customers agreed to the wholly unprecedented and highly sensitive verification. Risen Verification Response (May 16, 2023) 2nd Rem. CR2, 2nd Rem. PR7; Risen Customer A Verification Response (May 17, 2023) 2nd Rem. CR3, 2nd Rem. PR9; *see also* Various Extension Requests 2nd Rem. PR2 PR4 PR6.

While one Customer ultimately declined verification, the circumstances of that unaffiliated Customer must be considered as a justification for their noncompliance. Risen tried to gain cooperation with Customer C but was ultimately not able to gain their cooperation. The Customer explained that the personnel and resources of a verification would be detrimental to its commercial priorities and that they do not believe such a verification is warranted given they are unaffiliated and provided a declaration of non-use in the original proceeding and additional corroborating information in 2022. Risen Verification Response (May 16, 2023) at Exhibit 2 2nd Rem. CR2, 2nd Rem. PR7; . Risen had not had business with the company for many years and even Risen's contacts at the company no longer worked at the company. Risen's U.S. Counsel was eventually able to get in contact with the Customer C's counsel, but after several discussions Customer C still declined verification for the reasons explained. Indeed, since Risen is the importer of record, Customer C had no financial incentive to agree to such an intrusive and

unprecedented request, even with Risen offering to compensate Customer C for the associated legal expenses. Given these facts, the lack of any information to the contrary, and the highly sensitive and overreaching request by the Department, the fact that this Customer declined verification cannot be a reasonable inference that the Customers, either Customer C or any other customer of Risen, somehow used the EBC program without Risen or the GOC's knowledge.

Risen exercised maximum efforts to obtain cooperation from its unaffiliated customers, and the responses of the majority of its customers reflect these efforts and corroborate the consistent certifications and documentation of non-use. Accordingly, Risen submits that the Court's conclusions in the last remand still hold:

> Considering that the POR was five years ago, that Commerce changed its policy, and that Risen complied to the best of its ability, the court concludes it is unreasonable for Commerce to require perfection. All of the record evidence points to nonuse of the program at issue. Commerce's concern about potentially hiding the use of EBCP in the nonresponding companies is not reasonable when considering the collateral impact of AFA on the fully cooperating Risen, the age of this case, and the still-relevant initial complete set of nonuse declarations, which has not been seriously undermined. Substantial evidence does not support Commerce's continued application of AFA to Risen's detriment on this record.

Slip Op. 23-48 at 11; *see also Dalian Meisen Woodworking Co. v. United States*, 2022 Ct. Intl. Trade LEXIS 52, *16 (Discussing the EBC program and reminding the Department that the "application of an adverse inference is based on a respondent's efforts to comply with Commerce's requests for information. The purpose of the application of adverse facts available is to encourage respondents to comply with Commerce's requests.") *citing Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224, 1239-40 (2021); *see also Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d 1312, 1318 (Ct. Int'l Trade 2017) ("In light of the customer declarations provided by JA Solar certifying non-use of the program and the lack of evidence to the contrary, the mere possibility that one of JA Solar's

customers participated in the program is not enough…"). The cooperation efforts and the enormous amount of cooperation Risen was able to obtain must also be considered in light of the particular facts of this case where the Department is requesting that unaffiliated Customers, Risen's Customers many years ago, allow the Department to verify their books and records at this very late stage.

      **C.**      **The Department Continues to Refuse to Examine the Information on the Record.**

The Department's determination that it need not consider non-use of the EBC program or applying a pro rata adjustment because verification was "not successful within the meaning of the Court's instructions" is wholly contradictory to the Court's instructions. Remand Results at 7 & 19. Nothing in the Court's opinion defined "successful" as meaning that all of Risen's Customers must be verified in order for any one of them to have a successful verification. Indeed, the very fact that the Court was addressing a pro rata rate of 95% was because 5% of Risen's Customers had not provided the EBC supplemental questionnaire. As such, the Court was directly addressing that a pro rata rate would be appropriate specifically because not all could be verified (i.e. at a minimum the 5% that did not provide a supplemental questionnaire).

The Department's reasoning here is the same reasoning the Court found illogical at oral argument. Each Customer's use of the EBC program stands alone. In other words, *in arguendo*, if one Customer did use the EBC program, that has absolutely no bearing on whether another Customer used the EBC program. Indeed, the majority of the Customers agreed to verification and the Department had every opportunity and ability to verify their non-use. Accordingly, even if assuming as AFA (which for the reasons discussed above, would still not be supported by the record) that Customer C did benefit from the EBC program, the Department could verify and find non-use of the EBC program by the other Customers. This is the precise situation

contemplated by applying a *pro rata* adjustment.  The EBC program concerns financing to purchase subject merchandise; therefore, a Customer's use of the program certainly cannot exceed the value of subject merchandise they purchased from Risen.  As such, the pro rata adjustment based on the sales value of the Customer as already discussed in the last remand and sanctioned by the Court, is wholly logical. The meaning of the Court's statement of the phrase "if that is successful" is so clear and straightforward, the Department's reliance on this phrase to continue to apply total AFA to Risen amounts nothing less than flagrant disregard of the clear intention and direction of the Court.

