UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD., | ) |
| Plaintiff, | ) |
| and | ) |
| JINGAO SOLAR CO., LTD., SHANGHAI JA SOLAR TECHNOLOGY CO., LTD., JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., HEFEI JA SOLAR TECHNOLOGY CO., LTD., and JA SOLAR (XINGTAI) CO., LTD., | ) Consol. Court No. 20-03912 |
| Consolidated Plaintiffs, | ) |
| SHANGHAI BYD CO., LTD., | ) |
| Plaintiff-Intervenor, | ) |
| TRINA SOLAR CO. LTD., YANCHENG TRINA GUONENG PHOTOVOLTAIC TECHNOLOGY CO., LTD., and CHANGZHOU TRINA SOLAR YABANG ENERGY CO., LTD. | ) |
| Plaintiff-Intervenors, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant. | ) |

## **ORDER**

Upon consideration of parties' comments regarding the second remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained.

Dated: _____, 2023          _____
New York, NY                                                JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| JINGAO SOLAR CO., LTD., SHANGHAI JA ) | |
| SOLAR TECHNOLOGY CO., LTD., JA SOLAR ) | |
| TECHNOLOGY YANGZHOU CO., LTD., ) | |
| HEFEI JA SOLAR TECHNOLOGY CO., LTD., ) | |
| and JA SOLAR (XINGTAI) CO., LTD., ) | Consol. Court No. 20-03912 |
| ) | |
| Consolidated Plaintiffs, ) | **PUBLIC VERSION** |
| ) | |
| SHANGHAI BYD CO., LTD., ) | Business Proprietary Information |
| ) | (BPI) Denoted by Brackets [ ] on |
| Plaintiff-Intervenor, ) | Pages 8-10, 12-13, 15-18. |
| ) | |
| TRINA SOLAR CO. LTD., YANCHENG TRINA ) | |
| GUONENG PHOTOVOLTAIC TECHNOLOGY ) | |
| CO., LTD., and CHANGZHOU TRINA SOLAR ) | |
| YABANG ENERGY CO., LTD. ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' AND PLAINTIFF-INTERVENORS'
COMMENTS REGARDING THE SECOND REMAND REDETERMINATION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                   JOSHUA E. KURLAND
SPENCER NEFF                                  Senior Trial Counsel
Attorney                                      Commercial Litigation Branch
Office of the Chief Counsel                   Civil Division
for Trade Enforcement and Compliance         U.S. Department of Justice
U.S. Department of Commerce                   P.O. Box 480, Ben Franklin Station
                                             Washington, D.C. 20044
                                             Telephone:  (202) 616-0477
                                             Email:  Joshua E. Kurland@usdoj.gov

September 29, 2023                            *Attorneys for Defendant United States*

## **TABLE OF CONTENTS**

BACKGROUND ......................................................................................................... 2

I.      The Underlying Administrative Review ................................................................. 2

II.     The Court's First Remand Order And Commerce's First Remand Results...................... 5

III.    The Court's Second Remand Order And Commerce's Second Remand Results.............. 7

SUMMARY OF THE ARGUMENT ............................................................................ 10

ARGUMENT ............................................................................................................. 11

I.      Legal Standard ..................................................................................................... 11

II.     Commerce's Finding That Risen Used The EBCP Is Supported By Substantial
        Evidence And Complies With The Court's Remand Order.................................. 11

III.    Commerce's Land Benchmark Calculation Is Supported By Substantial Evidence
        And Complies With The Court's Remand Order .............................................. 19

IV.     Commerce's Ocean Freight Benchmark Calculation Is Supported By Substantial
        Evidence And Complies With The Court's Remand Order.................................. 26

CONCLUSION............................................................................................................ 26

## <u>TABLES OF AUTHORITIES</u>

<u>CASE(S)</u>                                                                                                  <u>PAGE(S)</u>

*ABB, Inc. v. United States*,
   273 F.Supp.3d 1186 (Ct. Int'l Trade 2017) ........................................................... 26

*AMS Associates, Inc. v. United States*,
   719 F.3d 1376 (Fed. Cir. 2013) ............................................................................ 15

*Archer Daniels Midland Co. v. United States*,
   917 F. Supp. 2d 1331 (Ct. Int'l Trade 2013) ........................................................ 14

*Cooper (Kunshan) Tire Co., Ltd. v. United States*,
   610 F. Supp. 3d 1287 (Ct. Int'l Trade 2022) ........................................................ 14

*Dorbest Ltd. v. United States*,
   789 F.Supp.2d 1364 (Ct. Int'l Trade 2011) .......................................................... 25

*DynaEnergetics U.S., Inc. v. United States*,
   298 F. Supp. 3d 1363 (Ct. Int'l Trade 2018) ........................................................ 11

*Essar Steel Ltd. v. United States*,
   753 F.3d 1368 (Fed. Cir. 2014)............................................................................. 18

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)............................................................................................. 25

*Fine Furniture (Shanghai) Ltd. v. United States*,
   748 F.3d 1365 (Fed. Cir. 2014)............................................................................. 14

*Huvis Corp. v. United States*,
   570 F.3d 1347 (Fed. Cir. 2009)............................................................................. 25

*Rhone Poulenc, Inc. v. United States*,
   899 F.2d 1185 (Fed. Cir. 1990) ............................................................................ 21

*Risen Energy Co. v. United States*,
   570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ..................................................... 5, 6

*Risen Energy Co. v. United States*,
   No. 20-03912, 2023 WL 2890019 (Ct. Int'l Trade Apr. 11, 2023) ................................. *passim*

*Wuxi Tianran Photovoltaic Co., Ltd. v. United States*,
   No. 21-00538, ECF No. 46 (Ct. Int'l Trade Jan. 10, 2023)................................ 15, 17

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ...................................................... 11

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
961 F. Supp. 2d 1346 (Ct. Int'l Trade 2014) .................................................... 22

## <u>STATUTES</u>

19 U.S.C. § 1516a(b) ........................................................................................... 11

19 U.S.C. § 1677(5) ............................................................................................ 22

19 U.S.C. § 1677e(a) .......................................................................................... 15

19 U.S.C. § 1677e(d) .......................................................................................... 18

19 U.S.C. § 1677m(d) ........................................................................................ 15

19 U.S.C. § 1677m(e) ......................................................................................... 15

19 U.S.C. § 1677m(i) .......................................................................................... 15

## <u>REGULATIONS</u>

19 C.F.R. § 351.511(a).................................................................................... 3, 5

19 C.F.R. § 351.524(d) ...................................................................................... 21

## <u>ADMINISTRTIVE DETERMINATIONS</u>

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*,
85 Fed. Reg. 79,163 (Dep't of Commerce Dec. 9, 2020) ............................................ 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*,
87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022)........................................... 15

*Laminated Woven Sacks from the People's Republic of China*,
72 Fed. Reg. 67,893 (Dep't of Commerce Dec. 3, 2007),
73 Fed. Reg. 35,639 (Dep't of Commerce Jun. 24, 2008)........................... 4, 22, 24

