Slip Op. 23-161

# UNITED STATES COURT OF INTERNATIONAL TRADE

RISEN ENERGY CO., LTD.,

    Plaintiff,

JINGAO SOLAR CO., LTD., *ET AL*.,

    Consolidated Plaintiffs,

SHANGHAI BYD CO., LTD., TRINA SOLAR CO., LTD., *ET AL*.,

    Plaintiff-Intervenors,

v.

UNITED STATES,

    Defendant.

Before: Jane A. Restani, Judge

Consol. Court No. 20-03912

## OPINION AND ORDER

[Commerce's Final Results in the Sixth Administrative Review of Commerce's countervailing duty order on crystalline silicon photovoltaic cells from the People's Republic of China are partially sustained and partially remanded for reconsideration consistent with this opinion.]

Dated: November 17, 2023

Gregory S. Menegaz and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff Risen Energy Co., Ltd. With them on the brief was Judith L. Holdsworth.

Jeffrey S. Grimson, Mowry & Grimson, PLLC, of Washington, DC, for consolidated plaintiff JingAo Solar Co., Ltd. With him on the brief were Sarah M. Wyss, Bryan P. Cenko, Jill A. Cramer, Yixin (Cleo) Li, and Ronalda G. Smith.

Craig A. Lewis, Hogan Lovells US LLP, of Washington DC, for plaintiff-intervenor Shanghai BYD Co., Ltd.

Jonathan M. Freed, Trade Pacific PLLC, of Washington DC, for plaintiff-intervenor Trina Solar Co., Ltd. With him on the brief were Robert G. Gosselink and Kenneth N. Hammer.

Joshua E. Kurland, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Spencer Neff, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Restani, Judge: Before the court are the second remand results of the U.S. Department of Commerce ("Commerce") pursuant to the court's order in Risen Energy Co. v. United States, Slip Op. 23-48, 2023 WL 2890019 (CIT Apr. 11, 2023) ("Risen II"), in the Sixth Administrative Review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells"), from the People's Republic of China, covering the period from January 1, 2017, to December 31, 2017. See Final Results of Redetermination Pursuant to Court Remand Order, ECF Nos. 115–116 (July 12, 2023) ("Second Remand Results"). Plaintiff Risen Energy Co., Ltd. ("Risen") and Consolidated Plaintiffs JingAo Solar Co., Ltd. ("JA Solar") (collectively, "Plaintiffs")[1] challenge the Second Remand Results as unsupported by substantial evidence or otherwise not in accordance with law.

## BACKGROUND

While the court presumes familiarity with the facts as set out in Risen Energy Co. v. United States, 46 CIT __, __, 570 F. Supp. 3d 1369, 1372 (2022) ("Risen I") and in Risen II, the court briefly summarizes the relevant record evidence for ease of reference. In March 2019, Commerce began the Sixth Administrative Review of the countervailing duty order on solar cells from the People's Republic of China. Initiation of Antidumping and Countervailing Duty Administrative

---

[1] Plaintiff-intervenors Shanghai BYD Co., Ltd. ("Shanghai BYD") and Trina Solar Co., Ltd. ("Trina") are non-examined parties who seek the benefits of whatever relief the court grants. See; Trina's Comments on Second Remand Results, ECF No. 120 (Aug. 11, 2023) ("Trina Br."); Shanghai BYD's Comments on Second Remand Results, ECF No. 119 (Aug. 11, 2023) ("Shanghai BYD Br.").

Reviews, 84 Fed. Reg. 9297, 9303–04 (Dep't Commerce Mar. 14, 2019). On November 5, 2019, the U.S. International Trade Administration selected JA Solar and Risen as mandatory respondents in this review. See Department of Commerce, Respondent Selection Memorandum at 1–2, P.R. 98 (Nov. 5, 2019).

Commerce published its preliminary results on February 11, 2020, see Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2017, 85 Fed. Reg. 7,727 (Dep't Commerce Feb. 11, 2020), along with the accompanying Preliminary Issues and Decision Memorandum, Decision Memorandum for the Preliminary Results of the Administrative Review of the Countervailing Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2017, C-570-980, POR 01/01/2017-12/31/2017 (Dep't Commerce Jan. 31, 2020) ("PDM").

