C-570-980<br>
Remand<br>
Slip Op. 23-48<br>
POR:  01/01/2017 – 12/31/2017<br>
**Public Document**<br>
E&C/VII:  GHC

*Risen Energy Co., Ltd. et al. v. United States*,<br>
Consol. Court No. 20-03912, Slip Op. 23-161 (CIT November 17, 2023)<br>
Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,<br>
from the People's Republic of China

RESULTS OF REDETERMINATION<br>
PURSUANT TO COURT REMAND

**I.     SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court) in *Risen Energy Co., Ltd. et al. v. United States*, Consol. Court No. 20-03912, Slip Op. 23-161 (CIT November 17, 2023) (*Third Remand Order*).  These results of redetermination concern the 2017 administrative review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China (China).[1]  Specifically, these results of redetermination concern Commerce's *Second Remand Results* wherein Commerce:  (1) continued to find that Risen Energy Co., Ltd. (Risen) used the Government of China's (GOC) Export Buyer's Credit program (EBCP); (2) explained its use of 2010 CBRE Thailand land prices when formulating its tier three benchmark for the provision of land for less than adequate remuneration (LTAR); and (3) removed Descartes

---

[1] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 79163 (December 9, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).  On April 2, 2021, Commerce published *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Notice of Amended Final Results of 2017 Countervailing Duty Administrative Review*, 86 FR 17356 (April 2, 2021), correcting certain ministerial errors made in the calculations of the subsidy rates determined in the *Final Results*.

ocean freight prices from its ocean freight benchmark, which is used in several subsidy calculations involving the provision of goods for LTAR.[2]

On November 17, 2023, the Court remanded certain aspects of the *Second Remand Results*. Specifically, the Court ordered Commerce to: (1) remove Risen's program rate for the EBCP from Risen's total countervailable subsidy rate; and (2) return to the land benchmark calculation methodology Commerce used in the *First Remand Results* (*i.e.*, rely on a simple average of Malaysian and Thai land values to formulate the land for LTAR benchmark).[3] We have complied with the Court's instructions and have revised the applicable subsidy rates accordingly.

With respect to Commerce's removal of the Descartes' ocean freight prices from its ocean freight benchmark, and thus, solely relying on ocean freight prices from Xeneta to calculate the ocean freight benchmark, the Court affirmed Commerce's findings in the *Second Remand Results* on this issue.[4] As such, we have not disturbed the ocean freight benchmark for these results of redetermination.

## II. ANALYSIS

1. <u>Export Buyer's Credit Program – Risen</u>

In the *Final Results*, Commerce relied on adverse facts available (AFA) in finding that Risen benefitted from the EBCP as a failure to cooperate by the GOC, notwithstanding the

---

[2] *See Risen Energy Co., Ltd. v. United States*, 570 F. Supp. 3d 1369 (CIT 2022) (*First Remand Order*); *see also Final Results of Remand Redetermination Pursuant to Court Remand, Risen Energy Co., et al. v. United States*, Consol. Court. 20-03912; Slip Op. 22-44 (CIT May 12, 2022), dated October 6, 2022 (*First Remand Results*), available at https://access.trade.gov/Resources/remands/22-44.pdf; *Risen Energy Co., Ltd. v. United States*, Consol. Court No. 20-03912; Slip Op. 23-48 (CIT April 11, 2023) (*Second Remand Order*); and *Final Results of Redetermination Pursuant to Court Remand, Risen Energy Co., Ltd. v. United States*, Consol. Court No. 20-03912, Slip Op. 23-48 (CIT April 11, 2023), dated July 11, 2023 (*Second Remand Results*), available at https://access.trade.gov/Resources/remands/23-48.pdf.
[3] *See Third Remand Order* at 6-12 and 12-17.
[4] *Id*. at 17.

submission of non-use declarations from certain of Risen's U.S. customers. In the *First Remand Order*, the Court granted Commerce's request to reconsider the application of AFA for this program and ordered Commerce to attempt to verify the responses of Risen to the extent possible.[5] On remand, Commerce reopened the record and issued a EBCP supplemental questionnaire to Risen. In the *First Remand Results*, Risen provided requested information on behalf of six of its 12 U.S. customers, stating that these six customers were responsible for roughly 95 percent of Risen's U.S. sales during the period of review (POR).[6] As a result, Commerce stated that because "Risen was unable to provide complete information for all of its importers/customers, the record continues to contain evidentiary gaps whether certain U.S. importers/customers of Risen used the EBCP."[7] Commerce stated further that it "requires information regarding *all* of a respondent's U.S. importers/customers in order to ensure that *none* of those importers/customers have received benefits under the EBCP."[8] Because of Risen's inability to provide complete information regarding its customers' usage of the EBCP, in the *First Remand Results*, Commerce again found that Risen used this program consequent to the AFA applied to the GOC.[9]