Indeed, the Department cannot use "facts otherwise available" under 19 U.S.C. § 1677e(a) or apply adverse inference under § 1677e(b) because necessary information is not missing from the record.  At a minimum, for the Customers that consented to verification, the Department has no basis to apply facts available because no necessary information is missing and the information is verifiable.  *See also  Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351, 1366-1367 (Fed. Cir. 2021) (finding the Department's application of AFA to the entire sales database was not supported by substantial evidence when the missing information only involved 2.5% of the sales.); *see also Diamond Sawblades Manufacturers' Coalition v. United States*, 547 F. Supp. 3d 1323 (Ct Int'l Trade 2021) (Upholding the Department's application of AFA to only the 2.5% of the sales).

**II.    Conclusion and Request to Directed Remand Results**

In light of the foregoing, the Department's Remand Results are not supported by substantial evidence or in accordance with the law.  As detailed above, the Department has avoided the record and contravened the clear directions from the Court.  The Department's approach in the review and both remands are akin to delay tactics that have continued to harm

8

Risen (as the importer of record due refund) and the Department has made increasingly unreasonable demands from Risen's unaffiliated Customers years after the POR, realizing it would become more and more problematic for the Customers to comply. When 100% of Risen's customers provided certifications during the review, the Department ignored them and applied AFA. Two more years later and five years after the customers' business with Risen, only in the Court proceeding after remand did the Department issue a supplemental EBC questionnaire, and Risen was able to get 95% to respond, but the Department ignored this using the 5% as an excuse to apply AFA. Almost a year later, this Court found again this was unreasonable. Now six years after the customers' business with Risen, the Department demanded in person verifications of all Customers. Risen was able to get all but one Customer to comply, but the Department ignored this using the remaining customer as an excuse to apply AFA.

    Risen submits that with this pattern, another remand will only continue these delay tactics, and maybe with more months passing by, another past Customer of Risen's will decide the extraordinary request by the Department is too much at this late date, and give the Department another excuse to apply AFA on yet a third remand. We remind the Court that these unaffiliated Customers had business with Risen six years ago and have no practical interests in the outcome (the Customers are not the importer of record), and thus Risen has had to expend substantial effort by its staff and Counsel to convince these Customers to spend their time and open their highly confidential records out of goodwill with Risen. Such request from the Department would be the third time the Department asked cooperation from the customers relating to the same issue (one supplemental questionnaire and two verification requests) , and it would be more and more difficult each time for Risen to persuade the customers that this is still a serious effort by the Department to investigate, and not just harassment to dissuade their

9

cooperation. The Customers have already demonstrated substantial cooperation in providing highly confidential information on their loans and financials to the record many years after the period of review and years after being a customer of Risen.  As reiterated above, everything on the record has only corroborated the Customer's and Risen's statements all along that they did not use the EBC program.  Yet the Department's decisions in the review and each remand has shown no true attempt to investigate this non-use.

Under these circumstances, Risen respectfully requests that this Court take more directed action on this remand.  *Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d 1317, 1328 (Ct Int'l Trade 2018) (ordering ab initio the Department to exclude voluntary respondents from the Order finding a remand for reconsideration is unnecessary and considering the delay of justice); *Royal Thai Gov't v. United States*, 850 F. Supp. 44, 51 (Ct. Int'l Trade 1994) (rejecting the Department's change in rationale after the court directed the Department to limit itself "to the evidence and analysis underlying the agency's [prior] decision."); *ABB, Inc. v. United States*, 273 F. Supp. 3d 1186, 1199 (Ct. Int'l Trade 2017) (discussing that the Court could have narrowed the scope of the remand.).

The Court should **order** the Department to either find non-use of the Export Buyer's Credit Program *in toto* or to assign a *pro-rata* EBC rate based on the record as developed to date.

                                               Respectfully submitted,

                                               /s/ Gregory S. Menegaz
                                              Gregory S. Menegaz
                                              Alexandra H. Salzman
                                              **deKieffer & Horgan, PLLC**
                                              Suite 1101
                                              1156 Fifteenth Street, N.W.  20005
                                              Tel: (202) 783-6900
                                              Fax:  (202) 783-6909
                                              email:  gmenegaz@dhlaw.com

Date: August 11, 2023                         *Counsel to Plaintiff*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **3,207** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**deKieffer & Horgan, PLLC**
*Counsel to Plaintiff*