*Wood Mouldings and Millwork Products from the People's Republic of China*,
88 Fed. Reg. 62,319 (Dep't of Commerce Sept. 11, 2023). .............................. 16, 17

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____
                                        )
RISEN ENERGY CO., LTD.,                 )
                                        )
              Plaintiff,                )
                                        )
       and                              )
                                        )
JINGAO SOLAR CO., LTD., SHANGHAI JA      )
SOLAR TECHNOLOGY CO., LTD., JA SOLAR     )
TECHNOLOGY YANGZHOU CO., LTD.,           )
HEFEI JA SOLAR TECHNOLOGY CO., LTD.,     )
and JA SOLAR (XINGTAI) CO., LTD.,        )      Consol. Court No. 20-03912
                                        )
              Consolidated Plaintiffs,  )      **<u>PUBLIC VERSION</u>**
                                        )
SHANGHAI BYD CO., LTD.,                  )      Business Proprietary Information
                                        )      (BPI) Denoted by Brackets [ ] on
              Plaintiff-Intervenor,      )      Pages 8-10, 12-13, 15-18.
                                        )
TRINA SOLAR CO. LTD., YANCHENG TRINA     )
GUONENG PHOTOVOLTAIC TECHNOLOGY          )
CO., LTD., and CHANGZHOU TRINA SOLAR     )
YABANG ENERGY CO., LTD.                  )
                                        )
              Plaintiff-Intervenors,     )
                                        )
       v.                               )
                                        )
UNITED STATES,                          )
                                        )
              Defendant.                )
_____ )

**DEFENDANT'S RESPONSE TO PLAINTIFFS' AND PLAINTIFF-INTERVENORS'**
**<u>COMMENTS REGARDING THE SECOND REMAND REDETERMINATION</u>**

        Defendant, the United States, respectfully submits these comments in support of the

Department of Commerce's second redetermination filed in accordance with this Court's

decision and remand order in *Risen Energy Co. v. United States*, No. 20-03912, 2023 WL

2890019 (Ct. Int'l Trade Apr. 11, 2023) (*Risen II*). Final Results of Remand Redetermination Pursuant to Court Order, ECF Nos. 115-116 (Jul. 12, 2023) (Second Remand Results).

Plaintiff, Risen Energy Co., Ltd. (Risen), consolidated plaintiffs, JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., and JingAo Solar Co., Ltd. (collectively, JA Solar), plaintiff-intervenor, Shanghai BYD Co., Ltd. (Shanghai BYD), and plaintiff-intervenors, Trina Solar Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Guoneng Photovoltaic Technology Co., Ltd., and Changzhou Trina Solar Yabang Energy Co., Ltd. (collectively, Trina), filed comments concerning Commerce's remand results. Risen Cmts., ECF No. 118; JA Solar Cmts., ECF No. 123; Shanghai BYD Cmts., ECF No. 119; Trina Cmts., ECF No. 120. For the reasons discussed below, we respectfully request that the Court sustain Commerce's remand redetermination.

## BACKGROUND

### I.     The Underlying Administrative Review

This case stems from challenges to the final results of Commerce's administrative review of its countervailing duty order covering solar cells from China for the year 2017. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*, 85 Fed. Reg. 79,163 (Dep't of Commerce Dec. 9, 2020), and accompanying Issues and Decision Memorandum (IDM). In the final results, based on the government of China's (GOC) non-cooperation with the review, Commerce applied an adverse inference when selecting among the facts otherwise available on the record (AFA) to fill a gap in connection with its review of China's Export Buyer's Credit Program (EBCP), in finding that both mandatory respondents in the review, Risen and JA Solar, used and benefitted from the program. *See generally* IDM at Cmt. 1. On March 28, 2022, however, following oral argument, Commerce requested that its

determination on this issue be remanded for further consideration in light of changes to

Commerce's practice.  Def. Mot. for Remand, ECF No. 83.

Commerce also found that both respondents benefitted from the provision of land for less

than adequate remuneration (LTAR).  IDM at 6.  Commerce made its land for LTAR finding by

benchmarking the respondents' costs of land inputs to Thai land prices, pursuant to 19 C.F.R.

§ 351.511(a)(2)(iii) ("tier three").  *Id.* at Cmt. 8.  The specific Thai dataset that Commerce relied

upon was a 2010 report by Coldwell Banker Richard Ellis (CBRE) that Commerce discussed in

its preliminary decision memorandum (PDM) and later placed on the record.  *Id.*; PDM at 18

(Jan. 31, 2020) (P.R. 188); CBRE Data Memo (Jan. 31, 2020, placed on record May 19, 2020)

(P.R. 202).  Importantly, in its underlying calculations, Commerce calculated a land benchmark

for each year in which respondents reported purchases of land-use rights by indexing the Thai

CBRE prices to the year in which a land purchase was made.[1]  Final Analysis Memorandum for

JA Solar (Nov. 27, 2020) (P.R. 245; C.R. 323), and accompanying Excel Worksheet at Tabs

LandBM (rows 31-48) and Land (columns R, Q) (C.R. 324) (JA Solar Calc. Worksheet); Final

Analysis Memorandum for Risen (Nov. 27, 2020) (P.R. 244; C.R. 321) and accompanying Excel

Worksheet at Tabs LandBM (rows 32-49) and RisenEnergy_Land (column Q) (C.R. 322) (Risen

Calc. Worksheet).  Notwithstanding its calculations, Commerce incorrectly stated in the final

results that it indexed the 2010 Thai CBRE prices to the 2017 period of review.  IDM at 51.

Despite Commerce's misstatement in the final results, JA Solar and Risen both received

notice of and an opportunity to respond to Commerce's actual calculations.  First, in the January

---

[1] This is important to the current claims because it is the same approach of indexing benchmark
data to the year of the land purchase that Commerce applied in the second remand results,
although at the time it relied solely on the Thai data on the record at that stage of proceedings.  It
is also a more accurate way to calculate the land benchmark than by comparing purchases from
years other than 2017 to data indexed to 2017 prices.

PUBLIC VERSION

2020 PDM, Commerce stated that it was proceeding consistent with the methodology established in its *Sacks from China* investigation and invited parties "to submit alternative benchmark data that is consistent with the guidance provided in *Sacks from China* and the Land Benchmark Analysis."  PDM at 17-18.  In *Sacks from China*, Commerce explained that "{i}n order to calculate the benefit, we first multiplied the benchmark land rate (*deflated from 2007 to the year the transactions were approved by the state authority)* by the total area of {the respondents'} tracts."  *Laminated Woven Sacks from the People's Republic of China*, 72 Fed. Reg. 67,893, 67,909 (Dep't of Commerce Dec. 3, 2007) (emphasis added), *unchanged in final* 73 Fed. Reg. 35,639 (Dep't of Commerce Jun. 24, 2008), at IDM pg. 17 (*Sacks From China*)).