Commerce published its final determination on December 9, 2020. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 79,163 (Dep't Commerce Dec. 9, 2020); see also Issues and Decision Memorandum for the Final Results of the Administrative Review of the Countervailing Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2017, C-570-980, POR 01/01/2017-12/31/2017 (Dep't Commerce Nov. 27, 2020) ("IDM").

In Risen I, the court upheld Commerce's determination that Plaintiffs received regionally specific electricity subsidies subject to countervailing duties. See 570 F. Supp. 3d at 1382. The

Consol. Court No. 20-03912 Page 4

court remanded to Commerce to reconsider (1) the benchmark for land prices in China and (2) the benchmark for determining the cost of ocean freight for subsidy calculations involving provisions of raw materials for less than adequate remuneration. Id. at 1376, 1379. Additionally, the court granted the United States' request for remand on the Government of China's ("GOC") Export Buyer's Credit Program ("EBCP") but instructed Commerce to attempt to verify or to explain the reason that the court "should not provide some form of equitable relief." Id. at 1373.

After the first remand, Commerce found that it was able to verify JA Solar's non-use of the EBCP program. Final Results of Redetermination Pursuant to Court Remand Order at 15–20, ECF No. 94 (Oct. 7, 2022) ("First Remand Results"). Commerce continued to use adverse facts available ("AFA"), however, to find that Risen had benefited from EBCP. Id. As to land subsidies, Commerce modified its land benchmark by simple averaging 2021 data from Malaysia that Commerce placed on the record ("Malaysian data") with Commerce's original data source ("2010 CBRE data"). Risen II, 2023 WL 2890019 at *7. Commerce adjusted its ocean freight benchmark to attempt to counter concerns about double counting and use of data sets that contained shipping routes not comparable to those actually used by the Plaintiffs. Id. at *8. After considering the results of the first remand, the court remanded again for reconsideration on all three issues. Id. at *9. In the second remand, the court ordered Commerce to attempt to verify Risen's non-use of the EBCP program. Risen II, at *5. It additionally ordered Commerce to either explain its use of the 2010 CBRE data, which it held was not supported by substantial evidence due to staleness issues, or to use only the Malaysian data in the benchmark calculation. Id. at *7. On ocean freight, the court likewise ordered Commerce to either explain why Commerce's choice of data was supported by substantial evidence, or to replace that data with the JA Solar's proposed data set ("Xeneta data"). Id. at *9.

On remand, Commerce reopened the record and began the verification process, but ceased verification processes entirely when one of Risen's customers declined to participate in in-person verification proceedings. See Second Remand Results at 5–6. For the land benchmark issue, Commerce changed its calculation method entirely. Id. at 8–10. Instead of simple averaging the data sets to get one benchmark, Commerce's new formula uses whichever data set is most contemporaneous to the purchase year of a piece of land for use as the benchmark for that land transaction, simple averaging the two data sets for transactions where neither source is contemporaneous. Id. On ocean freight, Commerce decided to rely on the Xeneta data alone for the ocean freight calculation. Id. at 11–12. All parties are satisfied with the new ocean freight calculation. Id. at 26–27. Risen continues to contest Commerce's EBCP finding and JA Solar continues to contest Commerce's land benchmark. Risen Comments on Second Remand Results at 1, ECF No. 118 (Aug 11, 2023) ("Risen Br."); JA Solar Comments on Second Remand Results at 2, ECF No. 123 (Aug 11, 2023) ("JA Solar Br.").

The Second Remand Results do not adequately address all of the court's concerns in Risen II and they are not supported by substantial evidence. Accordingly, the court once again remands with further instructions.

## JURISDICTION & STANDARD OF REVIEW

The court's jurisdiction continues pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). The court sustains Commerce's final redetermination results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(a)(2)(B)(i).