In the *Second Remand Order*, the Court remanded the *First Remand Results* with respect to the EBCP, holding that Commerce's findings were unsupported by substantial evidence.[10] The Court identified three reasons for its holding: (1) all of Risen's customer's non-use certifications were already on the record of the proceeding; (2) the EBCP questionnaire response that Risen

---

[5] *See First Remand Order* at 5. In the *First Remand Results*, Commerce concluded that the other mandatory respondent in the underlying administrative review, JA Solar Co., Ltd. (JA Solar), did not use the EBCP during the POR.
[6] *See First Remand Results* at 7-9.
[7] *Id*. at 8.
[8] *Id*. at 7-9 (emphasis added).
[9] *Id*.
[10] *See Second Remand Order* at 4-11.

was able to provide from its importers/customers accounted for 95 percent of its U.S. sales during the POR; and (3) Risen cooperated with Commerce's requests for information and, given the length of time between the *First Remand Order* and the underlying administrative review, Risen had no way to receive questionnaire responses from all of its customers.[11]  On remand, the Court ordered Commerce to attempt to verify Risen's importers/customers to the extent Commerce found appropriate and, if successful, to either apply a *pro rata* program rate adjustment to Risen's for the EBCP or find that Risen did not use the EBCP at all.[12]  Pursuant to the Court's order, in the *Second Remand Results*, Commerce reached out to Risen to gauge its U.S. customers' availability for verification.  In response, Risen informed Commerce that all of its importers/customers consented to participate in verification except for one importer/customer that accounted for a significant portion of Risen's U.S. sales during the POR.[13]  As a result, Commerce stated that it was not able to verify non-use for all of Risen's U.S. sales for the POR, and decided not to proceed with verifying Risen's U.S. importers/customers.[14]

Thus, in the *Second Remand Results*, Commerce found that the information submitted by Risen was insufficient to compensate for the deficiencies (*i.e.*, evidentiary gaps in the record) that stemmed from the GOC's withholding of requested information, and continued to find that AFA was warranted in finding that Risen used the EBCP during the POR.[15]  Commerce emphasized that it was not applying AFA to Risen as a result of the failure to cooperate by its importers/customers.  Rather, Commerce was applying AFA to the GOC for its failure to cooperate by not providing requested information regarding the EBCP.[16]  Commerce also

---

[11] *Id.*
[12] *Id.* at 11.
[13] *See Second Remand Results* at 5-6.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 6-7.

concluded that because verification of Risen's submissions was not successful within the meaning of the Court's instructions, it was not necessary or appropriate to apply a *pro rata* adjustment to Risen's program rate for the EBCP or to conclude that Risen did not use this program.[17]

In the *Third Remand Order*, the Court rejected Commerce's reasoning for continuing to find that Risen used the EBCP based on AFA, stating that the use of AFA is only appropriate where information is otherwise not available on the record.[18] The Court concluded that in this instance, the relevant information was submitted on the record, and that Commerce must show that such information is not reasonably verifiable before it applies AFA.[19] However, for Commerce to find that information is not verifiable, the Court explained that Commerce must at least attempt to complete verification. Until Commerce actually attempts verification and confronts these challenges, the Court concluded that there is little for Commerce "hang its hat on when it 'continues to find a "gap" in the record.'"[20]

In its order, the Court found that Risen filled the gap caused by the GOC's non-compliance with Commerce's questionnaire, and certified its non-involvement with the EBCP along with producing non-party customer certifications and financial data from those customers, which demonstrate non-use of this program.[21] In ordering Commerce to remove the EBCP AFA rate from Risen's total countervailable rate, the Court stated that Commerce presented no evidence that Risen's importers/customers were lying about their financial information, and that

---

[17] *Id*. at 7.
[18] *See Third Remand Order* at 8-9.
[19] *Id*. at 9.
[20] *Id*. (citing *Guizhou Tyre Co., v. United States*, 348 F. Supp. 3d 1261, 1270 (CIT 2018)).
[21] *See Third Remand Order* at 9.

all of the evidence presented to Commerce and to the Court supports the conclusion that Risen's sales were not aided by the EBCP.[22]