Further, following the preliminary results, Commerce in April 2020 released its underlying calculations showing that Commerce had indexed the land benchmark data to the year of purchase rather than solely to the period of review.  Prelim. Calc. Memo at 3 (P.R. 199; C.R. 308), and accompanying Prelim. JA Solar Calc. Worksheet at Tabs LandBM (rows 31-48) and Land (columns R, Q) (Apr. 14, 2020) (C.R. 306).  Next, because Commerce initially failed to place the Thai CBRE data and its Land Benchmark Analysis memo on the record, it did so in May 2020, while giving parties another opportunity to submit information to rebut, clarify, or correct the benchmark materials.  CBRE Data Memo at 1 (P.R. 202).  JA Solar, which had earlier advocated a world-market price that Commerce declined to adopt in the PDM and Nexus Report data for land with factories and warehouses that JA Solar argued were more contemporaneous to the period of review than the CBRE data, did not respond to this additional opportunity to submit information.  JA Solar Benchmark Submission at 4-5 (Jan. 13, 2020) (P.R. 166; C.R. 284); JA Solar Land Benchmark Submission at 2-3 (Feb. 18, 2020) (P.R. 192).

PUBLIC VERSION

Commerce additionally found that both respondents benefitted from the provision of several inputs (solar grade polysilicon, aluminum extrusions, and solar glass) for less than adequate remuneration.  IDM at 6.  Commerce adjusted the benchmark prices for these inputs by adding a price component representing ocean freight costs.  In this regard, petitioner SunPower Manufacturing Oregon, LLC provided a Descartes report listing freight prices from various ports in the United States to various ports in China.  SunPower Benchmark Submission at Ex. 5 (Jan. 13, 2020) (P.R. 170, 175).  By contrast, JA Solar provided Xeneta data listing ocean freight prices between various ports around the world.  JA Solar Benchmark Submission at Ex. 7B (Jan. 13, 2020) (P.R. 166; C.R. 284, 296).  Commerce calculated its ocean freight benchmark under 19 C.F.R. § 351.511(a)(2)(ii) by deriving a single ocean freight price for both the Descartes and Xeneta data, before simple averaging the two prices.  IDM at Cmt. 9.

## II.   The Court's First Remand Order And Commerce's First Remand Results

On May 12, 2022, the Court granted Commerce's remand motion with respect to the EBCP, holding that Commerce "may attempt to verify the customer certifications of non-use," but that "{i}f the Government decides to remove the EBCP from its subsidy calculation under protest but does not intend to appeal, it must explain on remand why the Court should not provide some form of equitable relief{.}"  *Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369, 1373 (Ct. Int'l Trade 2022) (*Risen I*).

In the same decision, the Court held that Commerce needed to provide further explanation for its reliance solely on the Thai CBRE data for its land benchmark.  *Id.* at 1375-76. The Court identified several deficiencies with the Thai data, including the Thai data's relative staleness in comparison to the 2017 period of review.  *Id.*  The Court thus remanded for Commerce to reconsider its selection of the Thai land data in light of these considerations.  *Id.*

The Court similarly remanded Commerce's reliance on the Descartes data to calculate the ocean

freight benchmark.  *Id.* at 1379.

Pursuant to the Court's order in *Risen I*, Commerce issued its first remand results on

October 7, 2022.  Final Results of Remand Redetermination Pursuant to Court Order, ECF Nos.

93-94 (Oct. 7, 2022) (First Remand Results).  On remand, Commerce reopened the record and

issued questionnaires to JA Solar and Risen seeking "all loans/financing to each of your U.S.

importers/customers."  EBCP Supplemental Questionnaire at 3 (Jun. 7, 2022) (R.P.R. 1-2).  JA

Solar responded by providing Commerce with complete information on behalf of itself and its

sole United States importer/customer, JA Solar USA.  JA Solar EBCP Supp. Questionnaire Resp.

(Jul. 8, 2022) (R.P.R. 13; R.C.R. 5); First Remand Results at 6-7.  Given that JA Solar provided

complete information on behalf of its sole importer/customer, Commerce proceeded to conduct a

virtual verification of the information and was able to verify it.  First Remand Results at 7; JA

Solar Verification Report (Aug. 31, 2022), (R.P.R. 27; R.C.R. 24).  Because the information that

JA Solar provided supported a finding that JA Solar did not use the EBCP, Commerce removed

the program from its calculation of JA Solar's total subsidy rate.  First Remand Results at 7.

Risen, by contrast, provided responses to Commerce's questionnaire on behalf of six out

of its 12 customers.  Risen EBCP Supp. Questionnaire Resp. (Jul. 8, 2022) (R.P.R. 12; R.C.R. 2-

4); First Remand Results at 7-8.  As a result, Commerce continued to find that the record lacked

complete information with respect to Risen's usage of the EBCP.  Remand Results at 7-8.  Thus,

applying AFA—based on the government of China's failure to cooperate—Commerce found that

Risen had used the EBCP.  First Remand Results at 8-9.

Addressing the Court's concerns regarding its Thai land data benchmark, Commerce

reopened the record and placed a "Costs of Doing Business" report containing Malaysian land

prices on the record.  First Remand Results at 11; Malaysian Land Report (Aug. 8, 2022) (R.P.R. 16).  In response, Risen submitted earlier versions of the Malaysian data, which Commerce had used in prior reviews.  First Remand Results at 11 (citation omitted).  Commerce then revised its land benchmark to include the Malaysian land values, and calculated a new benchmark using a simple average of the Thai and Malaysian data.  First Remand Results at 11-13; Memorandum, Calculations for the Final Results (Oct. 6, 2022) (R.P.R. 38; R.C.R. 32) and accompanying Excel Worksheet at Tabs LandBM, 2017 Malaysia Land BM, and Land (R.C.R. 33) (First Remand Calc. Worksheet).  Significantly, Commerce's calculations in the remand results continued to calculate a land benchmark for each year in which the respondents reported purchases of land-use rights by indexing the Thai and Malaysian prices to the year in which a land purchase was made.  First Remand Calc. Worksheets at Tabs LandBM (rows 31-48), 2017 Malaysia Land BM (rows 37-58), and Land (columns R, Q) (R.C.R. 33).  Commerce also addressed the additional flaws that the Court identified regarding the Thai land data.  First Remand Results at 11-13.

With respect to its benchmark for ocean freight, Commerce reduced the weight assigned to the petitioner's Descartes data in its calculation of the benchmark by averaging the Descartes data with the United States-China routes in the Xeneta data, before averaging both datasets.  *See* Remand Results at 13-15.  Commerce also excluded land routes containing inland freight from its benchmark calculation.  *See* Draft Remand Calculation Memorandum at 3 (Aug. 30, 2022) (R.P.R. 28; R.C.R. 25), unchanged in final remand.