# DISCUSSION

## I.　Export Buyer's Credit Program

The GOC's EBCP promotes exports by providing credit at preferential interest rates to qualifying foreign purchasers of GOC goods. See Clearon Corp. v. United States, 359 F. Supp. 3d 1344, 1347 (2019). During the review, Risen reported that none of its customers used the EBCP during the Period of Review ("POR") and confirmed that it had never been involved in assisting customers in obtaining loans under the program;[2] it also provided certifications of non-use from its U.S. customers attesting to this fact. See Risen Section III Questionnaire Response, Ex. 19 at 23–24, P.R. 144–162, C.R. 109–276 (Dec. 30, 2019); Risen Unaffiliated Supplier II, Section III Questionnaire Response at 23, Ex. 15, P.R. 164, C.R. 277 (Jan. 6, 2020). The GOC, however, did not provide all of the initially requested information to Commerce, stating that the questions were inapplicable because "the GOC believes that none of the respondents under review applied for, used, or benefitted from the alleged program." GOC Initial Questionnaire Response at 126, C.R. 104–108, P.R. 140–143 (Dec. 30, 2019); see IDM at 27.

Previously, the court remanded Commerce's application of AFA to Risen. See Risen II. The court concluded that Risen had provided sufficient information from its customers to potentially eliminate any gap in the record caused by the GOC's non-compliance with Commerce's questionnaire. Id. at *5. The court therefore ordered Commerce to attempt to verify the information provided by Risen, and stated that, if verification were successful, Commerce "should either accept the pro rata adjustment sought by Risen or conclude that the EBCP was not used at all." Id. at *5.

---

[2] See GOC Initial Questionnaire Response at 126, C.R. 104–108, P.R. 140–143 (Dec. 30, 2019); see also id. at Ex F-2 (indicating exporters are involved in the process).

On remand, Commerce had Risen gauge each of its customers' availability for in-person verification. Second Remand Results at 5. Risen has already stated that none of its customers used the EBCP, all of the customers provided non-use certifications, and all of the significant customers provided their own financial records to Commerce. See IDM at 27–28; see also IDM at Ex. 19; see also Risen EBC Questionnaire Response, P.R. 12, C.R. 2–4 (Sept. 29, 2023); see also Risen EBC Questionnaire Response, P.R. 12, C.R. 2–4 (Oct. 19, 2022). In addition to these earlier requests, Commerce now had Risen ask each certifying customer to participate in expensive and time-consuming in-person verification lasting one to two days. Second Remand Results at 5. All but one of Risen's certifying customers consented to participate in such verification proceedings, but because that one customer refused to participate, Commerce declined to initiate any verification proceedings. Id. at 5–6. Commerce argues that because the one customer who refused to participate in in-person verification accounts for a significant portion of Risen's sales during the POR, verification of non-use of the EBCP program is impossible because the "unverified" information from that one customer would leave an insurmountable gap in the record. Id. at 6. Though the customer that declined in-person verification proceedings had submitted financial records prior to the in-person verification request, Commerce rejected all the financial records as unverifiable without in-person verification proceedings. Second Remand Results at 16–17. As a result, Commerce did not conduct any type of verification proceedings and continued to apply AFA because, in its view, in the absence of such successful verification, Risen could not fill the gap caused by the GOC's non-compliance with Commerce's earlier questionnaire about use of the EBCP program. Id. at 20

Now, Risen objects to the Second Remand Results, arguing that Commerce has ignored the court's directions to attempt verification. Risen Br. at 8. The clear implication of the court's

direction was to conduct so much verification as was appropriate to these particular proceedings. See Risen II at *5. Risen asserts that Commerce has made increasingly unreasonable demands from unaffiliated customers long after the POR and that Commerce was only seeking to delay the proceedings. Risen Br. at 8–9. Risen contends that the record contained sufficient information to demonstrate non-use through the provided customer financial information and certifications. Id. at 10. Risen now asks that the court order Commerce to either find non-use or assign a pro-rata rate so that Commerce may not delay Risen's relief again. Id.