In the *First Remand Results*, Commerce explained that it could not verify non-use of this program by only a portion of Risen's importers/customers because doing so would provide Risen with an opportunity to evade Commerce's scrutiny by providing responses from only importers/customers that have not used the EBCP.[23] As stated above, Commerce concluded that it could not verify information submitted by Risen's importers/customers regarding this program, and that the record is insufficient to compensate for the "gaps" in the record resulting from the GOC's withholding of requested information.[24] Risen provided information from a large portion, but not all, of Risen's importers/customers, and Commerce was explicitly denied the opportunity to verify the accuracy of all of the information submitted by Risen; therefore, Commerce contends respectfully that these gaps in the record still exist for determining that Risen did not use the EBCP during the POR. Nevertheless, under respectful protest, and based on Risen's claims of non-use and the information submitted by its importers/customers, we are finding that Risen did not use the EBCP during the POR as directed by this Court. This finding complies with the Court's *Third Remand Order*.[25] As a result, we have removed the 5.46 percent AFA rate from Risen's total countervailable subsidy rate.[26]

2. <u>Tier Three Benchmark for the Provision of Land for LTAR</u>

In the *First Remand Order*, the Court remanded Commerce's benefit calculations for the provision of land for LTAR. Specifically, the Court ordered Commerce to: (1) reconsider or

---

[22] *Id*. at 12.
[23] *See First Remand Results* at 9.
[24] *See Second Remand Results* at 6.
[25] *See Third Remand Order* at 12.
[26] *See* Memorandum, "Analysis Memorandum for Third Court Remand," dated concurrently with these results of redetermination (Analysis Memorandum), and Risen's associated Excel calculations spreadsheet at the work tab, "Summary."

further explain its reliance on geographic proximity in its land for LTAR benchmark analysis; (2) consider whether land values in Thailand remain a suitable benchmark to determine the value of Chinese land; and (3) provide a more robust explanation for why it rejected the Nexus Innovative Real Estate Solutions rental pricing data (Nexus Reports) in developing its land for LTAR benchmark.[27]  Commerce attempted to address these issues in the *First Remand Results* by using a simple average of Thai land prices from the 2010 Coldwell Banker Richard Ellis Asian Marketview Report (2010 CBRE Report), indexed for inflation, with Malaysian land prices from the Malaysian Investment Development Authority Cost of Doing Business Report (Malaysian Land Values).[28]

In the *Second Remand Order*, the Court stated that it was no longer addressing arguments regarding geographic proximity regarding China or Commerce's rejection of the Nexus Reports in developing the land for LTAR benchmark.[29]  On remand, the Court ordered Commerce to provide a compelling reason for its continued use of Thai land prices from the 2010 CBRE Report or otherwise only use the prices from Malaysian Land Values.[30]  In its ruling, the Court indicated that it was concerned that the Thai land prices in the 2010 CBRE Report are relatively "stale" for purposes of developing the land for LTAR benchmark.[31]  In the *Second Remand Results*, when explaining why the Thai Prices from the 2010 CBRE Report were still appropriate to use when constructing the land for LTAR benchmark (*i.e.*, the relevant consideration when determining the contemporaneity of a land benchmark source is the year of the purchase of the land-use right in question), Commerce also recalculated its land benchmark in a manner that was

---

[27] *See First Remand Order* at 11.
[28] *See First Remand Results* at 9-13.
[29] *See Second Remand Order* at 12 (footnote 3).
[30] *Id*. at 11-14
[31] *Id*.

7

different than the methodology that it used in the *First Remand Results*. Specifically, instead of continuing to rely on a simple average of the Thai and Malaysian land prices as in the *First Remand Results*, in the *Second Remand Results*, for every given land purchase, Commerce selected the land benchmark source (either Malaysian land prices or Thai land prices) that was closest to the time of the land purchase.[32] For instances when the indexed Thai land prices and the Malaysian land prices were equally contemporaneous to the date of a land purchase, Commerce relied on a simple average of the Thai and Malaysian land prices.[33]

In the *Third Remand Order*, the Court found that Commerce "satisfactorily explained" its use of the Thai land prices from the 2010 CBRE Report.[34] However, the Court ruled that Commerce "exceeded the scope of the remand by implementing a new method of calculating the benchmark."[35] The Court stated that it remanded Commerce to further explain the use of only one data set (*i.e.*, the Thai land values from the 2010 CBRE Report) and not for Commerce to change its calculation methodology.[36] Thus, in the *Third Remand Order*, the Court remanded Commerce to use its land for LTAR calculation methodology as applied in the *First Remand Results* (*i.e.*, rely on a simple average of the Thai and Malaysian land prices). Accordingly, to comply with the Court's order, we have revised our land for LTAR benchmark for this remand redetermination as instructed.[37]

---

[32] *See Second Remand Results* at 9-10.
[33] *Id.* at 10-11.
[34] *See Third Remand Order* at 12; *see also Second Remand Results* at 8-11 where Commerce explained why the Thai land prices from the 2010 CBRE Report were not "stale" for constructing its land benchmark for calculating land for LTAR benefits for the POR.
[35] *Id.*
[36] *See Third Remand Order* at 15-16.
[37] *See* Analysis Memorandum and JA Solar's and Risen's associated Excel calculations spreadsheet at the work tab, "RevisedLandBM." Commerce notes that for these results of redetermination, it continues to rely on the Malaysian land prices submitted by Risen. *See Second Remand Results* at 10.