III.    **The Court's Second Remand Order And Commerce's Second Remand Results**

On April 11, 2023, the Court issued its second remand decision in this case.  *Risen II*, 2023 WL 2890019.  With respect to the EBCP, the Court instructed Commerce to "attempt to verify Risen's submissions to the extent Commerce finds appropriate, and if that is successful, it

should either accept the *pro rata* adjustment sought by Risen or conclude that the EBCP was not used at all." *Id.* at *5. With respect to the land benchmark, the Court held that Commerce "fails to provide sufficient reasons to continue relying on the stale data from Thailand when it has the contemporary data from Malaysia" and "must provide a compelling reason for its continued use of the stale 2010 CBRE report or otherwise use the Malaysian data only." *Id.* at *7. Finally, regarding ocean freight, the Court held that "{i}f Commerce cannot supply a convincing reason as to why the Descartes data improves accuracy, Commerce should not use it." *Id.* at *9. The Court therefore remanded the matter to Commerce for a redetermination consistent with its opinion on those three issues. *Id.*

On remand, Commerce reopened the record and attempted to schedule verification for the six Risen customers that responded to Commerce's supplemental questionnaire concerning the EBCP. Memorandum, Microsoft Teams Call With Counsel to Risen (May 1, 2023) (R.P.R.2 1; R.C.R.2 1). One of those customers, [                    ], representing [    ] percent of Risen's sales during the period of review, informed Risen that it would not participate in verification. Second Remand Results at 5; Risen EBCP Verification Information at Ex. 2 (May 16, 2023) (R.P.R.2 7; R.C.R.2 2) (Risen First Verification Resp.). Risen explained that it had not conducted business with the customer since [                  ]. Risen First Verification Resp. at Ex. 1. However, the other customers among the six who responded to the supplemental questionnaire indicated willingness to participate in verification. *Id.*; Risen EBCP Verification Information at Ex. 1 (May 17, 2023), (R.P.R.2 9; R.C.R.2 3) (Risen Second Verification Resp.).

Subsequently, on July 12, 2023, Commerce filed its second remand redetermination, as ordered by the Court in its April 2023 decision. Commerce found that it could not verify a large portion of the sales that Risen claimed did not benefit from the EBCP. Second Remand Results

at 5-6.  Therefore, Commerce continued to find that the information provided by Risen was not sufficient to overcome the deficiencies created by the government of China's reporting, and continued to apply AFA to calculate a rate for the EBCP with respect to Risen.  *Id.* at 6-7. Commerce also found that, because its verification of the information reported by Risen was unsuccessful, applying a *pro rata* adjustment to the EBCP rate it calculated for Risen was neither necessary nor appropriate.  *Id.* at 7.

Regarding land, Commerce explained that "the appropriate methodology for calculating land benchmarks is to index land prices to the date of the purchase of the land-use rights rather than to the {period of review}."  *Id.* at 9; *see* JA Solar Calc. Worksheet at Tabs RevisedLandBM (rows 31-48), RevisedMalaysiaLandBM (rows 45-64), and Land (columns R, Q) (June 23, 2023) (R.C.R.2 6) (Second Remand Calc. Worksheet).  Therefore, addressing the Court's instruction for Commerce to provide a "compelling reason" for its continued use of the Thai CBRE data, Commerce explained that the Thai land prices included in the 2010 Thai CBRE report were actually more contemporaneous for certain land-use purchases than the Malaysian data.  Second Remand Results at 8-9.  Commerce thus continued to use the Thai land data, indexed when appropriate, to calculate benchmarks for land-use purchases between [      ] and [      ], because those years are closest in time to when the 2010 Thai data was compiled.  *Id.* at 10.  Commerce similarly relied on the Malaysian data for purchases made between [      ] and [      ] because it was more contemporaneous to those years.  *Id.*  For purchases made during [      ], Commerce continued to rely on a simple average of the Thai and Malaysian land prices, because the datasets are equidistant in time from that year.  *Id.* at 10-11.

Although this represents a revised explanation from Commerce's previous explanation regarding its use of the Thai data, it did not represent a significant change in Commerce's

calculation methodology in the sense that Commerce throughout the proceeding has applied the

benchmark data indexed to the year of the land purchase, rather than to the period of review.

Regarding ocean freight, Commerce found that "reevaluating the Descartes data would

potentially involve reopening the record to append information regarding tariff codes and freight

forwarder codes that are found in the Descartes data, analyzing this new information, and

providing interested parties with an opportunity to comment on this issue," and that it would not

be feasible to conduct such an analysis in the timeframe required to complete the remand

redetermination.  *Id.* at 12.  Therefore, Commerce recalculated a benchmark price for ocean

freight solely by reference to the Xeneta data.  *Id.*

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's second remand results because they are supported

by substantial evidence and comply with the Court's remand order.  With respect to the EBCP,

Commerce complied with the Court's order to attempt verification of Risen.  However, not all of

Risen's customers were able to verify the information that Risen provided regarding the EBCP.

The customer that did not agree to participate in verification—in addition to the six who failed to

respond to Commerce's questionnaire—left Commerce with a gap in the record pertaining to

approximately [   ] percent of Risen's POR sales.  Commerce's finding that this is insufficient to

plug the gap created by the GOC's non-cooperation is supported by substantial evidence.

With respect to Commerce's land benchmark calculations, Commerce's determination on

remand to use the land benchmark data source closest in time to the year of the land-use rights

purchase in question is supported by substantial evidence and in compliance with the Court's

remand order, in addition to furthering the interest in the accuracy of Commerce's calculations.

Commerce's clarification of its land benchmark methodology and corresponding benchmark

calculations provide the "compelling reason" that the Court ordered as to why Commerce should continue to use the 2010 Thai CBRE data as a benchmark source for the land for LTAR program. Commerce's land benchmark calculations, as explained in the second remand results, are also consistent with Commerce's countervailing duty regulations and are otherwise reasonable.

Finally, the Court should sustain Commerce's determination on remand not to use Descartes data to value ocean freight because Commerce complied with the Court's remand order and no party contests this aspect of Commerce's finding.

## ARGUMENT

### I.     Legal Standard

The Court sustains any determination, finding, or conclusion found by Commerce unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). This standard applies equally to remand redeterminations. *DynaEnergetics U.S., Inc. v. United States*, 298 F. Supp. 3d 1363, 1367 (Ct. Int'l Trade 2018). Remand redeterminations are also reviewed for compliance with the Court's order. *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

### II.    Commerce's Finding That Risen Used The EBCP Is Supported By Substantial Evidence And Complies With The Court's Remand Order

The Court in *Risen II* found that "Commerce cannot reasonably conclude that Risen did not supply information that rendered the missing data from the GOC irrelevant and essentially eliminated any gap in the record." 2023 WL 2890019 at *5. The Court added,

> Considering that the POR was five years ago, that Commerce
> changed its policy, and that Risen complied to the best of its
> ability, the court concludes it is unreasonable for Commerce to
> require perfection. All of the record evidence points to nonuse of
> the program at issue. Commerce's concern about potentially
> hiding the use of EBCP in the nonresponding companies is not
> reasonable when considering the collateral impact of AFA on the

11

> fully cooperating Risen, the age of this case, and the still-relevant
> initial complete set of nonuse declarations, which has not been
> seriously undermined.