If "necessary information is not available on the record" or if a responding party "withholds information" requested by Commerce, Commerce shall "use the facts otherwise available in reaching the applicable determination . . . ." 19 U.S.C § 1677e(a). Commerce may use AFA only when information is missing from the record because a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce. 19 U.S.C. § 1677e(b). The application of adverse facts that collaterally impact a cooperating party is disfavored. Fine Furniture (Shanghai) Ltd. v. United States, 36 CIT 1206, 1211 n.10, 865 F. Supp. 2d 1254, 1262 n.10 (2012), aff'd, 748 F.3d 1365 (Fed. Cir. 2014). "When Commerce has access to information on the record to fill in the gaps created by the lack of cooperation by the government, as opposed to the exporter/producer, however, it is expected to consider such evidence." GPX Int'l Tire Corp. v. United States, 37 CIT 19, 59, 893 F. Supp. 2d 1296, 1332 (2013), aff'd, 780 F.3d 1136 (Fed. Cir. 2015) (citing Fine Furniture, 36 CIT at 1216, 865 F. Supp. 2d at 1265); see also Guizhou Tyre Co. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1261, 1270 (2018) ("To apply AFA in circumstances where relevant information exists elsewhere on the record — that is, solely to deter non-cooperation or 'simply to punish' — . . . that is a fate this court should sidestep.") (citation omitted). Use of AFA is only appropriate where information is

otherwise not available on the record, and should not be used "simply to punish" a non-cooperative party. Guizhou Tyre, 42 CIT at __, 348 F. Supp. 3d at 1270 (2018) (citations omitted).

Here, the relevant information was submitted. Commerce must show that such information is not reasonably verifiable before it applies AFA. See Changzhou Trina Solar Energy Co. v. United States, 42 CIT __, __, 352 F. Supp. 3d 1316, 1327 (2018) (citing 19 U.S.C. § 1677m(e)); Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1382–83 (Fed. Cir. 2016) (holding that if the requirements of § 1677m(e) are not met, Commerce need not consider information submitted by an interested party). Verification is undefined by the statute, and the statute does not describe what processes Commerce should use to verify information. See 19 U.S.C. § 1677e(b). In order to find that information is not verifiable, however, Commerce must at least attempt to complete verification. See Guizhou Tyre Co. v. United States, 43 CIT __, __, 415 F. Supp. 3d 1402, 1405 (2019) ("The adverse use of facts otherwise available can only be used to fill gaps necessary to complete the factual record . . . . But until these reasons are grounded in facts supported by the record—that is, until the Department actually attempts verification and adequately confronts these (purportedly) insurmountable challenges, there is little for the Department to hang its hat on when it 'continues to find a "gap" in the record.'") (citations omitted) (emphasis in original).

Risen itself has filled the gap caused by the GOC's non-compliance with Commerce's questionnaire. It has both certified its non-involvement in the program and produced non-party customer certifications and back-up financial data from those customers, all demonstrating non-use. See Second Remand Results at 5; see also First Remand Results at 6; see also Risen Br. at 10. For the reasons set forth below, the court concludes that Commerce did not attempt a reasonable level of further verification of that information. In considering this issue, the court is mindful that

Risen's customers are unaffiliated businesses sharing sensitive information years after relevant transactions with Risen may have ended. See Department of Commerce, Export Buyer's Credit Supplemental Questionnaire at Ex. 2, P.R. 1–2 (Sept. 29, 2023). The court is also mindful that asking a private entity with no legal obligation to do so to allow government officials to inspect its records is asking for something that can be both expensive and time consuming.[3] This new request for in-person verification, coming more than six years after the POR, has already caused one customer to decline to participate in unlimited verification proceedings. See Second Remand Results at 5–6; see also Risen Br. at 5. At this point, the gap that Commerce alleges exists—the unverifiable information from the drop-out customer that is a result of non-compliance with Commerce's verification request—is a new circumstance that has emerged late in the process as a result of Commerce's newly crafted verification requirements. When the process of verification itself becomes the source of new non-compliance, courts should consider whether the process, as laid out by Commerce, is reasonably necessary or whether it has become so onerous as to impede good faith efforts by respondents to comply. Here, the factors laid out all together—non-use certificates and supporting records followed by requests for in-person visits of several days and government intrusion into all financial records on the premises of U.S. customer companies, all

---

[3] There are many reasons, utterly unrelated to the current litigation, why a private non-party business entity might be reluctant to submit to one to two day in-person verification proceedings several years after the POR. The decision not to participate does not logically imply that the company used EBCP. A government inspection of any kind will necessarily involve legal fees, time spent preparing matters, and almost always presents the risk that the company, which is currently under no obligation to participate, may open the door to further liability on other matters. Asking to verify the financial records of independent customers presents a high hurdle, one for which the Respondent must rely heavily on business relationships to attempt to fulfill the requirement. As time since the POR passes, the likelihood that those relationships may have shifted since the transactions at issue took place increases. See Risen Br. at 5. By drawing this process out, Commerce increased the odds that the Respondent would be unable to fill the gap to Commerce's satisfaction.

taking place six years after the POR, nearly four years after submission of the certificates, and in a world in which no verification efforts have ever produced evidence of the use of this program[4]—add up to an onerous unnecessary level of verification.