In its order, the Court indicated that it does not find Commerce's "new methodology that focuses on the time of the lease," to be an "unreasonable method" for constructing its land for LTAR benchmarks.[38] We appreciate the Court's clarification in its remand order that it does not consider Commerce's new methodology to be an "unreasonable method" for constructing its land for LTAR benchmarks.[39] Accordingly, if appropriate, Commerce intends to re-evaluate its methodology for calculating its land for LTAR benchmarks in future segments of its countervailing duty proceedings.

3. Ocean Freight

In the *Final Results*, Commerce calculated a "tier two" benchmark for the price of ocean freight when constructing the LTAR benchmarks for the respondents' purchases of solar glass, solar grade polysilicon, and aluminum extrusions by using a simple average of data from Descartes and from Xeneta.[40] In the *First Remand Order*, the Court remanded Commerce to "reconsider the flaws" in the Descartes data, and to consider whether it was necessary to use the Descartes data to arrive at a "world market price" in developing its LTAR benchmarks.[41] In the *First Remand Results*, Commerce concluded that it provided an adequate explanation for accepting the Descartes data, and recalculated the ocean freight benchmark to correct the bias towards U.S. shipping routes.[42]

In its *Second Remand Order*, the Court found that it could not sustain Commerce's ocean freight benchmark calculations in the *First Remand Results*, finding that Commerce did not comply with the Court's instructions to explain its continued use of the Descartes data.[43] The

---

[38] *See Third Remand Order* at 15.
[39] *Id.*
[40] *See Final Results* IDM at 55-56; *see also* 19 CFR 351.511(a)(2)(ii).
[41] *See First Remand Order* at 16.
[42] *See First Remand Results* at 23-35.
[43] *See Second Remand Order* at 18.

9

Court instructed Commerce to provide "a convincing reason as to why the Descartes data improves accuracy" for the ocean freight benchmark or not to use it.[44] In the *Second Remand Results*, Commerce removed the Descartes data from its ocean freight benchmark, thus complying with the Court's order.[45] The Court affirmed Commerce's finding on this issue.[46] Accordingly, Commerce has not disturbed its ocean freight benchmark for these results of redetermination.

### III.    RESULTS OF REDETERMINATION

Upon remand, Commerce finds the EBCP to be not used by Risen, notwithstanding Commerce's continued assessment that the underlying determination to rely on AFA in finding that Risen used the program is correct. Pursuant to the Court's order, Commerce has also revised the calculation of its land for LTAR benchmark by returning to the calculation methodology used in the *First Remand Results*. Finally, because the Court affirmed Commerce's finding of its calculation for its ocean freight benchmark, Commerce made no change to this calculation for these results of redetermination. If these remand results are affirmed by the Court, we intend to issue amended final results providing the updated subsidy rates in the fourth column of the below chart:

| Company | Program | Subsidy Rate in *Second Remand Results* (percent *ad valorem*) | Subsidy Rate Pursuant to Third Results of Redetermination (percent *ad valorem*) |
|---|---|---|---|
| JA Solar | Aluminum Extrusions for LTAR | 0.00 | 0.00 |
| | Solar Grade Polysilicon for LTAR | 0.11 | 0.11 |

---

[44] *Id.*
[45] *See Second Remand Results* at 10-11.
[46] *See Third Remand Order* at 17.

| | | | |
|---|---|---|---|
| | Solar Glass for LTAR | 3.51 | 3.51 |
| | Land for LTAR | 0.65 | 0.59 |
| | Total CVD Rate | 7.68 | 7.62 |
| Risen | EBCP | 5.46 | 0.00 |
| | Aluminum Extrusions for LTAR | 0.01 | 0.01 |
| | Solar Glass for LTAR | 1.93 | 1.93 |
| | Solar Grade Polysilicon for LTAR | 0.00 | 0.00 |
| | Land for LTAR | 0.25 | 0.22 |
| | Total CVD Rate | 9.69 | 4.20 |
| Non-Selected Companies Under Review that are Subject to this Litigation[47] | Total CVD Rate | 9.07 | 5.26 |

12/7/2023

X _Elouaradia_ (signature)

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance

---

[47] The non-selected companies under review that are subject to this litigation are Shanghai BYD; Changzhou Trina Solar Yabang Energy Co., Ltd.; Hubei Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science and Technology Co., Ltd.; Trina Solar Co., Ltd.; Yancheng Trina Solar Energy Technology Co., Ltd.; and Turpan Trina Solar Energy Co., Ltd.

11