*Id.* The Court finally concluded that Commerce's application of AFA was unsupported by

substantial evidence and held that Commerce "should attempt to verify Risen's submissions to

the extent Commerce finds appropriate, and if that is successful, it should either accept the *pro*

*rata* adjustment sought by Risen or conclude that the EBCP was not used at all." *Id.*

Commerce complied with the Court's remand order by attempting to perform verification

of Risen and its customers, but found that verification would not be feasible given the gaps in the

record caused by [              ]'s non-compliance with Commerce's verification request (on

top of the previous non-compliance by six other customers). *See* Second Remand Results at 5-6.

After Risen notified Commerce that [              ] would not be participating in verification,

the gap in the record created by companies that either did not respond to Commerce's EBCP

supplemental questionnaire or did not submit to verification accounted for approximately [   ]

percent of Risen's sales during the period of review. *See id.* Given these facts, Commerce found

that it could not verify Risen's claims of non-use of the EBCP because Commerce is unable to

verify non-use based on evidence provided by only a portion of Risen's customers. *Id.*

The non-compliance of a customer representing a significant portion of Risen's sales

means that the facts before Commerce for the second remand results changed from those in the

first remand results, which led the Court to opine that "Commerce cannot reasonably conclude

that Risen did not supply information that rendered the missing data from the GOC irrelevant

and essentially eliminated any gap in the record." *Risen II*, 2023 WL 2890019, at *5.  As

Commerce explained in its second remand results, the information effectively missing from the

record increased [        ] when it became apparent that [              ] would not be

participating in verification.  *See* Second Remand Results at 19-20.

      Moreover, Commerce's determination that [              ] would not comply with

Commerce's request for verification is supported by the record.  In declining Commerce's

verification request, [            ] stated that "onsite verification would create an undue

burden on our company" and that "we believe an onsite verification is not warranted."  *Id.*

(quoting Risen First Verification Resp. at Ex. 2 (R.P.R.2 7; R.C.R.2 2)).  However, the impetus

to determine when verification is warranted lies with Commerce and not with parties such as

Risen or [            ].  *Id.*  Therefore, Commerce's conclusion that the information provided

by Risen would not fill the gaps in the record created by the GOC's failure to cooperate complies

with the Court's remand order and is supported by substantial evidence.

      With respect to the Court's concerns regarding Commerce's failure to rely on the initial

non-use declarations that Risen provided, Commerce explained that it is not required to consider

information that cannot be verified, including the non-use declaration and EBCP Questionnaire

Response provided by [            ], and that such unverified information is not appropriate

to use as support for a finding of non-use.  *See* Second Remand Results at 16-18.  Although the

Court also cited additional factors in its remand order (including the length of time between this

remand determination and the period of review, Commerce's policy change regarding the EBCP,

and the fact that Risen has been cooperative with Commerce's requests for information in this

proceeding), they do not change the fact that the record lacks verified non-use information for

approximately [        ] of Risen's sales.  Thus, Commerce is not holding Risen to the standard

of "perfection" the Court described in its remand decision.  *Risen II*, 2023 WL 2890019, at *5.

The Federal Circuit has held that Commerce is authorized to apply AFA to a foreign government

PUBLIC VERSION

in a manner that impacts a respondent, notwithstanding that respondent's cooperation.  *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014); *see also Cooper (Kunshan) Tire Co., Ltd. v. United States*, 610 F. Supp. 3d 1287, 1303 (Ct. Int'l Trade 2022) (citations omitted).  Although Commerce should "seek to avoid such impact if relevant information exists elsewhere on the record," *Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013), the gap in the record in this case precludes Commerce from mitigating the negative collateral impact on Risen.

Risen argues that Commerce failed to consider the record in its entirety in finding that Risen used the EBCP; however, these arguments lack merit.  *See* Risen Cmts. 4-7.  First, Risen references the non-use certifications provided by its customers in the underlying review, arguing that the record does not support a finding that the EBCP was used.  *Id.* at 4 (citing Risen Sec. III Resp. at 27-28, Ex. 19 (Dec. 30, 2019) (P.R. 158; C.R. 172); Risen Unaffiliated Supplier II's Sec. III Resp. at 23, Ex. 15 (Jan. 6, 2020) (P.R. 164; C.R. 277)).  Trina supports Risen's position, while Shanghai BYD also cites the non-use certifications provided by Risen in support of its position that the record does not support applying AFA for the EBCP.  *See* Trina Cmts. 3-4; Shanghai BYD Cmts. 3.  But, as Commerce found in its second remand results, information that cannot be verified cannot be the basis for a non-use finding.  *See* Second Remand Results at 16-18.  Indeed, contrary to Risen's assertion that "nothing on this record has undermined the reliability of these {non-use} certifications," Risen Cmts. 4, a majority of the certifications were undermined by the companies' unwillingness either to respond to Commerce' supplemental questionnaire or to participate in verification, affecting a substantial portion of Risen's overall sales.[2]

---

[2] Likewise, contrary to Risen's claims that Commerce's effort to verify each of the supplemental questionnaire responses was "unprecedented," Risen Br. 3, 5, Commerce proceeded both consistent with its stated practice regarding the EBCP and with this Court's instructions in

PUBLIC VERSION

Moreover, although the statute does not explicitly address how Commerce should treat information that cannot be verified as part of a non-mandatory verification, the scheme supports Commerce's determination not to rely on information that could not be verified.  Specifically, 19 U.S.C. § 1677e(a)(2)(D) provides that, when information provided by a respondent cannot be verified as provided in 19 U.S.C. § 1677m(i), Commerce "shall, subject to section {19 U.S.C. § 1677m(d)}, use the facts otherwise available in reaching the applicable determination under this subtitle."  Section 1677m(e) likewise provides that Commerce shall not decline to consider information if, among other factors, "the information can be verified."  19 U.S.C. § 1677m(e)(2).  Although verification was not mandatory in this case, the facts available provision of the statute, read together with section 1677m(e)(2), indicates that Commerce has the discretion to disregard evidence that cannot be verified.  *See AMS Associates, Inc. v. United States*, 719 F.3d 1376, 1380 (Fed. Cir. 2013) ("In disregarding information that it could not verify, Commerce did not act contrary to law.").  Likewise, because Commerce was not able to verify information provided by [                    ], the portion of Risen's EBCP supplemental questionnaire response pertaining to [                    ] is not an appropriate basis for finding non-use of the EBCP.

Risen also contends that the government of China's initial questionnaire response, in which it averred that Risen did not use the EBCP based on a search of the Chinese Export-Import Bank's loan database, supports Risen's claim of non-use.  Risen's Cmts. 4-5 (citing GOC Initial

---

remanding the case to "attempt to verify Risen's submissions to the extent Commerce finds appropriate, and if that is successful, it should either accept the *pro rata* adjustment sought by Risen or conclude that the EBCP was not used at all."  *Risen II*, 2023 WL 2890019, at *5; *see also*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022), and IDM at 21-22 (discussing Commerce's practice as of June 2022); *Wuxi Tianran Photovoltaic Co., Ltd. v. United States*, No. 21-00538, ECF No. 46 (Ct. Int'l Trade Jan. 10, 2023) (discussing plaintiff's objection to Commerce's "general practice of requiring complete participation in verification for all of a respondent's customers" (quotation marks omitted)).