Risen produced non-use certificates two years after the POR, in early 2020.  See Risen Section III Questionnaire Response, P.R. 144–162, C.R. 109–276 (Dec. 30, 2019).  Those certificates have been on the record since that time.  Id.[5]  Commerce also has the financials of each of the third-party customers that produced a non-use certificate.  See Risen EBC Questionnaire Response, P.R. 12, C.R. 2–4 (July 8, 2022); see also Risen Verification Response, P.R. 7, C.R. 2, (May 17, 2023). Commerce has expressed no doubts about the financials.  Both the non-use certificates and the financial records produced by the third-parties represent evidence of non-use that supports Risen's own statement that its sales were not involved in the EBCP program.  No evidence presented to the court suggests that these statements are not punishable under 18 U.S.C. § 1001 if either Risen or a customer is lying.[6]  Commerce, nonetheless, sought to complete burdensome verification procedures presumably in order to determine whether or not the

---

[4] Risen Energy Co., Ltd. v. United States, Slip Op. 23-148, 2023 WL 6620508, at *8 n.2 (CIT Oct. 11, 2023).

[5] Particularly crucial in this case is the lapse in time between the POR and the current verification efforts.  The process of contesting anti-dumping determinations is by design already drawn out; Risen produced non-use certificates two years after the POR, in 2019.  Litigation on the POR has drawn out since that production.  In the nearly four intervening years of litigation, Risen lost at least one  customer, who, reasonably, no longer wishes to participate in this proceeding. It is impossible to evaluate how a full verification would have gone had it been attempted four years ago, but that it was not attempted four years ago is not Risen's fault.  If Commerce wishes to apply AFA, it must ensure that its processes are timely, particularly as even when the system is operating in as timely a manner as possible it already asks respondents to go back to customers over two years after any sales.  New, invasive verification efforts begun six years after the POR and three remands later is not a timely verification process.

[6] 18 U.S.C. § 1001 punishes false official statements with up to five years imprisonment.  In this additional layer of verification, Commerce is questioning Risen's U.S. based customers, who are in turn speaking to the United States government.  Ordinarily, these statements would be within the scope of 18 U.S.C. § 1001.

statements are true. Commerce has presented no evidence to the court that these companies are lying about their financials.[7] Commerce has presented no evidence to indicate that the companies do not know what they are talking about.[8] At this stage, every piece of evidence presented to Commerce and to the court supports the conclusion that Risen's sales were not aided by the EBCP. In the face of substantial evidence of non-use from Risen and its customers, and no evidence of use supported by actual evidence or any reasonable AFA inference, Commerce must not include a subsidy amount for EBCP.[9]

## II. Land Benchmark[10]

For simplicity's sake, the court assumes a basic level of familiarity with the facts of its earlier rulings on the benchmark land issue. See Risen I; see also Risen II. The current issue before the court is whether Commerce complied with the court's remand order that it either provide a "compelling reason for its continued use of the stale 2010 CBRE report or otherwise use the Malaysian data only." Risen II, at *7. Commerce has now satisfactorily explained its use of the 2010 CBRE report, but has exceeded the scope of the remand by implementing a new method of calculating the benchmark. The court therefore will remand to Commerce to use the method from the last remand stage, as that method is now explained.

"The court reviews remand determinations for compliance with the court's order." Nakornthai Strip Mill Public Co. Ltd. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303,

---

[7] Commerce has also never found any evidence that any U.S. company has used EBCP. Risen Energy Co. v. United States, Consol. Court No. 22-00231, slip op. at 8 n.2 (CIT Oct. 11, 2023).
[8] See Yama Ribbons and Bows Co. v. United States, Slip Op. 23-127, 2023 WL 5501536 at *14 (CIT Aug. 25, 2023).
[9] The court is aware from previous oral argument that Commerce rejects a pro-rata approach. Additionally, Commerce confirms in briefs that it is not willing to consider a pro-rata approach. Gov't Br. at 18.
[10] The benchmark is set in order to determine whether lease payments constitute less than adequate remuneration ("LTAR").