Questionnaire Resp. at 126-128, Exs. II.F.1-2 (Dec. 30, 2019) (P.R. 140, 143; C.R. 104, 108)).

Commerce explained in the final results, however, that it "cannot simply rely on the GOC's

assurances that it has checked its records," and that it has no way of verifying such responses

when the GOC does not provide Commerce with the information requested by Commerce.  IDM

at 33; *see also id.* at 31 ("without a thorough understanding of how the program functions, it is

impossible to confirm non-use of the program").  Therefore, the information cited by Risen is not

sufficient for purposes of a finding of non-use of the EBCP.  *See Wood Mouldings and Millwork*

*Products from the People's Republic of China*, 88 Fed. Reg. 62,319 (Dep't of Commerce Sept.

11, 2023), and IDM at 29-30 (*Wood Mouldings from China*) (addressing similar arguments).

    Risen next argues that the circumstances of [          ]'s non-compliance and

Risen's efforts to comply with Commerce's information requests should mitigate Commerce's

EBCP finding for Risen.  The issue on remand, however, is not whether *Risen or its customers*

cooperated to the best of their ability, but whether the information provided by Risen can "plug"

the gap in the record caused by the *government of China's* non-cooperation.  *Cf. Risen II*, 2023

WL 2890019, at *5 (stating that "Commerce cannot reasonably conclude that Risen did not

supply information that rendered the missing data from the GOC irrelevant and essentially

eliminated any gap in the record").  Although the Court in *Risen II* did discuss the extent of

Risen's cooperation, it was at a time when all parties' understanding was that the proportion of

missing or unverifiable information corresponded to a considerably smaller percentage of

Risen's sales.  Nor does the statute direct Commerce to consider such factors in determining

whether a respondent has provided information sufficient to overcome the application of AFA,

especially when the gap in the record is much larger in the second remand results compared to

the first remand results.  *See* Second Remand Results at 19-20.  The asserted reasons for

[                    ]'s refusal have no bearing on the factual question of whether the information that Commerce requires to make a finding of non-use is on the record.  Hence, there is no legal basis for Risen's position that Commerce must consider Risen's efforts to seek compliance from [                    ] in a manner that would mitigate the impact of the gap in the record.

Risen (joined by Shanghai BYD) additionally argues that the Court's holding obliges Commerce to apply a *pro rata* adjustment to account for its customers that were available for verification.  *See* Risen Cmts. 7-8; Shanghai BYD Cmts. 3-4.  But the language of the Court's remand decision states that Commerce "should attempt to verify Risen's submissions to the extent Commerce finds appropriate, *and if that is successful*, it should either accept the *pro rata* adjustment sought by Risen or conclude that the EBCP was not used at all."  *Risen II*, 2023 WL 2890019, at *5 (emphasis added).  Risen argues the opposite—that Commerce should accept Risen's *pro rata* approach even though verification was *unsuccessful*, whereas the Court did not indicate what Commerce should do following an unsuccessful verification.  *Cf. Wuxi Tianran*, No. 21-00538, ECF No. 46 (sustaining remand results following unsuccessful verification).

It is reasonable, moreover, for Commerce to define a "successful" verification as one in which it verifies all of the information provided in Risen's EBCP questionnaire response, such that Commerce can affirmatively determine use or non-use.  Indeed, Commerce's position has been that it needs loan information from *all* customers to find non-use of the EBCP; it follows that Commerce would verify all customers as well.  *See, e.g.*, First Remand Results at 8, 18-19 ("Commerce requires information regarding *all* of a respondent's U.S. importers/customers in order to ensure that none of those importers/customers have received benefits under the EBCP"); *Wood Mouldings from China*, 88 Fed. Reg. 62,319, and IDM at 30-31 (finding non-use for respondent that provided certifications and supplemental questionnaire responses for all U.S.

customers, which were subject to potential verification).  That applies in particular to a customer like [                ] that accounts for a considerable portion of Risen's sales, given Commerce's concern that a company would be able to conceal use of the EBCP if it is used by customers that ultimately do not cooperate with Commerce.  *See* Second Remand Results at 6; First Remand Results at 9.  Because Commerce was unable to successfully verify Risen's information, it continues to apply AFA, based on the GOC's failure to cooperate, to calculate a rate for the EBCP.  *See* Second Remand Results at 6-7.

Finally, Risen's insistence that Commerce apply an adjusted subsidy rate to the EBCP does not align with Commerce's practice and is unreasonable.  As Commerce explained in the first remand results, there is no precedent for Commerce to apply an adjusted AFA rate in the manner that Risen suggests, and such an approach would be inappropriate because Commerce has no way to determine the size of the subsidies received by the customers that cannot be verified.  *See* First Remand Results at 20.  This concern is further magnified in this remand proceeding, now that information pertaining to [  ] percent of Risen's sales is either missing from the record or unverifiable.  Allowing for a prorated subsidy rate in this circumstance opens the door for a scenario in which only customers that have not received a benefit under the EBCP cooperate with Commerce's verification procedures, thereby concealing a benefit that Risen has received under the program.  *See* Second Remand Results at 6; First Remand Results at 9.  Thus, Risen does not provide a compelling reason for Commerce to deviate from its statutorily authorized method of selecting an AFA rate for the EBCP.  *See* 19 U.S.C. § 1677e(d)(1)(A)(i); *Essar Steel Ltd. v. United States,* 753 F.3d 1368, 1373-74 (Fed. Cir. 2014) (affirming application of "hierarchical methodology" to select AFA rate).

III.    **Commerce's Land Benchmark Calculation Is Supported By Substantial Evidence And Complies With The Court's Remand Order**

With respect to calculating the land benchmark, the Court in *Risen II* held that Commerce "must provide a compelling reason for its continued use of the stale 2010 CBRE report or otherwise use the Malaysian data only."  2023 WL 2890019, at *7.  Commerce complied with the Court's order and explained why it was appropriate to continue using the Thai CBRE data based on the year-specific nature of its benchmark calculations, while adjusting its calculations to use the data source closest in time to the purchase date for the land-use rights, rather than the 2017 period of review.  *See* Second Remand Results at 9-10.  Because the Thai data—which includes prices for 2007 and 2010—is more contemporaneous to a number of the purchases than the Malaysian alternative, Commerce provided a "compelling reason" for continued use of the Thai data for those years in which it is the most contemporaneous source.  *Id.* at 9-10, 24-25.