1306 (2008) (citations omitted); accord Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014). "Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." Sullivan v. Hudson, 490 U.S. 877, 886 (1989).

On remand, the court ordered Commerce to either justify its use of the 2010 CBRE report data in its land benchmark formula, or eliminate use of the 2010 CBRE report data in favor of the alternatively proposed Malaysian data. Risen II, at *7. The remand order presented Commerce with two clear options. See id. Instead of electing to execute either of those two options, Commerce elected to invent a third option: change the formula used to calculate the land benchmark, and then explain why the 2010 CBRE report data made sense for use in the new formula. Second Remand Results at 10; Commerce's Comments on Second Remand Results at 19, ECF No. 128 (Sept. 29, 2023) ("Gov't Br."). JA Solar argues that changing the land benchmark formula entirely now is outside of the scope of the remand, and that changing the formula at such a late stage unfairly denied JA Solar the opportunity to comment appropriately on the new proposed calculation method and to present appropriate data for the new benchmark methodology. JA Solar Br. at 2–5. Commerce argues that the court did not bar Commerce from changing its method on remand, and that because, absent a bar from the court, Commerce generally has broad discretion to reopen matters on remand, its new determination should be upheld. Gov't Br. at 26. The progress of this litigation, however, makes clear why the new methodology was indeed barred.

At the outset, prior to any remand, Commerce stated that the 2010 CBRE data was "indexed to the POR". IDM at 51. In its explanation of its method, Commerce cited to an earlier review of a different product from China, Laminated Woven Sacks from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative

Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination, 72 Fed. Reg. 67,893, 67906–08 (Dep't Commerce Dec. 3, 2007) ("Sacks from China").  IDM at 51; PDM at 18.  In Sacks from China, Commerce apparently indexed data to the purchase year, not the POR.  Sacks from China, 72 Fed. Reg. at 67,909.  But Commerce did not specifically note that aspect of Sacks from China.  When laying out its land benchmark calculation method here, Commerce did not claim that it was focusing on the dates of leases or indexing the data to the year of the lease.  IDM at 51; PDM at 18.  Instead, Commerce referenced indexing the 2010 CBRE data to "the POR."  IDM at 51.  Among other disputes affecting the land LTAR benchmark, a dispute about the staleness of the 2010 CBRE data for indexing to the POR then came to the court.  See Risen I; see also Risen II.

JA Solar has multiple leases with different purchase years that Commerce needed to evaluate.  See Second Remand Results at 10–11.  This is not the fact pattern of Sacks from China.  See Sacks from China, 72 Fed. Reg. at 67,909.  Apparently, Commerce's method of handling multiple leases was not fully developed when it initially analyzed the land subsidy in this case.  Commerce started with the simplest method to assess the LTAR for multiple leases, and used the 2010 CBRE data for all land rights regardless of purchase year.[11]  See IDM at 51–52.  When, taking Commerce at its word that contemporaneity to the POR was the issue, the parties disputed Commerce's use of the 2010 CBRE data,[12] Commerce then decided on remand to include the Malaysian data in its calculation as well, which was more contemporaneous to both the POR and some lease purchase data.  See First Remand Results at 22–23.  Commerce averaged the 2010 CBRE data with the Malaysian data.  First Remand Results at 11.  Although it was asked to provide

---

[11] Presumably, the desire for simplicity also led to indexing to the POR.
[12] See IDM at 48–50.

an explanation of why it was using both data sets, Commerce did not explain what it was doing. See Risen II at *7. Looking at the record through the lens of Commerce's latest explanation, the court can now glean that the range of years contained within the 2010 CBRE data and the Malaysian data when combined together made the data set as a whole a more accurate representation of the range of purchase dates at issue in this case.

It seems that Commerce did not offer the court this explanation at the time because it likely was focusing on the geographical and economical suitability of the two countries for benchmark data. It did not say that because it was addressing multiple leases that were initiated over a range of years neither data set alone was more suitable than the other. By choosing a new methodology that focuses on the time of the lease, Commerce has implicitly explained this now and the court does not find it to be an unreasonable method based on the litigation as it stood at the time.