As an initial matter, despite Commerce's revised explanation and adjustment to its calculations, Commerce's basic methodology for calculating the land benchmark by inflating or deflating the benchmark data to the year of purchase (rather than the period of review) has not changed.  Throughout the proceeding, Commerce has calculated a series of benchmark prices for each year, then assigned each land-use right purchase a benchmark corresponding to the year of purchase.  This is apparent from the calculation spreadsheets for the initial determination, first remand results, and second remand results, all of which show that Commerce adjusted the data it used—Thai data alone in the initial review and a combination of the Thai and Malaysian data in the remand results—to the year of purchase.  *See* JA Solar Calc. Worksheet at Tabs LandBM (rows 31-48) and Land (columns R, Q) (C.R. 324); First Remand Calc. Worksheet at Tabs LandBM (rows 31-48), 2017 Malaysia Land BM (rows 37-58), and Land (columns R, Q)

(R.C.R. 33); Second Remand Calc. Worksheet at Tabs RevisedLandBM (rows 31-48),

RevisedMalaysiaLandBM (rows 45-64), and Land (columns R, Q) (R.C.R.2 6).

Despite Commerce's inaccurate past statements, the only variation in the land benchmark

calculation between the original preliminary and final results, first remand results, and second

remand results is the data source that Commerce used to generate the benchmark for a given

year.  In the original determination, Commerce calculated its yearly benchmark price based on

Thai land data because Commerce deemed that data to be the only source on the record

appropriate for use.  *See* PDM at 18; IDM at 52.  In the first remand results, having added the

Malaysian data to the record, Commerce calculated a benchmark price for each year based on a

simple average of the Thai and Malaysia land data, while still inflating or deflating each of the

two sources to the relevant purchase year.  First Remand Calc. Worksheet at Tabs LandBM,

2017 Malaysia Land BM, and Land (R.C.R. 33).  In the second remand results, Commerce

calculated a benchmark price for each year based on the data source (Thai or Malaysian data)

closest in time to the year in which land was acquired.  Second Remand Calc. Worksheet at Tabs

RevisedLandBM, RevisedMalaysiaLandBM, and Land (R.C.R.2 6).  The main difference

between the first and second remand results is that, rather than relying on a simple average of the

Thai and Malaysian data adjusted to each year in which one of the respondents purchased land,

Commerce in the second remand relied solely on the record data that was most contemporaneous

to the year of purchase, and a combination of the two sources for the one year to which they were

equally contemporaneous.  *See id.*; Second Remand Results at 10-11, 24-25.[3]

---

[3] One additional difference is that Commerce adjusted its calculation to use Malaysian data that
Risen had placed on the record during the first remand, containing Malaysian land values for the
years 2014 to 2019 (and indexed values for earlier years), which Commerce concluded were
more contemporaneous with certain land-use rights purchases, compared to the 2021 Malaysian
data that Commerce used in the first remand results.  *See* Second Remand Results at 10 (citing
Risen First Remand Rebuttal Information (Aug. 16, 2022) (R.P.R. 22)).

By using the data most contemporaneous to the time for which it requires a benchmark, Commerce is seeking to calculate the most accurate benchmark possible while avoiding the type of staleness (or in the case of the Malaysian data non-contemporaneity) issues about which the Court expressed concern in its remand.  *See Risen II*, 2023 WL 2890019, at *7 ("{Commerce} has to decide if it has such defective data that it should be rejected in favor of better data.  The Malaysian data is contemporaneous while the Thai data is outdated by seven years and requires inflationary adjustments.").  Commerce's second remand results thus further the agency's mandate to determine dumping margins as accurately as possible, which constitutes a compelling reason to continue to rely on the Thai data while adjusting its calculation to ensure it is not using outdated information.  *See* Second Remand Results at 24-25; *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  Indeed, at least one plaintiff, Risen, supports Commerce's approach to the benchmark data on remand.  *See* Risen Cmts. 1; Second Remand Results at 23 (discussing Risen's support for approach to "more appropriately account for contemporaneity").  Conversely, relying solely on the Malaysian data as JA Solar, Trina, and Shanghai BYD advocate, would present precisely the type of non-contemporaneity issue that led the Court to remand the matter because Commerce would be required to deflate the Malaysian data to account for purchases that occurred multiple years earlier.

Moreover, as Commerce explained in the second remand results, its determination on remand is consistent with its regulations and with the original intent of Commerce's land for LTAR practice.  *See* Second Remand Results at 8-9.  Specifically, pursuant to 19 C.F.R. § 351.524(d)(3) regarding Commerce's process for allocating non-recurring benefits over time, Commerce will "select a discount rate based upon *data for the year in which the government*

*agreed to provide the subsidy*" (emphasis added).[4]  Further, Commerce stated as early as the preliminary results that it was proceeding using the methodology established in its *Sacks from China* investigation, which states that "{i}n order to calculate the benefit, we first multiplied the benchmark land rate (deflated from 2007 *to the year the transaction was officially approved by the country*) . . . ."  *See* PDM at 17-18; *Sacks from China*, 73 Fed. Reg. 35,639, at IDM pg. 17 (emphasis added)).  Correspondingly, this Court previously recognized Commerce's practice in *Zhaoqing New Zhongya Aluminum Co. v. United States*, in which the Court discussed the short time between the acquisition date of land use rights and the timing of the benchmark data in relation to Commerce's decision not to deflate that data.  961 F. Supp. 2d 1346, 1354-55 (Ct. Int'l Trade 2014).  Under these circumstances, Commerce appropriately corrected its previous misstatements and followed its stated, more-accurate practice for valuing land in providing a compelling reason to continue to use the Thai land data.

Risen, as we established above, supports Commerce's approach to "more appropriately account for contemporaneity" in its land benchmark.  Risen Cmts. 1; Second Remand Results at 23.  By contrast, JA Solar does not challenge Commerce's explanation that the correct approach is to calculate a benchmark for the year in which land was purchased rather than the period of review, but nonetheless (joined by Trina and Shanghai BYD) advocates that the Court restrict Commerce solely to using the Malaysian data on procedural grounds.  *See* JA Solar Cmts. 2-7; Trina Cmts. 3-4; Shanghai BYD Cmts. 4-5.  These challenges lack merit.

Contrary to JA Solar's assertion that Commerce used an "entirely new" benchmark calculation in the second remand results, JA Solar Cmts. 3-4, we showed above that Commerce's

---

[4] Also, under 19 U.S.C. § 1677(5)(E)(iv), Commerce must set benchmarks reflecting "prevailing market conditions."  The statute further defines prevailing market conditions as including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*

explanation on remand is consistent with the manner in which Commerce has calculated the land benchmark throughout the proceedings.  *Compare* Second Remand Results at 9, 24-25 *with* JA Solar Calc. Worksheet at Tabs LandBM (rows 31-48) and Land (columns R, Q) (C.R. 324). Moreover, contrary to JA Solar's contention that Commerce failed to provide a compelling reason for its continued use of the Thai CBRE data, JA Solar Cmts. 4, Commerce provided a compelling explanation that "{w}hen comparing the contemporaneity of these two data sources against the dates the respondents purchased their land-use rights, it is clear that the Thai prices from the 2010 CBRE Report . . . provide a more contemporaneous benchmark price" for certain years "because the actual Thai prices for 2007 and 2010 are more contemporaneous with the dates of these purchases than the actual Malaysian prices{.}"  Second Remand Results at 24.  If Commerce were to rely solely on the Malaysian data in its benchmark calculations as JA Solar advocates, *see* JA Solar Cmts. 4-5, Commerce's calculation would clearly be skewed in the manner about which the Court expressed concern, just in a way that advantages JA Solar.