The scope of the remand was limited. No party suggested another methodology might be appropriate. This fact and the prejudice of further delay resulted in the limited remand. Nonetheless on remand, Commerce changed its calculation method and in doing so it exceeded the remand's scope. The court's either or remand must be read in context of the Supreme Court's language in Regents. See Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891 (2020). In Regents, the Supreme Court highlighted that, when explanation of agency action is insufficient, courts may remand either for the agency to offer "a fuller explanation of the agency's reasoning at the time of the agency action," or for the agency to "'deal with the problem afresh' by taking new agency action." Regents, 140 S. Ct. at 1907–08 (2020) (citations omitted) (emphasis in original). The court here remanded to Commerce for the narrow purposes of further explanation or use of only one data set, not for Commerce to deal with the problem afresh and change its

calculation methodology.  That was an option Commerce did not propose to the court prior to remand.[13]

Commerce could have sought a new remand here that allowed it to "deal with the problem afresh"[14] but parties then would have had an opportunity to argue against a broad remand or to seek the opportunity to present new data matched to the new methodology.[15]  Commerce did not return to the court for the required direction and the court finds it would now needlessly prolong this case to start again, solicit new data, and rebrief the case.  Interests in finality supports making a decision on the record as it is whenever possible.  "To allow constant reopening and supplementation of the record would lead to inefficiency and delay in finality."  Essar Steel Ltd. v. United States, 678 F.3d 1268, 1277 (Fed. Cir. 2012).[16]  The late stage of litigation here makes it particularly inappropriate to start this case again.[17]

The remand order the court gave instructed Commerce to explain or drop the 2010 CBRE data. The court finds that Commerce has now adequately explained its reasoning at the time of the

---

[13] General principles of administrative law that allow the agency flexibility must give way to the litigation posture of the parties.  One could argue that government waived the option of starting again by not seeking a broad remand.  One might also observe that the underlying trade laws provide time limits for agency action.  Starting again late in a case does not advance the preference of the statute for prompt action.

[14] Regents, 140 S. Ct. 1891, 1908 (2020) (citations omitted).

[15] JA Solar has argued that, were Commerce to have adopted this method of calculation at the outset, it might have proposed different benchmark data. JA Solar Br. at 5.  The interests of proper process would require Commerce to allow JA Solar to submit data matching any new methodology.  See Regents, 140 S. Ct. 1891, 1908 (2020) ("An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action.").

[16] The holding of Essar only restricts what the court may do, not what Commerce may do.  Essar Steel Ltd. v. United States, 678 F.3d 1268, 1278 (Fed. Cir. 2012).  Nonetheless, its general concern for finality applies.

[17] Of course, Commerce did reopen the record on remand, for the purposes of beginning verification on the EBCP issue.  But Commerce did not solicit new data on the land benchmark issue.  The court is called on to decide what the correct relief is now at this stage, not what Commerce might have done that it did not do.

first remand results.  The court accordingly remands for application of the first remand results for the land benchmark.[18]

### III.   Ocean Freight

On remand, all parties agree that Commerce has complied with the court's remand instruction on this issue and request that Commerce's determination in this matter be upheld.  Gov't Br. at 11; Risen Br. at 1; JA Solar Br. at 2; Trina Br. at 4; Shanghai BYD Br. at 5.  The court affirms Commerce's findings on this issue.

### CONCLUSION

For the foregoing reasons, the court remands to Commerce for a determination consistent with this opinion on the issues.  As this remand does not require time for reopening of the record or reconsideration, the government remand shall be issued within 20 days hereof.  Comments may be filed 10 days thereafter and any response 5 days thereafter.

/s/ Jane A. Restani
Jane A. Restani. Judge

Dated: 17 November 2023
New York, New York

---

[18] Both Risen and JA Solar had challenged the first remand results as to the land benchmark, seeking the elimination of the 2010 CBRE data.  Risen Comments on First Remand Redetermination at 8, ECF 98, (Nov. 7, 2022); JA Solar Comments on First Remand Redetermination at 4–9, ECF 96, (Nov. 7, 2022).  The court has now rejected those challenges.