JA Solar further argues that fairness concerns should preclude Commerce from revising its methodology on remand, claiming that it would have submitted different benchmark data "had it known that Commerce would take a purchase-year approach to the land benchmark, rather than using POR data as has been its standard past practice."  JA Solar Cmts. 5-6; *see generally id.* at 5-7.  But these arguments are belied by the record.  In the preliminary results, Commerce—without stating that it would index land benchmark data to the period of review— stated that it was proceeding consistent with the methodology established in *Sacks from China* and invited parties "to submit alternative benchmark data that is consistent with the guidance provided in *Sacks from China* and the Land Benchmark Analysis."  PDM at 17-18.  That guidance, in turn, explained that Commerce's approach is to index benchmark land data to the

PUBLIC VERSION

year in which the land transaction(s) occurred.  *See Sacks from China*, 72 Fed. Reg. at 67,909,

*unchanged in final* 73 Fed. Reg. 35,639, at IDM pg. 17; *see also* Land Benchmark Analysis

Memorandum at 30 (Jan. 31, 2020, placed on record May 19, 2020) (P.R. 203) (stating that

Commerce "intends to follow the methodology used in *LWS* in selecting {land benchmark}

prices").  Then, subsequent to releasing the preliminary analysis worksheet showing that it had

calculated land benchmarks on a year-specific basis, Commerce placed the Thai CBRE data and

Land Benchmark Analysis memo on the record and gave parties another opportunity to rebut,

clarify, or correct those benchmark materials.  *See* Prelim. JA Solar Calc. Worksheet at Tabs

LandBM and Land (C.R. 306); CBRE Data Memo at 1 (P.R. 202).  JA Solar thus had both notice

of Commerce's calculation method and an opportunity to submit alternate data.

 Further, given that Commerce released its calculations at every stage of the proceeding,

JA Solar had opportunities in connection with the preliminary results, final results, and first

remand results to dispute Commerce's year-specific calculations if it disagreed with them

because they appeared in the calculation memoranda released for each of those determinations.

JA Solar's claim that it could not have been on notice regarding the nature of Commerce's

calculations in the first remand results because Commerce averaged the Thai and Malaysian data

is inaccurate, JA Solar Cmts. 6, because Commerce's calculation memo still shows that

Commerce deflated the Malaysian data to the year of the land purchase before averaging it with

the Thai data.  *See* First Remand Calc. Worksheet at Tabs LandBM (rows 31-48), 2017 Malaysia

Land BM (rows 37-58), and Land (columns R, Q) (R.C.R. 33); First Remand Draft Calc.

Worksheet at Tabs LandBM (rows 31-48), 2017 Malaysia Land BM (rows 37-58), and Land

(columns R, Q) (Aug. 31, 2022) (R.C.R. 26).  Indeed, when Commerce placed Malaysian data on

the record during the first remand, Risen responded by submitting Malaysian data for earlier time

periods "to clarify the costs during those years" and Commerce ultimately relied on that data in its second remand calculations.  Risen First Remand Rebuttal Submission at 1, Ex. 1 (R.P.R. 22). JA Solar, for its part, continued to advocate that Commerce select benchmark data from outside Asia to benchmark land in China.  *See* Rejection Memo (Sept. 2, 2022) (R.P.R. 29) (rejecting JA Solar submission of new factual information "purporting to demonstrate that producers view Mexico and Brazil as reasonable alternatives to China for production").

At the same time, Commerce is permitted to change its practice when such a change is permitted by law.  *See Dorbest Ltd. v. United States*, 789 F.Supp.2d 1364, 1370 (Ct. Int'l Trade 2011) (citation omitted).  Commerce may "deviate from a past practice when 'the new policy is permissible under the statute, . . . there are good reasons for it, and . . . . the agency *believes* it to be better, which the conscious change of course adequately indicates.'"  *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  In doing so, "Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology."  *Id.*  Other than raising alleged fairness issues, JA Solar fails to identify how Commerce's determination to use the benchmark source most contemporaneous to the year of the purchase is inconsistent with law.  And although Commerce has only recently used more than one dataset in land benchmark calculations, JA Solar is incorrect to suggest that Commerce's determination in this case is a matter of post-hoc justification.  *See* JA Solar Br. 7.  Indeed, Commerce employed a similar approach in a recent remand redetermination pertaining to Commerce's countervailing duty order on aluminum foil from China (even though Commerce used only one data source in that case).  *See* Final Results of Remand Redetermination, *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, Ct. Int'l Trade No. 21-00133, ECF No. 67-68, at 20-30 (Aug. 4, 2023).

Finally, JA Solar's argument that Commerce exceeded the scope of the Court's remand order lacks merit. The Court did not direct Commerce to exclude the Thai CBRE data, and it did not preclude Commerce from adjusting its calculation to comply with the Court's remand order if Commerce provided a compelling reason to continue using the Thai data (which Commerce has done). In general, Commerce has broad discretion to reconsider issues on remand. *See ABB, Inc. v. United States*, 273 F.Supp.3d 1186, 1199 n.14 (Ct. Int'l Trade 2017) ("Unless specifically directed by the court, Commerce has broad discretion to fully consider the issues remanded." (citations omitted)). Therefore, the Court should sustain Commerce's remand redetermination because it lawfully addresses the concerns raised by the Court regarding the staleness of the Thai CBRE data and provides a "compelling reason" to continue using the data.

## IV. Commerce's Ocean Freight Benchmark Calculation Is Supported By Substantial Evidence And Complies With The Court's Remand Order

The Court in *Risen II* held that "{i}f Commerce cannot supply a convincing reason as to why the Descartes data improves accuracy, Commerce should not use it." 2023 WL 2890019, at *9. On remand, Commerce determined not to use the Descartes data and calculated an ocean freight benchmark based solely on of the Xeneta data. *See* Second Remand Results at 11-12. No party opposes this aspect of Commerce's remand redetermination. Therefore, Commerce complied with the Court's remand order, and its redetermined ocean freight benchmark calculation should be sustained.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's second remand results and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                    /s/ Joshua E. Kurland
SPENCER NEFF                                   JOSHUA S. KURLAND
Attorney                                       Senior Trial Counsel
Office of the Chief Counsel                    Commercial Litigation Branch
for Trade Enforcement and Compliance           Civil Division
U.S. Department of Commerce                    U.S. Department of Justice
                                               P.O. Box 480, Ben Franklin Station
                                               Washington, D.C. 20044
                                               Telephone:  (202) 616-0477
                                               Email:  Joshua E. Kurland@usdoj.gov

September 29, 2023                             *Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's attached filing complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which the motion was prepared, the confidential version of the brief contains a total of 8,196 words.


/s/ Joshua E. Kurland


September 29, 2023